No. 25-2899

# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

FEMALE ATHLETES UNITED,

*Plaintiff-Appellant*,

v.

KEITH ELLISON, in his official capacity as Attorney General of Minnesota; REBECCA LUCERO, in her official capacity as Commissioner of the Minnesota Commission on Civil Rights; ERICH MARTENS, in his official capacity as Executive Director of the Minnesota State High School League; WILLIE JETT, in his official capacity as the Minnesota Commissioner of Education; INDEPENDENT SCHOOL DISTRICT NO. 11 SCHOOL BOARD; INDEPENDENT SCHOOL DISTRICT NO. 192 SCHOOL BOARD; AND INDEPENDENT SCHOOL DISTRICT NO. 279 SCHOOL BOARD,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Minnesota
Case No. 0:25-cv-02151-ECT-DLM

## APPELLANT'S EMERGENCY MOTION FOR AN INJUNCTION PENDING APPEAL UNDER FED. R. APP. P. 8

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

Jonathan A. Scruggs
Henry W. Frampton, IV
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@ADFlegal.org
hframpton@ADFlegal.org

Rory T. Gray
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville GA 30043
(770) 339-0774
rgray@adflegal.org

*Counsel for Plaintiff-Appellant*

## CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellant Female Athletes United is a nonprofit corporation with no parent companies and no stock.

# TABLE OF CONTENTS

Corporate Disclosure Statement ..................................................................i

Table of Authorities .................................................................................iv

Introduction ............................................................................................1

statement ...............................................................................................1

I.  Background on Title IX ........................................................................1

    A.  The statute ..................................................................................1

    B.  The athletic regulations ................................................................2

    C.  The policy interpretation ..............................................................3

    D.  The definition of "sex" ................................................................4

II.  Minnesota's rules for athletic competition ...........................................6

III.  Males' competitive advantage over females .........................................7

IV.  The bylaws' effect on FAU's members ................................................9

V.  Procedural History ...........................................................................11

Argument ...............................................................................................12

I.  FAU's Title IX claims are likely to succeed. ........................................13

    A.  FAU may sue based on Title IX's athletic regulations, which comport with the statute and sound in disparate treatment, not disparate impact. ..........................................13

    B.  The League's eligibility bylaws violate Title IX. .................16

    C.  The district court's merits analysis conflicts directly with Title IX's text and regulations. ...................................18

    D.  This Court hasn't applied a clear-notice requirement for prospective relief, and Defendants had notice. ...............19

Appellate Case: 25-2899      Page: 3      Date Filed: 10/06/2025 Entry ID: 5564959

II.     FAU's members face irreparable harm. ........................................21

III.    The public interest and balance of harms favor FAU. ..................22

Conclusion ........................................................................................23

Certificate of Compliance ................................................................25

Certificate of Service ........................................................................26

Appellate Case: 25-2899     Page: 4     Date Filed: 10/06/2025 Entry ID: 5564959

# TABLE OF AUTHORITIES

## Cases

*A.J.T. ex rel. A.T. v. Osseo Area Schools Independent School District*,
  605 U.S. 335 (2025) ........................................................................15

*Adams ex rel. Kasper* v. *School Board of St. Johns County*,
  57 F.4th 791 (11th Cir. 2022)................................................5, 8, 22

*Alabama v. United States Secretary of Education*,
  2024 WL 3981994 (11th Cir. Aug. 22, 2024) ...................................5

*Alexander v. Sandoval*,
  532 U.S. 275 (2001) ..................................................................13–14

*Anders v. California State University, Fresno*,
  2021 WL 1564448 (E.D. Cal. Apr. 21, 2021)............................15–16

*Barrett v. West Chester University of Pennsylvania*,
  2003 WL 22803477 (E.D. Pa. Nov. 12, 2003)................................16

*Berndsen v. North Dakota University System*,
  7 F.4th 782 (8th Cir. 2021)..................................................13, 18–19

*Biediger v. Quinnipiac University*,
  691 F.3d 85 (2d Cir. 2012).................................................15–16, 19

*Cape v. Tennessee Secondary School Athletic Association*,
  563 F.2d 793 (6th Cir. 1977) ............................................................8

*Chalenor v. University of North Dakota*,
  291 F.3d 1042 (8th Cir. 2002) ..................................................13, 20

*Clark ex rel. Clark v. Arizona Interscholastic Association*,
  695 F.2d 1126 (9th Cir. 1982) ..........................................................8

*Cohen v. Brown University*,
  101 F.3d 155 (1st Cir. 1996)............................................................8

*D.M. ex rel. Bao Xiong v. Minnesota State High School League*,
  917 F.3d 994 (8th Cir. 2019) ..........................................................13

Appellate Case: 25-2899    Page: 5    Date Filed: 10/06/2025 Entry ID: 5564959

*Department of Education v. Louisiana,*
603 U.S. 866 (2024) ..........................................................5

*EEOC v. Dial Corporation,*
469 F.3d 735 (8th Cir. 2006) .......................................15

*Eggers v. Evnen,*
48 F.4th 561 (8th Cir. 2022)..........................................22

*Equity in Athletics, Inc. v. Department of Education,*
639 F.3d 91 (4th Cir. 2011) ...........................................15

*Grandson v. University of Minnesota,*
272 F.3d 568 (8th Cir. 2001) ........................................15

*Jackson v. Birmingham Board of Education,*
544 U.S. 167 (2005) ................................................20–21

*Kelley v. Board of Trustees,*
35 F.3d 265 (9th Cir. 1994) ..........................................15

*Loper Bright Enterprises v. Raimondo,*
603 U.S. 369 (2024) ........................................................2

*Mansourian v. Regents of University of California,*
602 F.3d 957 (9th Cir. 2010) .......................................20

*Mayerova v. Eastern Michigan University,*
346 F. Supp. 3d 983 (E.D. Mich. Sept. 27, 2018)...........16

*McCormick ex rel. McCormick v. School District of Mamaroneck,*
370 F.3d 275 (2d Cir. 2004).....................................14, 22

*Missouri v. Biden,*
112 F.4th 531 (8th Cir. 2024)...................................12–13

*Neal v. Board of Trustees of California State Universities,*
198 F.3d 763 (9th Cir. 1999) ....................................16, 18

*O'Connor v. Board of Education of School District 23,*
449 U.S. 1301 (1980) ......................................................7

Appellate Case: 25-2899   Page: 6   Date Filed: 10/06/2025 Entry ID: 5564959

*Parker v. Franklin County Community School Corporation,*
667 F.3d 910 (7th Cir. 2012) ............................................. 14–15, 21

*Pederson v. Louisiana State University,*
213 F.3d 858 (5th Cir. 2000) ...................................................... 15, 21

*Pennhurst State School & Hospital v. Halderman,*
451 U.S. 1 (1981) .............................................................................. 20

*Petrie v. Illinois High School Association,*
394 N.E.2d 855 (Ill. App. Ct. 3d 1979) ............................................ 7

*Portz v. St. Cloud State University,*
16 F.4th 577 (8th Cir. 2021) ...................................................... 13, 20

*Portz v. St. Cloud State University,*
196 F. Supp. 3d 963 (D. Minn. 2016) ............................................ 22

*Richland/Wilkin Joint Powers Authority v. United States Army Corps of Engineers,*
826 F.3d 1030 (8th Cir. 2016) ........................................................ 23

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College,*
600 U.S. 181 (2023) ........................................................................ 19

*Tennessee v. Cardona,*
737 F. Supp. 3d 510 (E.D. Ky. 2024) ............................................ 22

*Trump v. Boyle,*
145 S. Ct. 2653 (2025) ...................................................................... 5

*United Food & Commercial Workers Union v. Brown Group,*
517 U.S. 544 (1996) ........................................................................ 11

*United States v. Virginia,*
518 U.S. 515 (1996) .......................................................................... 8

*Warth v. Seldin,*
422 U.S. 490 (1975) ........................................................................ 11

*Wells ex rel. Glover v. Creighton Preparatory School,*
  82 F.4th 586 (8th Cir. 2023) ............................................................ 15

*Yellow Springs Exempted Village School District v. Ohio High School*
  *Athletic Association,*
  647 F.2d 651 (6th Cir. 1981) ............................................................ 16

## **Statutes**

20 U.S.C. § 1681 ............................................................ passim

Educ. Amends. of 1974, Pub. L. No. 93-380, § 844, 88 Stat. 484
  (1974) ............................................................ 2

Minn. Stat. § 121A.04 ............................................................ 6

Minn. Stat. § 128C.01 ............................................................ 6

Minn. Stat. § 363A.03 ............................................................ 5

## **Other Authorities**

A Policy Interpretation: Title IX and Intercollegiate Athletics,
  U.S. Dep't of Educ. (Dec. 11, 1979) ............................................................ passim

*Diagnostic & Statistical Manual of Mental Disorders Fifth Edition*
  *Text Revision* (2022) ............................................................ 5

Minn. Noncompliance Finding, U.S. Dep'ts of Educ. & Health &
  Human Servs. (Sept. 30, 2025) ............................................................ 16–19

MSHSL, *2025-2026 MSHSL Official Handbook*: *Bylaws* ............................................................ 6–7

MSHSL, *Girls Softball State Tournament Champions – 1977-2025* ............................................................ 6

## **Rules**

Fed. R. App. P. 8 ............................................................ 12

## **Regulations**

34 C.F.R. § 106.2 ............................................................ 6

34 C.F.R. § 106.41 ............................................................ passim

Appellate Case: 25-2899    Page: 8    Date Filed: 10/06/2025 Entry ID: 5564959

## INTRODUCTION

This Court has a stark choice. Either side with Female Athletes United (FAU), the federal government, and other courts by upholding Title IX's athletic regulations and athletes' right to enforce them. Or side with Defendants by rejecting the regulations as inconsistent with Title IX (despite Congress's seal of approval on them)—thereby dooming the regulations for invalidation and making Title IX enforcement all but impossible for private athletes. The right answer is clear.

So is the merits question. The federal government recently concluded that Minnesota violated Title IX by forcing females to compete against male athletes. That's correct. All this Court needs to do is enforce Title IX as Congress intended—to ensure female athletes can compete fairly and safely in their own sports. With the softball season fast approaching, FAU's female members will be forced to compete against a male and forever lose their right to equal and safe athletic opportunity. Because irreparable harm is imminent, the Court should issue an injunction pending appeal without delay.

## STATEMENT

### I.    Background on Title IX

#### A.    The statute

In Title IX, Congress mandated that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be

1

denied the benefits of, or be subjected to discrimination under" federally funded "education program[s] or activit[ies]." 20 U.S.C. § 1681(a). Atypically, Congress then ordered the Department of Education's predecessor to issue implementing regulations that "include with respect to intercollegiate *athletic activities* reasonable provisions considering the *nature of particular sports*." Educ. Amends. of 1974, Pub. L. No. 93-380, § 844, 88 Stat. 484, 612 (1974) (emphasis added) ("Javits Amendment").

### B.    The athletic regulations

The agency developed Title IX athletic regulations through notice and comment, and President Ford signed and submitted the final version to Congress. A Policy Interpretation: Title IX and Intercollegiate Athletics at 1.B, U.S. Dep't of Educ. (Dec. 11, 1979), perma.cc/FVR6-RATY ("Interpretation"). Congress held hearings, carefully considered whether the regulations were consistent with Congress's intent in enacting the statute, and allowed the regulations to go into effect. *Id*. Those implementing regulations, which were "issued roughly contemporaneously with enactment of the statute" and have remained "consistent over time" deserve great "respect." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024).

The regulations allow funding recipients to "sponsor separate teams for members of each sex where selection for such teams is based

Appellate Case: 25-2899     Page: 10     Date Filed: 10/06/2025 Entry ID: 5564959

upon competitive skill or the activity is a contact sport." 34 C.F.R. § 106.41(b). But there's a caveat: recipients that have sex-designated teams "*shall* provide equal athletic opportunity for members of both sexes," *id.* § 106.41(c) (emphasis added), and a key metric of equality is "[w]hether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes," *id.* § 106.41(c)(1).

### C. The policy interpretation

On the heels of the regulation, the Department of Education's predecessor issued a policy interpretation "to provide a framework" for resolving Title IX complaints in the college context and offer "additional guidance" on Title IX's requirements for "intercollegiate athletic programs." Interpretation.II. Though the interpretation was "designed specifically for intercollegiate athletics," the agency said that "its *general principles* will often apply to … interscholastic athletic programs" and "may be used for guidance" in that context "when appropriate." Interpretation.III (emphasis added).

Generally, the policy interpretation lists three principles, or "Overall Determination of Compliance" factors, that may apply to K-12 athletic programs: (1) whether a funding recipient's policies are "discriminatory in language or effect"; (2) whether "disparities of a substantial and unjustified nature" exist in the "benefits, treatment,

3

services, or opportunities" that a recipient affords "*male and female athletes*" in the "program as a whole"; or (3) whether such disparities in "individual segments" of a recipient's program are "substantial enough in and of themselves to deny equality of athletic opportunity." Interpretation.VII.B.5 & C.6 (emphasis added).

Specifically, the interpretation clarifies that—for non-contact sports—"[e]ffective accommodation means" that if a recipient sponsors a team for "one sex," "it *must* do so for members of the other sex" if: (a) opportunities for "the excluded sex have historically been limited," (b) "sufficient interest and ability" exists among "members of the excluded sex to sustain a viable team and a reasonable expectation of intercollegiate competition," and (c) "the excluded sex" doesn't "possess sufficient skill to be selected for a single integrated team, or to compete actively on such a team if selected." Interpretation.VII.C.4.b (emphasis added).

## D.    The definition of "sex"

Title IX and the implementing regulations don't define "sex." But their text shows that "sex" means the biological *binary* of male or female. *Compare* 20 U.S.C. § 1681(a)(2) ("students of both sexes"); *id.* § 1681(a)(8) (students of "one sex" vs. "the other sex"), *with* 34 C.F.R. § 106.41(b) ("one sex" vs. "the other sex"); *id.* § 106.41(c) & (c)(1) ("both sexes"); *id.* § 106.41(c) ("male and female teams"). The definition of "sex"

4

when Title IX was enacted confirms this. *E.g.*, *Adams ex rel. Kasper* v. *Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 812–13 (11th Cir. 2022) (en banc) (citing dictionary definitions); *Alabama v. U.S. Sec'y of Educ.*, No. 24-12444, 2024 WL 3981994, at *4 (11th Cir. Aug. 22, 2024) (sex in Title IX means "'biological sex'").

That definition rules out gender identity, which is an *unlimited* or non-binary "social identity" that includes "male, female, some category in between (i.e. *gender fluid*), or a category other than male or female (i.e., *gender neutral*)." *Diagnostic & Statistical Manual of Mental Disorders Fifth Edition Text Revision* 511 (2022). Minnesota's definition of "gender identity" is a perfect example: it encompasses "a person's inherent sense of being a man, woman, *both, or neither*." Minn. Stat. § 363A.03, subd. 50 (emphasis added).

Consistent with a biological definition of sex, all nine Justices agreed last year in an interim order that "sex discrimination" under Title IX *does not* "include discrimination on the basis of … gender identity." *Dep't of Educ. v. Louisiana*, 603 U.S. 866, 867 (2024). That order "inform[s] how [this Court] should exercise its equitable discretion in like cases," *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025), including this one.

5

## II. Minnesota's rules for athletic competition

Under Minnesota law, local school districts may delegate control over interscholastic athletic competition to the Minnesota State High School League ("MSHSL" or the "League"). Minn. Stat. § 128C.01. Minnesota, local school districts, and the League operate educational programs that receive federal funds. 20 U.S.C. § 1681(a). So they are each subject to Title IX. 34 C.F.R. § 106.2 (defining "Recipient").

For decades, the League met its Title IX obligation to provide equal athletic opportunity by sponsoring separate boys' baseball and girls' softball competition. *E.g.*, MSHSL, *2025-2026 MSHSL Official Handbook*: *Bylaws*, 402.00, 504.00, 515.00, https://perma.cc/HZ84-6PGF ("Bylaws"); *accord* Minn. Stat. § 121A.04, subd. 4 (requiring sex-designated teams when necessary to provide girls equal athletic opportunity). The League may have allowed a rare female to participate in boys' baseball if she could best male athletes at tryouts. *Accord* Minn. Stat. § 121A.04, subd. 3(d) (reserving "one … team[ ]" for the "sex whose overall athletic opportunities have previously been limited" and opening "the other team" to "either sex"). But girls' softball remained exclusively female for nearly 40 years. MSHSL, *Girls Softball State Tournament Champions – 1977-2025*, https://perma.cc/WAK4-XKRR.

Roughly ten years ago, the rules changed. Acting on a recommendation by the Minnesota Department of Education, the League enacted eligibility bylaws that ignore athletes' biological sex.

6

Now, the League allows students to participate in "athletics" based on "their gender identity or expression" and redefines "equal opportunity" in those terms. Bylaws 300.00(3)(A); *accord* Doc. 65 at 3. These concepts have no analogue in Title IX or its mandatory regulations.

The League's bylaws take no account of *objective* factors, such as an athlete's natal sex, hormone levels, or testosterone suppression. What matters is that an athlete's *subjective* "gender identity" is "sincerely held as part of the student's core identity." Bylaws 300.00(3)(B)(1). Plus, only determinations of athletic "*ineligibility*" based on gender identity are subject to appeal. *Id.* (emphasis added). Findings of *eligibility* based on gender identity are deemed final.

## III. Males' competitive advantage over females

Unsurprisingly, male competitive advantage is the reason the League sponsored separate boys' baseball and girls' softball competition to begin with. For over 40 years, courts have recognized that females are at a "substantial physical disadvantage" in competition against males and that even "isolated instances of male participation upon girls' teams create[s] an advantage for those teams." *Petrie v. Ill. High Sch. Ass'n*, 394 N.E.2d 855, 861 (Ill. App. Ct. 3d 1979); *accord O'Connor v. Bd. of Educ. of Sch. Dist. 23*, 449 U.S. 1301, 1307 (1980) (Stevens, J., in chambers). The usual remedy is separating "play and competition … by sex," so that most females aren't "quickly … eliminated from

7

participation and denied any meaningful opportunity for athletic involvement." *Cape v. Tenn. Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977).

Minnesota is no exception. The League's *only* means of ensuring equal athletic opportunity is sex-designated teams that "allocate opportunities separately for male and female students." *Cohen v. Brown Univ.*, 101 F.3d 155, 177 (1st Cir. 1996). But the League exchanged sex for gender identity, rending a giant hole in that safety net and elevating personal identity over "the physiological fact that males … have an undue advantage competing against women." *Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982).

Though bylaws change, biology doesn't. *Accord United States v. Virginia*, 518 U.S. 515, 554 (1996) ("Physical differences between men and women … are enduring …."). Males perform better in almost all sports than equally aged, trained, and talented females, Doc. 8-2 at 7, because males have—for example—(1) higher cardiac outputs, *id.* ¶¶ 106, 194; (2) grater bone density, *id.* ¶¶ 193, 195, 198; (3) more skeletal muscle and less fat, *id.* ¶¶ 8, 80, 86, 93–98, 194, 198; (4) larger maximal oxygen consumption, *id.* ¶¶ 194; and (5) greater height and better economy of motion, *id.* ¶¶ 71–81. *Accord Adams*, 57 F.4th at 819–20 (Lagoa, J., specially concurring) (discussing these facts).

Even pre-puberty, males run faster, jump farther, and have greater upper-body strength than comparable females. Doc. 8-2 ¶¶ 109–

48, 154–65, 175–77; Doc. 117 ¶¶ 22–34. That makes a real difference in sports like softball. For instance, boys enjoy substantial advantages over girls in upper-body strength, throwing velocity and distance, and acceleration and change-of-direction, which are key to pitching, batting, fielding, and baserunning. Doc. 8-2 ¶¶ 126–32, 142–43; Doc. 117 ¶ 65.

Puberty blockers, testosterone suppression, and cross-sex hormones don't bridge the gap. Even on puberty blockers and cross-sex hormones, males grow to about the same *male* height predicted at birth and enjoy the athletic advantages of greater height and longer limbs. Doc. 8-2 ¶¶ 209–12, 214; Doc. 117 ¶ 66. Compared to females, they also have more lean body mass, less body fat, and greater grip strength—a standard proxy for overall strength—all of which enhances males' athletic performance. Doc. 8-2 ¶¶ 204–08, 213–14, 236; Doc. 117 ¶ 162.

## IV. The bylaws' effect on FAU's members

Four FAU members are varsity athletes at Minnesota schools. They are talented players, on highly ranked all-female teams, who have spent much of their lives striving to excel at softball in the hope of winning, attracting recruiters, making a college team, and earning a scholarship. Doc. 48-2 ¶¶ 2–3, 7–17, 26; Doc. 48-3 ¶¶ 2–3, 7–17; Doc. 48-4 ¶¶ 2, 5–13; Doc. 113 ¶¶ 4–10, 35–45; Doc. 114 ¶¶ 4–7, 10–13, 17–24; Doc. 115 ¶¶ 4–7, 13–16, 29–38; Doc. 116 ¶¶ 3–16, 36–42, 45–49.

Each of FAU's members has been injured by the League's bylaws in the past and faces irreparable harm again next season. The reason—Athlete Doe, one of Minnesota's top girls' softball players, is male. The result—unequal competition: (1) Athlete Doe's team is mixed-sex, Doc. 115 ¶ 41; (2) Doe pitches with unmatched spin, force, and control, Doc. 48-2 at ¶ 35; Doc. 48-4 ¶¶ 18–21; Doc. 114 ¶¶ 32–33; and (3) increased stamina allows Doe to pitch straight through dozens of innings, regularly shutting out all-female teams, Doc. 48-2 ¶¶ 38–40, Doc. 116 ¶¶ 26–28. Plus, (4) FAU's members fear an enhanced risk of injury, Doc. 48-2 ¶¶ 44–45; Doc. 48-4 ¶¶ 29–31. The message—boys' athletic opportunities are important and worth protecting; girls' aren't. Doc. 48-3 ¶¶ 50–53; Doc. 116 ¶¶ 51–56.

Last season, FAU Athlete 1's team lost decisively to Athlete Doe's team in the regular season and in the sectional tournament. Doc. 48-2 ¶¶ 32–36; Doc. 113 ¶¶ 21–29. FAU Athlete 4's team also lost to Doe's team in the state tournament 5-0, with Doe pitching a complete-game shutout. This defeat ended the season for Athlete 4's team. Doc. 116 ¶¶ 14–26. Additionally, FAU Athlete 2 lost out on pitching a pre-season game due to Doe's involvement, and FAU Athletes 2 and 3's team narrowly missed playing Doe's team in the state tournament. Doc. 48-3 ¶¶ 34–38; Doc. 114 ¶¶ 10–11; Doc. 115 ¶¶ 10–11.

Next season, Athlete 1's team is *already scheduled* to play Athlete Doe's team during the regular season in mid-May 2026. Doc. 113 ¶¶ 32–

34. Athlete 2 and 3's team is likely to face Doe's team in a pre-season game—*same as last season*. Doc. 114 ¶¶ 8–9; Doc. 115 ¶¶ 8–9. And Athlete 4's team will compete at a regular-season tournament that Doe's team *joined in the past* and will likely attend again. Doc. 116 ¶ 43.

Given these undisputed facts, FAU has standing to seek prospective relief because "at least one member [has] standing" to bring "the type of claim[ ] pleaded by the association," *United Food & Com. Workers Union v. Brown Grp.*, 517 U.S. 544, 555 (1996), and courts assume an injunction will benefit members who are "actually injured," *Warth v. Seldin*, 422 U.S. 490, 515 (1975). *Accord* Doc. 134 at 29–34.

## V. Procedural History

Following President Trump's executive order on Title IX, the League asked the Minnesota Attorney General for a written opinion on its eligibility bylaws. The Attorney General rejected the executive order and half-a-century of judicial decisions interpreting Title IX and its implementing regulations to conclude that state law requires organizing sex-designated athletic teams based on gender identity, not sex. Doc. 7 at 2, 12.

FAU challenged the bylaws on behalf of its Minnesota athlete members. The complaint alleges that the bylaws discriminate based on sex and violate Title IX by denying females equal athletic opportunity

Appellate Case: 25-2899     Page: 19     Date Filed: 10/06/2025 Entry ID: 5564959

and by refusing to effectively accommodate female athletes' interests and abilities. Doc. 1.

The next day, FAU filed a motion for preliminary injunction, asking the district court to bar Defendants from forcing FAU members to compete with or against males in female-designated sports that either involve competitive skill or are contact sports. Doc. 6. The court held a hearing, Doc. 124, and denied the motion, Docs. 134–35. FAU filed a notice of appeal. Doc. 136.

Complying with Fed. R. App. P. 8(a)(1), FAU filed a motion for injunction pending appeal with the district court, Doc. 140, which the court quickly denied, saying the preliminary-injunction order "addressed the arguments FAU raises, and FAU identifies no persuasive reason to reverse course," Doc. 145 at 1. This motion followed.

## ARGUMENT

The preliminary injunction standard applies to FAU's request for an injunction pending appeal. *Missouri v. Biden*, 112 F.4th 531, 536 (8th Cir. 2024). That test considers (1) the likelihood of success on the merits, (2) the likelihood of irreparable harm, (3) the balance of the equities, and (4) the public interest. *Id.* FAU meets each factor, especially as the lower fair-chance-of-prevailing-on-the-merits standard applies to disputes over the League's bylaws. *D.M. ex rel. Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 999–1001 (8th Cir. 2019).

12

# I.  FAU's Title IX claims are likely to succeed.

Likelihood of success is the most important factor here. *Biden*, 112 F.4th at 536. The correct analysis is straightforward: effectively sponsoring *all-male* boys' baseball and *mixed-sex* girls' softball discriminates against females and violates Title IX. Full stop. The district court's novel reasoning contradicts precedent and statutory text.

## A.  FAU may sue based on Title IX's athletic regulations, which comport with the statute and sound in disparate treatment, not disparate impact.

The district court should have evaluated FAU's interim-relief request based on existing law. Instead, the court turned to radical and unraised legal theories. Doc. 134 at 37. That was error.

Eighth Circuit law is clear: private parties may sue based on Title IX's athletic regulations. *E.g.*, *Portz v. St. Cloud State Univ.*, 16 F.4th 577, 579–580 (8th Cir. 2021); *Berndsen v. N. Dakota Univ. Sys.*, 7 F.4th 782, 784 (8th Cir. 2021); *Chalenor v. Univ. of N. Dakota*, 291 F.3d 1042, 1043–45 (8th Cir. 2002). Lower courts aren't free to erase athletes' private right to enforce Title IX. Nor may they effectively wipe out Court of Appeals' rulings enforcing those rights across the nation.

Start with the district court's reliance on *Alexander v. Sandoval*, 532 U.S. 275, 293 (2001), which held that—in the context of disparate-impact regulations promulgated under § 602 of Title VI—Congress exhibited no intent to create a "private right of action to enforce" certain implementing "regulations." *Accord* Doc. 134 at 41–44. In so holding,

13

the Court specifically juxtaposed § 602's language with the "rights-creating," "no person … shall" language in Title VI's § 601. 532 U.S. at 288–89. In contrast, Congress uniquely mandated, reviewed, and allowed Title IX's athletic regulations to go into effect. *Supra* pp. 1–2; *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 286–88 (2d Cir. 2004). And Title IX and the athletic regulations Congress implicitly approved *both* contain the "'rights-creating,'" "no person … shall" language. 20 U.S.C. § 1681(a) ("No person … shall" be subject to sex discrimination); 34 C.F.R. § 106.41(a) (same).

Then consider the claim that the athletic regulations bar conduct that isn't "prohibited by … [Title IX's] text." Doc. 134 at 44 n.16 (citation modified). No daylight exists between the two. The statute prohibits "exclud[ing persons] from participation," "den[ying] the[m] benefits," or "discriminat[ing]" against them based on "sex." 20 U.S.C. § 1681(a). The regulations safeguard equal (*i.e.*, non-sex-discriminatory) participation and benefits in a particular context—athletics. 34 C.F.R. § 106.41(a). So they are consistent with and "provide guidance in interpretating § 1681." *Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 920 (7th Cir. 2012); *accord Kelley v. Bd. of Trustees*, 35 F.3d 265, 272 (9th Cir. 1994); *Anders v. Cal. State Univ., Fresno*, No. 1:21-cv-179, 2021 WL 1564448, at *6 (E.D. Cal. Apr. 21, 2021).

Next, observe the cramped definition of "intentional discrimina-tion," which almost requires animus. Doc. 134 at 45. That's wrong twice

14

over. "[D]iscriminatory intent can be inferred from the mere fact of differences in treatment." *EEOC v. Dial Corp.*, 469 F.3d 735, 741 (8th Cir. 2006); *accord Wells ex rel. Glover v. Creighton Preparatory Sch.*, 82 F.4th 586, 592 (8th Cir. 2023). Plus, "deliberate indifference" is a form of "intentional discrimination," which requires no "showing of personal ill will or animosity." *A.J.T. ex rel. A.T. v. Osseo Area Schs. Indep. Sch. Dist.*, 605 U.S. 335, 344–45 (2025) (citation modified). Courts routinely apply these standards in Title IX cases. *E.g.*, *id.* at 344 n.4; *Grandson v. Univ. of Minn.*, 272 F.3d 568, 575 (8th Cir. 2001); *Parker*, 667 F.3d at 921; *Pederson v. La. State Univ.*, 213 F.3d 858, 881–82 (5th Cir. 2000). And FAU's allegations are consistent with them. *E.g.*, Doc. 1 ¶¶ 118–22, 132–35, 151–55, 165–73, 181–82, 187–90. *Contra* Doc. 134 at 45.

Finally, overwhelming precedent establishes that claims grounded in Title IX's athletic regulations, or the policy interpretation of them, involve disparate *treatment*. *Contra* Doc. 134 at 21, 37, 44 & n.16. The Second, Fourth, and Seventh Circuits have rejected any suggestion that such claims involve disparate *impact. Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 97–98 (2d Cir. 2012); *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 102–04 (4th Cir. 2011); *Parker*, 667 F.3d at 919–20. So have district courts in the Third, Sixth, and Ninth Circuits. *Barrett v. W. Chester Univ. of Pa.*, No. Civ.A.3-CV-4978, 2003 WL 22803477, at *11–12 (E.D. Pa. Nov. 12, 2003); *Mayerova v. E. Mich. Univ.*, 346 F.

Appellate Case: 25-2899     Page: 23     Date Filed: 10/06/2025 Entry ID: 5564959

Supp. 3d 983, 989–91 (E.D. Mich. Sept. 27, 2018); *Anders*, 2021 WL 1564448, at \*6. The district court here stands alone.

The overwhelming weight of authority makes sense: sex-designated teams require sex-conscious decisions. *Neal v. Bd. of Trustees of Cal. State Univs.*, 198 F.3d 763, 772 n.8 (9th Cir. 1999). So Title IX claims about them "necessarily" sound in "disparate treatment." *Biediger*, 691 F.3d at 97–98.

## B.   The League's eligibility bylaws violate Title IX.

The bylaws' harm to FAU's members matters for standing. But the merits of FAU's claims don't turn on individual circumstances, as Title IX measures "equality … by the opportunities offered to the group," *Yellow Springs Exempted Vill. Sch. Dist. v. Ohio High Sch. Athletic Ass'n*, 647 F.2d 651, 657 (6th Cir. 1981), and requires "[sex]-conscious, group-wide comparisons," *Neal*, 198 F.3d at 772 n.8. So the federal government's recent finding that the League's eligibility bylaws violate Title IX shows that FAU will likely prevail on the merits. Minn. Noncompliance Finding, U.S. Dep'ts of Educ. & Health & Human Servs. (Sept. 30, 2025), perma.cc/BBC6-VXN7 ("Finding").

However you slice it, the federal government's conclusion is correct. No one disputes that the League's boys' baseball program is effectively male, while the equivalent girls' softball program is essentially mixed-sex because male athletes may participate based on

16

their identity. Under the statute, that's sex "discrimination" because females receive fewer "participation" opportunities and are denied the equal "benefits" of single-sex competition, *i.e.*, a level playing field that is critical for females given males' athletic advantage. 20 U.S.C. § 1681(a); *accord* Finding at 17.

In violation of the regulations, the League fails to provide females "equal athletic opportunity," including by denying females an equivalent "sport[ ]" that "effectively accommodat[ing] the[ir] interests and abilities." 34 C.F.R. § 106.41(c). The bylaws "effectively eliminate[ ] all-female" sports like softball, which—given males' biological advantage—"fails to effectively accommodate" females' interests or abilities and denies them "equal athletic opportunity." Finding at 48. Whereas male baseball athletes enjoy "fair and safe competition," female softball athletes face "unfair and unsafe competition, … risk injuries, are displaced from podiums, … lose opportunities for advancement …, and miss out on critical visibility for college scholarships." Finding at 17.

The policy interpretation also shows a Title IX violation. *But see* Finding at 7–8 (questioning the interpretation's application when a recipient "does not provide athletic programs separated by sex"). The bylaws "discriminat[e]" against female athletes, and the "substantial and unjustified" disparities between boys' baseball and girls' softball are "substantial enough" to deny equal athletic opportunity. Interpretation.VII.B.5 & C.6. Plus, the League's failure to offer females

17

a baseball-equivalent team for their "sex" alone violates Title IX. Interpretation.VII.C.4.b; *accord Berndsen*, 7 F.4th at 789. In sum, the League treats female athletes worse than male athletes on account of their sex. That's a prima facie violation of Title IX.

### C. The district court's merits analysis conflicts directly with Title IX's text and regulations.

The district court raised five points on the merits. None succeed. First, "one transgender athlete's participation in … softball" isn't the point. Doc. 134 at 46; *accord id.* at 57 n.20. Title IX requires sex-based, group-wide comparisons. *Neal*, 198 F.3d at 772 n.8. The bylaws "effectively eliminate[ ] all-female interscholastic athletic programs" in Minnesota, including softball—a prominent girls' sport. Finding at 48.

Second, Title IX doesn't *require* a particular means of providing equal athletic opportunity at the outset. Doc. 134 at 48. That's irrelevant. The League *chose* the sex-designated method decades ago and continues to effectively reserve boys' baseball for males. Consequently, girls' softball must also be "actually separated by sex, and only by sex," apart from 34 C.F.R. § 106.41(b)'s "limited exception." Finding at 6.

Third, a mixed-sex *league* treats boys and girls the same. But a league that sponsors sex-designated competition with *all-male* baseball and *mixed-sex* softball discriminates against females based on sex. *Contra id.* at 48–49, 55–56. That's what is at play here. *Accord Biediger*, 691 F.3d at 93 (participation opportunities must be "real, not illusory")

18

(citation modified). Any contrary suggestion "den[ies] reality." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 304 (2023) (Gorsuch, J., concurring).

Fourth, nothing supports requiring Title IX plaintiffs to address *every factor* raised in the athletic regulations or policy interpretation. *Contra* Doc. 134 at 50–56. Where, as here, the transgression of one § 106.41(c) factor is egregious and fundamental, a Title IX violation blooms without regard to the rest. Finding at 17, 44–48. Plus, only the policy interpretation's "general principles" apply "when appropriate" in the K-12 context, Interpretation.III. The federal government says not here. Finding at 6–8. And the only potentially relevant principles show a Title IX violation. *Supra* pp. 17–18; *accord Berndsen*, 7 F.4th at 787.

Finally, the notion that FAU didn't address how the bylaws harm female softball athletes' "participation opportunities" is wrong. Doc. 134 at 56. FAU explained that opening softball to males, while effectively closing baseball to females, gives substantially more participation opportunities to males. *E.g.*, Doc. 7 at 7–8, 19, 25–26; Doc. 112 at 28. That violates Title IX and Eighth Circuit precedent. *Accord Chalenor*, 291 F.3d at 1048; *Portz*, 16 F.4th at 581.

**D. This Court hasn't applied a clear-notice requirement for prospective relief, and Defendants had notice.**

The district court also opined that a "clear-notice requirement may apply to … injunctive relief" if compliance would cost money. Doc.

134 at 62. That's wrong for three reasons. First, FAU's requested injunction would impose no material costs: the League's physical-exam form *already* requires disclosure of sex and gender identity. Doc. 112 at 31.

Second, this Court has never applied a clear-notice requirement to prospective relief, even when the monetary costs were enormous. *E.g.*, *Portz*, 16 F.4th at 579–80, 583. This is no place to start, especially as *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981), is dissimilar. There, not even the agency thought that a provision "impose[d] conditions on participating States." *Id.* at 25. But here, "recipients have been on notice that they could be subjected to private suits for intentional sex discrimination under Title IX since 1979." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 182 (2005).

And that also provides the third reason. Defendants had clear notice. Their "decisions with respect to athletics are … 'always—by definition—intentional,'" *Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957, 968 (9th Cir. 2010) (quoting *Jackson*, 544 U.S. at 183); *accord Parker*, 667 F.3d at 921. That includes "act[ing] with deliberate indifference to the condition of [the] female [softball] program." *Pederson*, 213 F.3d at 882. Defendants may not have "intended to violate Title IX." *Id.* at 881. But that's irrelevant: their bylaws execution was intentional (not an "accident") and "treat[s] women differently," *id.* (citation

20

modified), which "violates the clear terms of the statute," *Jackson*, 544 U.S. at 183 (quotation omitted).

## II.    FAU's members face irreparable harm.

Without swift injunctive relief, FAU members face irreparable harm. The next softball season is approaching fast. After tryouts in the second week of March, the regular softball season runs from the first week of April to mid-May. That's when FAU Athlete 1's team is *calendared* to play Athlete Doe's team. FAU Athletes 2–4 are also likely to do so. *Supra* pp. 10–11. Next, sectionals begin in late May, followed by the state tournament in early June—post-season games that are practically certain to attract scout's attention.

Equal athletic opportunity is essential so that FAU members can play their best, advance to higher levels of competition, get noticed, stay safe, and attract offers to play for Division I or II schools (and the college scholarships that go with them). Doc. 113 ¶¶ 35–39; Doc. 115 ¶¶ 35–38; Doc. 116 ¶¶ 12–13. Otherwise, they will lose to Athlete Doe's team again, depressing their records and rankings further. And this is FAU Athletes 1 and 2's senior year—their last chance to succeed.

Being "treated unequally in violation of Title IX" *again* this season is irreparable harm "given the fleeting nature of [high school] athletics." *Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963, 972–73 (D. Minn. 2016). Once Defendants "deprive[ ]" FAU's members of an equal

Appellate Case: 25-2899     Page: 29     Date Filed: 10/06/2025 Entry ID: 5564959

"chance" to excel—and reach or win "[r]egional and [s]tate [c]hampionship competition"—there's no going back. *McCormick*, 370 F.3d at 302 n.25.

## III. The public interest and balance of harms favor FAU.

In suits against the government or state officials, "[t]he balance-of-harms and public-interest factors merge." *Eggers v. Evnen*, 48 F.4th 561, 564–65 (8th Cir. 2022) (citation modified). Both favor enforcing Title IX and the athletic regulations, which "have been unchanged for approximately 50 years." *Tennessee v. Cardona*, 737 F. Supp. 3d 510, 569 (E.D. Ky. 2024).

Given the "compelling" interest in eliminating "sex discrimina-tion," *Portz*, 196 F. Supp. 3d at 978, the public interest lies in correctly applying Title IX, *Cardona*, 737 F. Supp. at 569. Defendants' exchange of sex for gender identity moves the target and turns Title IX on its head. *Adams*, 57 F.4th at 814. After all, Minnesota sex-separated sports teams for decades and still effectively does for boys. So holding the State to the Title-IX-compliance method *it chose* and providing equal opportunities for girls fulfills Title IX's longstanding expectations.

Plus, Athlete Doe *doesn't* qualify to play college softball and stopped playing on a club team to not harm teammates' chances of advancing to the college level. Doc. 80 ¶ 21. The balance of harms

equally favors FAU's members who *do* qualify for college softball and have sacrificed for years to see that dream become reality. *Supra* p.9.

Because FAU's requested relief imposes no meaningful costs, FAU is a non-profit member organization, and an injunction is in the public interest, the Court should not require a bond. *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016) (approving bond waiver based on public interest).

## CONCLUSION

Female athletes have the right to safely play—and win—women's sports competitions. For the above reasons and those stated in the federal government's finding, the Court should issue an injunction pending appeal that bars Defendants from allowing males to compete with, or against, FAU's members in female-designated sports that qualify as contact sports or involve competitive skill.

Dated: October 6, 2025

Respectfully submitted,

*s/Rory T. Gray*

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@adflegal.org

Jonathan A. Scruggs
Henry W. Frampton, IV
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@adflegal.org
hframpton@adflegal.org

Rory T. Gray
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville GA 30043
(770) 339-0774
rgray@adflegal.org

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

This motion complies with the word limit of Fed. R. App. P. 27(d)(2)(A) because it contains 5,166 words, excluding parts exempted by Fed. R. App. P. 32(f).

This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in Word 365 using a proportionally spaced typeface, 14-point Century Schoolbook.

Dated: October 6, 2025

*s/Rory T. Gray*

Rory T. Gray
*Counsel for Plaintiff-Appellant*

Appellate Case: 25-2899    Page: 33    Date Filed: 10/06/2025 Entry ID: 5564959

## CERTIFICATE OF SERVICE

I hereby certify that on October 6, 2025, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by that system.

*s/Rory T. Gray*
Rory T. Gray
*Counsel for Plaintiff-Appellant*

Appellate Case: 25-2899    Page: 34    Date Filed: 10/06/2025 Entry ID: 5564959