No. 25-2899

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

FEMALE ATHLETES UNITED,

*Petitioner,*

v.

KEITH ELLISON, *in his official capacity as Attorney General of Minnesota*; et al.

*Respondents.*

On Petition for Review from the United States District Court of Minnesota

**BRIEF OF IOWA AND 18 STATES
SUPPORTING APPELLANT'S EMERGENCY MOTION FOR
INJUNCTION PENDING APPEAL**

BRENNA BIRD
Attorney General of Iowa




October 13, 2025

ERIC WESSAN
Solicitor General
Halle Kissell
Assistant Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 281-5164
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov
halle.kissell@ag.iowa.gov

*Counsel for Amicus Iowa Attorney General's Office
(Additional counsel listed after signature block)*

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................i
TABLE OF AUTHORITIES.............................................................................ii
STATEMENT OF AMICUS CURIAE ...........................................................1
SUMMARY OF ARGUMENT ........................................................................4
ARGUMENT .....................................................................................................5
   I.   Title IX Prohibits Discrimination Based on Biological Sex and Requires Equal Opportunities for Both Sexes. ................................5
   II.  Allowing Boys to Participate in Girls' Sports Denies Girls Title IX's Protections..................................................................................9
CONCLUSION ................................................................................................14
ADDITIONAL COUNSEL ............................................................................15
CERTIFICATE OF COMPLIANCE ............................................................16
CERTIFICATE OF SERVICE.......................................................................16

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Sch. Bd. of St Johns Cnty.*,
  57 F.4th 791 (11th Cir. 2022) ............................................................. 5, 6
*Bostock v. Clayton Cnty.*,
  590 U.S. 644 (2020) .................................................................... 1, 5, 6
*Clark v. Ariz. Interscholastic Ass'n*,
  695 F.2d 1126 (9th Cir. 1982) ................................................................ 9
*Dataphase Sys., Inc., v. C.L. Sys., Inc.*,
  640 F.2d 109 (8th Cir. 1981) .................................................................. 2
*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
  545 U.S. 546 (2005) ............................................................................ 5
*Female Athletes United v. Ellison*,
  No. 25-cv-2151 (ECT/DLM), 2025 WL 2682386 (D. Minn. Sept. 19, 2025) ................................................................. 2, 5, 8, 11, 12
*Frontiero v. Richardson*,
  411 U.S. 677 (1973) ......................................................................... 5, 7
*Mansourian v. Regents of the Univ. of Cal.*,
  594 F.3d 1095 (9th Cir. 2010) ............................................................... 9
*McCormick v. Sch. Dist. of Mamaroneck*,
  370 F.3d 275 (2d. Cir 2004) .................................................................. 9
*O'Connor v. Bd. of Ed. Of Sch. Dist. 23*,
  449 U.S. 1301 (1980) ........................................................................... 8
*Wis. Cent. Ltd. v. United States*,
585 U.S. 274 (2018) ............................................................................... 5

**Statutes**

20 U.S.C. § 1681(a) ......................................................................... 1, 4, 8
20 U.S.C. § 1681(a)(5) ........................................................................... 6
20 U.S.C. § 1681(a)(6)(B) ...................................................................... 6
20 U.S.C. § 1681(a)(7) ........................................................................... 6
20 U.S.C. § 1681(a)(8) ........................................................................... 6
20 U.S.C. § 1681(b) ............................................................................... 6

**Other Authorities**

David J. Handelsman et al., *Circulating Testosterone as the Hormonal Basis of Sex Differences in Athletic Performance*, 39(5) Endocrine Soc'y 803 (2018) ................................................................................................ 10

Michael J. Joyner et. al, *Evidence on Sex Differences in Sports Performance*, 138 J. of Applied Physiology 274 (2024) ........................... 10

Minnesota State High School League, Bylaw 300.00(3)(A) (2025) .. 1, 2, 8

Press Release, U.S. Dep't of Educ., U.S. Department of Education and U.S. Department of Health and Human Services Find that Minnesota Violated Title IX (Sept. 30, 2025), https://perma.cc/G8UZ-EFSH..2, 3, 12

117 Cong. Rec. 32,476 (1971) ..................................................................... 7

117 Cong. Rec. 39,259 (1971) ..................................................................... 7

118 Cong. Rec. 5803 (1972) ........................................................................ 4

# STATEMENT OF AMICUS CURIAE

States around the country—and in this circuit—have enacted laws that protect women's sports and limit participation in those sports to biological women. *See, e.g.*, Iowa Code §§ 261I.1–2. Indeed, every State in this circuit but one has enacted laws to do just that. *See* Movement Advancement Project, *Bans on Transgender Youth Participation in Sports: Map, available at* https://perma.cc/KQ3U-JWEK. That state has taken the opposite tack and mandated that women's sports accommodate biological men. That approach flouts Title IX's protections for women athletes.

A "major achievement[]" of Title IX is "giving young women an equal opportunity to participate in sports." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 727 (2020) (Alito, J., dissenting). Title IX is clear: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX protects biological sex—and thus, biological women are entitled to Title IX's

1

protections and obligations of equal treatment, benefits, and opportunities that their biological male counterparts experience.

Here, Title IX ensures female athletes receive the benefits of athletic competition and the corollary opportunities—like teambuilding, comradery, and avenues to higher education.

Minnesota State High School Leagues adopted a bylaw allowing students to participate in athletics "consistent with their gender identity or expression." Minnesota State High School League, Bylaw 300.00(3)(A) (2025) ("Bylaw 300.00(3)"), *available at*, https://perma.cc/HZ84-6PGF. That bylaw ignores biological sex. That violates Title IX's protections of equal treatment, benefits, and opportunities for female athletes.

Yet the district court refused to enjoin enforcement of the challenged bylaw. *Female Athletes United v. Ellison*, No. 25-cv-2151, 2025 WL 2682386, at *11, *23 (D. Minn. Sept. 19, 2025). Absent a preliminary injunction, female athletes will be stripped of Title IX's protections by forcing them to compete against biological men. That straightforward violation of Title IX shows significant chance of success on the merits.

And failing to enjoin enforcement of the challenged bylaws also risks causing irreparable harm to the student-athletes. Some students will graduate or otherwise be unable to participate in sports in high school going forward. Some students will be applying to colleges and universities on the basis of their athletic accomplishments. There is no way to ensure that those accolades will be lawfully allocated in a manner protecting women under Title IX without enjoining enforcement of this rule. That irreparable harm—not to mention Plaintiffs' likelihood of success on the merits—necessitates a preliminary injunction here.

Allowing biological males to participate in female sport's denies girls the protections of Title IX. There are physiological differences between biological males and females that are obvious in sports and sports performance. Those differences have been long understood to justify separate-sex teams to ensure fair and safe competition for females. *See* Press Release, U.S. Dep't of Educ., U.S. Department of Education and U.S. Department of Health and Human Services Find that Minnesota Violated Title IX (Sept. 30, 2025), https://perma.cc/G8UZ-EFSH (claiming that Minnesota "fails to recognize" these differences). That is basic biology. And to deny or ignore that deprives females of what

was fought for in this Nation's history—the right to be treated equally and to have the same opportunities as their male counterparts. Forcing biological females to compete against biological males denies females the equal opportunities that Title IX demands.

The undersigned amici curiae are 19 Attorneys General. Across the United States, States have enacted laws that do the opposite of Minnesota State High School League's bylaw here: Enforce Title IX's protections by barring biological males from competing on female sports teams. Minnesota State High School League's bylaw flouts Title IX, a federal civil rights statue, and harms equal protection of law for both biological sexes. States have an interest in ensuring that other States do not violate Title IX because such violations compromise the consistent enforcement of federal protections. And here, that is why the named States Attorneys General support a preliminary injunction.

## SUMMARY OF ARGUMENT

1. The text and history of Title IX show that Title IX prohibits discrimination on the basis of biological sex to ensure equal opportunity among biological males and biological females.

2. Allowing biological males to compete in female sports denies females the protections, benefits, and opportunities guaranteed under Title IX.

4

# ARGUMENT

## I. Title IX Prohibits Discrimination Based on Biological Sex and Requires Equal Opportunities for Both Sexes.

Congress enacted Title IX to guarantee that women would no longer be denied educational opportunities because of their biological sex. *See* 118 Cong. Rec. 5803 (1972) (Senator Bayh stating that "[t]he only antidote" to the "corrosive and unjustified discrimination against women," "is a comprehensive amendment such as the one now before the Senate.").

Its plain text forbids discrimination "on the basis of sex." Congress's intent in 1972 therefore was unequivocal: To ensure that female students could learn, compete, and thrive on equal footing with their male peers. *See* 20 U.S.C. § 1681(a); 118 Cong. Rec. 5803 (1972). The statute's protections thus hinge on the biological distinction between men and women—the very distinction that gave rise to the inequalities Congress sought to remedy. Reading Title IX to erase or blur that line would not advance its purpose; it would undo it, stripping women of the very protections the statute was designed to secure.

1. Title IX's scope turns in part on the meaning of "sex." Indeed, the scope of Title IX is understood by examining its "text in light of context,

structure, and related statutory provisions." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 558 (2005). And as the district court here correctly notes, "it's a fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary, contemporary, common meaning at the time Congress enacted the statute." *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018) (cleaned up); *Female Athletes United*, 2025 WL 2682386, at *15.

In 1972, when Congress enacted Title IX, the ordinary meaning of "sex" meant the biological distinction between males and females. *See Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality op.) ("[S]ex, like race and national origin, is an immutable characteristic determined solely by the accident of birth."). Dictionary definitions from the time of Title IX's enactment show that "when Congress prohibited discrimination on the basis of 'sex' in education, it meant biological sex." *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 812 (11th Cir. 2022); *see also Bostock*, 590 U.S. at 686 (Alito, J., dissenting) (examining dictionary definitions of "sex" prior to Title IX and finding that the "primary definition in every one of them refers to the division of living things into two groups, male and female, based on biology.").

Congress's use of "sex" throughout Title IX confirms that binary understanding based on biology. Indeed, binary distinctions are made many times throughout that section. *See* 20 U.S.C. § 1681(a)(8) (discussing "father-son or mother-daughter activities at an educational institution" and "if such activities are provided for students of one sex, opportunities for reasonably comparable activities shall be provided for students of the other sex."); 20 U.S.C. § 1681(a)(5) (discussing admitting "only students of one sex" at public universities); 20 U.S.C. § 1681(a)(6)(B) (discussing youth service organizations that have in the past "limited to persons of one sex"); 20 U.S.C. § 1681(a)(7) (applying to "Boy or Girl conferences"); 20 U.S.C. § 1681(b) (referencing "disparate treatment to the members of one sex"). Those references to "one sex" can only be understood as acknowledging the binary nature of biological sex as female or male.

Read in context, every part of Title IX and the meaning of the words in the statute at the time of enactment confirms that "sex" unambiguously refers to biological distinctions between males and females—the very basis on which Congress sought to secure equal opportunities for women.

2. The history and purpose of the adoption of Title IX also supports that "sex" means biological sex. Again, Congress created Title IX to protect women from discrimination in the realm of education. *See* 118 Cong. Rec. 5803 (1972). Congress wanted to "guarantee that women, too, enjoy the educational opportunity every American deserves." 117 Cong. Rec. 32,476 (1971) (statement of Sen. Bayh); *see also Frontiero*, 411 U.S. at 684 (noting that "[t]here can be no doubt that our Nation has had a long and unfortunate history of sex discrimination"). And Title IX intended to put women on an equal playing field as their male counterparts. *See* 117 Cong. Rec. 39,259 (1971) (Senator Green stating, "[a]ll that this title does is to ask that a woman be considered . . . in the same fashion as those of a male applicant."). The word "sex" understood in Title IX's historical context must mean biological sex as the purpose of Title IX was to rectify the disparate treatment of women compared to men.

The district court correctly found that "there is ample support for at least assuming that 'sex' refers to 'biological' sex." *Female Athletes United*, 2025 WL 2682386, at *15. Yet despite that, the district court went on to make findings contrary to that understanding. So under Title

IX, a person cannot "be excluded from participation in, be denied the benefits of, or be subjected to discrimination" in certain activities based on their biological sex. 20 U.S.C. § 1681(a).

## II. Allowing Boys to Participate in Girls' Sports Denies Girls Title IX's Protections.

Bylaws like Minnesota State High School League's undermine what Title IX was intended to do—provide individuals equal opportunities in education and activities and forbid differential treatment that causes harm by treating one sex better than the other. Allowing biological men to participate in athletics "consistent with their gender identity or expression" but opposite their biological sex denies the benefits of sports to young women. *See* Bylaw 300.00(3). By opening female athletic competitions to biological males, such bylaws erase the very distinction Congress recognized as essential to preserving fair and equal opportunities for women. That approach transforms a statute meant to protect women into one that disadvantages them, depriving female athletes of the level playing field Title IX guarantees.

In the sport contexts, courts have long recognized that "Title IX requires that schools provide equal athletic opportunity to boys and girls." *McCormick v. Sch. Dist. Of Mamaroneck*, 370 F.3d 275, 296

9

(2d Cir. 2004). Courts understand that ensuring equal opportunity will sometimes require maintaining female-only athletic teams. *See, e.g.*, *O'Connor v. Bd. of Ed. Of Sch. Dist. 23*, 449 U.S. 1301, 1307 (1980). Title IX "is widely recognized as the source of a vast expansion of athletic opportunities for women in the nation's schools and universities." *Mansourian v. Regents of the Univ. of Cal.*, 594 F.3d 1095, 1099 (9th Cir. 2010). And "there is clearly a substantial relationship between the exclusion of males from [a sports] team and [Title IX's] goal of redressing past discrimination and providing equal opportunities for women." *Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982).

Title IX gives women the opportunity to compete in sports and experience the benefits that come with being part of a team. But rules and laws like Minnesota's Bylaw 300.00(3), which allows biological males to compete against women because they "identify" as female, puts that hard-won opportunity at risk. There are serious concerns about a policy based on anything other than biology.

There are physiological differences between the sexes, specifically physiological advantages that males have over females. One study found,

> there is a clear sex difference in both muscle mass and strength even adjusting for sex differences in height and

weight. On average, women have 50% to 60% of men's upper arm muscle cross-sectional area and 65% to 70% of men's thigh muscle cross-sectional area, and women have 50% to 60% of men's upper limb strength and 60% to 80% of men's leg strength. Young men have on average a skeletal muscle mass of >12 kg greater than age-matched women at any given body weight.

David J. Handelsman et al., *Circulating Testosterone as the Hormonal Basis of Sex Differences in Athletic Performance*, 39(5) Endocrine Society 803, 812 (2018). Data shows that "[b]iological males as a group outperform biological females in athletic events dependent on strength, speed, power, and endurance." Michael J. Joyner et. al, *Evidence on Sex Differences in Sports Performance*, 138 J. of Applied Physiology 274, 275 (2024). And prepubescent boys also have physiological differences that lead them to perform better than their female counterparts. *See id.* at 275 – 276.

One only need look at the facts of this case to understand how these physiological differences affect sports. The female athletes provided specific examples to the district court of how this policy has affected them. When hitting against the male pitcher involved here, Athlete One batted three times and had zero hits even though she had a batting average of .300. *Female Athletes United*, 2025 WL 2682386, at *4. The

11

district court noted that was part of a trend—most batters fared worse when batting against the male pitcher. Athlete One's team played the biological male's team twice in the 2025 season; the biological male pitched the entirety of both games, and Athlete One's team's batting average was significantly lower than in other games competing against biological female pitchers. *Id.*

Indeed, in the first game the male athlete pitched a one-hitter and in the second game the male athlete pitched 7 strikeouts, held Athlete One's team below their typical batting average, and prevented that team from advancing to the sectional championship game. *Id.*

Athletes Two and Three played with the biological male on a club team where they acknowledged that the individual was pitching "much faster" and with much more "force, speed, and spin" than female pitchers in the league. *Id.* at *5. And Athlete Four had the same experience as Athlete One when playing against the biological male pitcher. *Id.* When Athlete Four's team played against the biological male pitcher, the team did not score, and they advanced past first base only twice. *Id.* Athlete Four, the second best hitter on her team, only batted one for three—an abnormal occurrence for her. *Id.*

By maintaining sex-specific sports, women can compete on a level playing field, reap the rewards of athletic participation, and avoid the safety risks inherent in competing against physiologically distinct opponents. What Minnesota State High School League has done here, interpreting Title IX to require that schools permit male athletes to compete based on their self-proclaimed gender identity, puts girls at a disadvantage and undermines the entire purpose of Title IX. Not only does it undermine Title IX, it violates it. *See* Press Release, U.S. Dep't of Educ., *supra* (U.S. Department of Education concluding that the Minnesota Department of Education and Minnesota State High School League "violated Title IX's prohibition on sex discrimination by allowing males to compete in female sports").

Title IX's text, history, and purpose all make clear that its protections are grounded in distinction based on biological sex to ensure that women can compete safely and fairly in all aspects of life—including athletics. It is essential to fulfilling Title IX's promise that females compete only against biological females in sports. To hold anything else violates Title IX's protections.

## CONCLUSION

The Court should grant Petitioners' motion to enjoin Defendants from enforcing Bylaw 300.00(3) pending the appeal.

October 13, 2025

Respectfully submitted,

BRENNA BIRD
Iowa Attorney General

*/s/ Eric Wessan*
ERIC WESSAN
*Solicitor General*

Halle Kissell
Assistant Solicitor General
Hoover State Office Building
1305 East Walnut Street
Des Moines, Iowa 50319
Phone: (515) 823-9117
eric.wessan@ag.iowa.gov
halle.kissell@ag.iowa.gov

*Counsel for the State of Iowa*

## ADDITIONAL COUNSEL

Steve Marshall
Attorney General of Alabama

Stephen J. Cox
Attorney General of Alaska

Tim Griffin
Attorney General of Arkansas

James Uthmeier
Attorney General of Florida

Chris Carr
Attorney General of Georgia

Theodore E. Rokita
Attorney General of Indiana

Kris Kobach
Attorney General of Kansas

Liz Murrill
Attorney General of Louisiana

Lynn Fitch
Attorney General of Mississippi

Catherine Hanaway
Attorney General of Missouri

Austin Knudsen
Attorney General of Montana

Michael T. Hilgers
Attorney General of Nebraska

Gentner Drummond
Attorney General of Oklahoma

Alan Wilson
Attorney General of South Carolina

Marty Jackley
Attorney General of South Dakota

Ken Paxton
Attorney General of Texas

Derek E. Brown
Attorney General of Utah

Keith G. Kautz
Attorney General of Wyoming

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 2,535 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(5) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: October 13, 2025

/s/ *Eric H. Wessan*
Solicitor General

# CERTIFICATE OF SERVICE

The undersigned certifies that on the thirteenth day of October, 2025, this brief was electronically filed with the Clerk of Court using the CM/ECF system, which will serve all counsel of record.

/s/ *Eric H. Wessan*
Solicitor General