NO. 25-2899

## UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

FEMALE ATHLETES UNITED,
*Plaintiff-Appellant*

v.

KEITH ELLISON, et al.,
*Defendants-Appellees*

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT OF MINNESOTA
No. 0:25-cv-02151-ECT-DLM

## BRIEF OF *AMICUS CURIAE* BY THE STATES OF WASHINGTON, CALIFORNIA, CONNECTICUT, HAWAI'I, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, NEVADA, NEW YORK, OREGON, RHODE ISLAND, AND VERMONT IN SUPPORT OF APPELLEES' OPPOSITION TO APPELLANT'S EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL

NICHOLAS W. BROWN
*Attorney General of Washington*

EMILY C. NELSON, WSBA 48440
BENJAMIN SEEL, WSBA 61165
*Assistant Attorneys General*
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744
emily.nelson@atg.wa.gov
benjamin.seel@atg.wa.gov

*Counsel for Amicus State of Washington*

*(Additional counsel listed on signature page)*

# TABLE OF CONTENTS

I.      INTRODUCTION ............................................................. 1

II.     IDENTITY AND INTEREST OF AMICI ...................................... 2

III.    ARGUMENT .................................................................. 4

    A.  The States Share a Long History of Protecting Transgender and Gender
        Expansive Youth from Discrimination Without Reducing Opportunities
        for Others ............................................................... 4

        1.  Transgender and gender expansive youth continue to face
            discrimination that harms their physical and mental health, and
            negatively impacts their academic performance ................................. 5

        2.  Amici States' protections for transgender youth yield broad benefits
            for all ............................................................... 9

    B.  Title IX Does Not Permit the Discriminatory Treatment Appellant Asks
        This Court to Impose Upon Minnesota's Transgender and Gender
        Expansive Youth Athletes ..................................................... 15

IV.     CONCLUSION ............................................................... 20

## TABLE OF AUTHORITIES

### Cases

*A.C. ex rel. M.C. v. Metropolitan Sch. Dist.*,
75 F.4th 760 (7th Cir. 2023) .................................................................18

*B.P.J. by Jackson v. West Virginia Board of Education*,
98 F.4th 542 (4th Cir. 2024) .................................................................17

*Bostock v. Clayton Cnty.*,
590 U.S. 644 (2020) .............................................................................16

*Brown v. Board of Educ.*,
347 U.S. 483 (1954) ...............................................................................9

*Dodds v. United States Dep't of Educ.*,
845 F.3d 217 (6th Cir. 2016) .................................................................18

*Doe ex rel. Doe v. Boyertown Area Sch. Dist.*,
897 F. 3d 518 (3d Cir. 2018) .................................................................18

*Doe v. Horne*,
115 F.4th 1083 (9th Cir. 2024) ..............................................................18

*Doe v. Horne*,
683 F. Supp. 3d 950 (D. Ariz. July 20, 2023) .......................................19

*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020) ....................................................... 14, 18

*Hecox v. Little*,
104 F.4th 1061 (9th Cir. 2024) ..............................................................17

*Parents for Privacy v. Barr*,
949 F. 3d 1210 (9th Cir. 2020) ..............................................................18

*Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No.
1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017) .....................................18

## Constitutional Provisions

Nev. Constitution, Art. 1, § 24...........................................................11

Wash. Const. Art. IX, § 1.............................................................12

## Regulations

28 C.F.R. § 54.450(a)–(b)............................................................16

34 C.F.R. § 106.41(a)–(b)...........................................................16

603 Mass. Code Regs. 26.05(5)(12) .......................................12

## Statutes

20 U.S.C. § 1681(a) ....................................................................16

2006 Wash. Sess. Laws, ch. 4, § 4 ...........................................12

Cal. Educ. Code § 221.5(f) .........................................................12

Conn. Gen. Stat. § 10-15c ...........................................................11

Mass. Gen. Laws ch. 76, § 5 ......................................................12

N.Y. Educ. Law § 11(6) ..............................................................12

N.Y. Educ. Law § 12(1) ..............................................................12

Wash. Rev. Code § 28A.642.080(3)(b) ......................................15

Wash. Rev. Code § 49.60.030......................................................12

Wash. Rev. Code § 49.60.040......................................................12

Wash. Rev. Code § 49.60.500......................................................12

Wash. Rev. Code Ann. § 28A.642.010........................................11

# Other Authorities

Alison R. Snyder et al., *Health-Related Quality of Life Differs Between Adolescent Athletes and Adolescent Nonathletes*,
19 J. Sport Rehab. 237 (2010) ..................................................................... 10, 11

Ancheta et al., *The Impact of Positive School Climate*, *supra*, at 80; *see also* Cady Stanton, *As 'Don't Say Gay' and similar bills take hold, LGBTQ youths feel they're 'getting crushed'*, USA Today (updated May 11, 2022), https://www.usatoday.com/story/news/education/2022/05/09/dont-say-gay-lgbtq-youth-reaction/7398468001/ ........................................8

Caitlin M. Clark & Joseph G. Kosciw, *Engaged or Excluded: LGBTQ Youth's Participation in School Sports and Their Relationship to Psychological Well-Being*,
59 Psych. Schs. 95 (2022) ....................................................................11

Caitlin M. Clark et al., GLSEN, *LGBTQ Students and School Sports Participation: Research Brief* (2021), https://www.glsen.org/sites/default/files/2022-02/LGBTQ-Students-and-School-Sports-Participation-Research-Brief.pdf.............................................................................11

California Interscholastic Fed'n, *Constitution, Bylaws, Sport Governing Rules 2025-2026* (2025), https://www.cifcs.org/information/2025-2026_Orange_Book_PRINT.pdf ....................................................................13

Ellis Barrera et al., *The Medical Implications of Banning Transgender Youth from Sport Participation*,
176 JAMA Pediatrics 223 (2022)....................................................................10

Emily A. Greytak et al., GLSEN, *Harsh Realities: The Experiences of Transgender Youth in Our Nation's Schools*, xi (2009), https://www.glsen.org/sites/default/files/2020-04/Harsh%20Realities.pdf.............................................................................5

*Improving School Climate for Transgender and Nonbinary
    Youth: Research Brief*, 1 (2021),
    https://www.glsen.org/sites/default/files/2021-11/GLSEN_Trans%26Nonbinary_
    ResearchBrief.pdf ................................................................5

Jayda Evans, *Ten years on, WIAA's transgender policy keeps conversation going,*
    The Seattle Times (Apr. 4, 2017),
    https://www.seattletimes.com/sports/high-school/ten-years-
    on-wiaas-transgender-policy-keeps-conversation-going/ ....................................14

Jennifer R. Pharr et al., *Serial Mediation Analysis of the Association of Familiarity
    with Transgender Sports Bans and Suicidality Among Sexual and Gender
    Minority Adults in the United States*,
    19 Int'l J. Env't Rsch. & Pub. Health 10461 (Aug. 2022).....................................11

Joseph G. Kosciw et al., GLSEN, *The 2021 National School Climate Survey: The
    Experiences of LGBTQ+ Youth in Our Nation's Schools* (2022),
    https://www.glsen.org/sites/default/files/2022-10/
    NSCS-2021-Full-Report.pdf ...................................................... passim

Judy Chiasson, *Success and Opportunity for Transgender Students*, HuffPost
    (updated Feb. 2, 2016),
    https://www.huffpost.com/entry/success-and-opportunity-for-transgender-
    students_b_3744830 ................................................................14

Kelly P. Troutman & Mikaela J. Dufur, *From High School Jocks to College
    Grads: Assessing the Long-Term Effects of High School Sport Participation on
    Females' Educational Attainment*,
    38 Youth & Soc'y 443 (2007).............................................................10

Kosciw et al., *The 2021 National School Climate Survey,supra*, at 43; *see also*
    April J. Ancheta et al., *The Impact of Positive School Climate on Suicidality and
    Mental Health Among LGBTQ Adolescents: A Systematic Review*,
    37 J. Sch. Nursing 75, (2020)...............................................................7

Landon D. Hughes et al., *Pediatric Provider Perspectives on Laws and Policies
    Impacting Sports Participation for Transgender Youth*,
    9 LGBT Health 247 (2022) ................................................................11

Laura Beth Nielsen et. al., *Misgendering, Academic Freedom,the First Amendment, and Trans Students*, 73 Case W. Res. L. Rev. 1177 (2023) ................................................................1

Maryland Pub. Secondary Schs. Athletic Ass'n, *MPSSAA Guidance for Participation of Transgender Youth in Interscholastic Athletics* (Aug. 2016) https://mpia.hcpss.org/sites/default/files/202306/MPSSAA_Transgender_Guidance_revised_8.16%20%281%29.pdf......................................................13

Massachusetts Interscholastic Athletic Ass'n, *MIAA Handbook July 1, 2023-June 30, 2025: Rules and Regulations Governing Athletics: A Handbook for Principals and Athletic Directors* (2023), https://www.miaa.net/sites/default/files/2024-04/ miaa-handbook-23-25.pdf ........................................................................13

Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students — 19 States and Large Urban School Districts, 2017*, 68 Morbidity & Mortality Wkly. Rep. 67, 67–70 (2019) ..........................5

New York State Educ. Dep't, *Creating a Safe, Supportive,and Affirming School Environment for Transgender and Gender Expansive Students: 2023 Legal Update and Best Practices* (June 2023), https://nysed.gov/sites/default/files/programs/student-support-services/creating-a-safe-supportive-and-affirming-school-environment-for-transgender-and-gender-expansive-students.pdf ..........................................................12

New York State Pub. High Sch. Athletic Ass'n, *NYSPHSAA Handbook* (Aug. 2023) https://nysphsaa.org/documents/2023/8/21/NYSPHSAA_Handbook_005.pdf................................................................................................13

Nhan L. Truong et al., GLSEN, *Erasure and Resilience: The Experiences of LGBTQ Students of Color*, 3 (2020), https://www.glsen.org/sites/default/files/2020-06/Erasure-and-Resilience-Black-2020.pdf........................................................................................7

Office of Elementary & Secondary Educ., U.S. Dep't of Educ., *Safe & Supportive Schools* (May 30, 2023), https://www.ed.gov/about/ed-offices/oese/safe-supportive-schools ........................................................................................9

Patrick McGreevy, *California transgender students given access to opposite-sex programs*, L.A. Times (Aug. 12, 2013), https://www.latimes.com/politics/la-xpm-2013-aug-12-la-me-pc-gov-brown-acts-on-transgender-bill-20130812-story.html......................................................14

Richard Bailey, *Physical Education and Sport in Schools: A Review of Benefits and Outcomes*, 76 J. Sch. Health 397 (2006) ...............................................................................11

Ryan D. Burns et al., *Sports Participation Correlates WithAcademic Achievement: Results From a Large AdolescentSample Within the 2017 U.S. National Youth Risk BehaviorSurvey*, 127 Perceptual & Motor Skills 448 (2020) ........................................................10

Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *Early Insights: A Report of the 2022 U.S. Transgender Survey*, 22 (2024), https://transequality.org/sites/default/files/202402/2022%20USTS%20Early%20Insights%20Report_ FINAL.pdf ...........................................................................................................5

Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *The Report of the 2015 U.S. Transgender Survey* (2016), https://transequality.org/sites/default/files/docs/usts/ USTS-Full-Report-Dec17.pdf ...........................................................................6, 7

Scott B. Greenspan et al., *LGBTQ+ Youth's Experiences and Engagement in Physical Activity: A Comprehensive Content Analysis*, 4 Adolescent Rsch. Rev. 169 (2019)....................................................................10

Shoshana K. Goldberg, et al., Human Rts. Campaign Found., *2023 LGBTQ+ Youth Report* (Aug. 2023), https://reports.hrc.org/2023-lgbtq-youth-report ....................................................6

The Trevor Project, *2023 U.S. National Survey on the Mental Health of LGBTQ Young People*, 16 (2023), https://www.thetrevorproject.org/survey-2023/assets/static/05_TREVOR05_2023survey.pdf.........................................6, 8

Washington Interscholastic Activities Ass'n, *WIAA Handbook 2024-25* (Feb. 26, 2025) https://assets.wiaa.com/results/handbook/2024-25/ handbook.pdf ............................................................................... 13, 14

Washington Off. of Superintendent of Pub. Instruction, *Gender-Inclusive Schools*, https://ospi.k12.wa.us/policy-funding/equity-and-civil-rights/resources-school-districts-civil-rights-washington-schools/gender-inclusive-schools ................... 11

What We Know Project, Cornell Univ., *What Does the Scholarly Research Say About the Effects of Discrimination on the Health of LGBT People?* (2019), https://whatweknow.inequality.cornell.edu/topics/lgbt-equality/what-does-scholarly-research-say-about-the-effects-of-discrimination-on-the-health-of-lgbt-people/ ...........................................................................................7

# I.    INTRODUCTION

Appellant Female Athletes United (FAU) seeks to force the categorical exclusion of transgender[1] and gender expansive girl athletes from competing in a broad swath of girls' sports in the Minnesota State High School League (MSHSL). FAU claims that such extraordinary relief is necessary on an emergency basis because Minnesota state law and MSHSL's bylaws—which protect the right of all students to participate in sports consistent with their gender identity—violate Title IX of the Education Amendments of 1972 and discriminate against cisgender female student-athletes.

The district court correctly determined that FAU was not likely to succeed on its Title IX claims and denied FAU's unsupported request for a preliminary injunction. In a well-reasoned, 66-page order, the district court analyzed each of FAU's arguments and found it had provided no evidence that the participation of an exceedingly small number of transgender girls—even those with competitive

---

[1] FAU persistently misgenders a student-athlete discussed in this case by referring to her as "male" throughout their papers. *See* Appellant's Emergency Mot. for an Inj. Pending Appeal under Fed R. App. P. 8 at 1, 10, and 16. Amici States note that studies show persistent misgendering causes significant psychological, physical, and social harms. *See* Laura Beth Nielsen et. al., *Misgendering, Academic Freedom, the First Amendment, and Trans Students*, 73 Case W. Res. L. Rev. 1177, 1182–83 (2023) (citing studies).

athletic skill—denied FAU's members "effective accommodation" or "equal treatment" under Title IX.

The district court's conclusion accords with the applicable Title IX regulations and is consistent with the Amici States' experience with laws like Minnesota's. Amici States have allowed transgender female students to participate in girls' sports for decades without depriving cisgender female students of the benefits of participating in athletic activities. Rather, in Amici States' experience, safe and supportive school policies, like those of Minnesota and the MSHSL, net a more positive experience for *all* student-athletes, regardless of their gender identity. The Court should deny Appellant's request for an emergency injunction pending appeal.

## II. IDENTITY AND INTEREST OF AMICI

The States of Washington, California, Connecticut, Hawai'i, Illinois, Maine, Maryland, Massachusetts, Nevada, New York, Oregon, Rhode Island, and Vermont ("Amici States" or "States") respectfully submit this brief in support of Appellees' Opposition to FAU's Motion for Preliminary Injunction Pending Appeal. The Amici States have an interest in sharing with the Court their experience successfully supporting the right of all students to participate in sports consistent with their gender identity, including transgender female student-athletes' participation in girls' and women's sports. In the Amici States' experience, gender-inclusive sports

policies, such as Minnesota's laws and MSHSL's bylaws, promote inclusive school and athletic environments that benefit all students. These policies do not compromise fairness or reduce opportunities for cisgender students.

The Amici States strongly support the right of transgender people to live with dignity, be free from discrimination, and have equal access to publicly funded educational opportunities, including student athletic programs. Discrimination and exclusion on the basis of one's transgender status cause tangible educational, emotional, economic, and health harms to vulnerable youth. To prevent these injuries, many of the Amici States have adopted laws and policies aimed at combatting discrimination against transgender people and facilitating inclusive environments. The States submit this brief to describe their experiences with administering such policies—including policies permitting transgender students to participate in sex-separated athletic programs on an equal basis with other students.

The Amici States also share a strong interest in seeing that Title IX is properly applied to protect transgender people from discrimination. Appellant FAU distorts the purpose of the statute and attempts to use it as a tool of exclusion on the basis of sex; ironically, the very harm that Title IX was created to remedy. In the district court, FAU failed to show a likelihood of success on the merits given the incongruence between its unsupported claims and what Title IX and its implementing regulations require. And nothing about that is altered by the

Department of Education's finding that Minnesota's laws and the MSHSL's bylaws violate Title IX—issued 11 days after the district court's denial of FAU's motion for a preliminary injunction, and without any investigation—because the finding is similarly divorced from the statute, the applicable regulations, and the Department's own interpretive guidance.

## III.  ARGUMENT

### A.  The States Share a Long History of Protecting Transgender and Gender Expansive Youth from Discrimination Without Reducing Opportunities for Others

The Amici States have adopted laws to combat discrimination against transgender and gender-expansive youth in their schools, including in interscholastic activities like sports. The States have significant, long-term experience administering these laws, which include statutes and policies permitting all students to participate on the sports team that aligns with their gender identity in sex-separated athletic programs. These laws were not created in a vacuum. Rather, they were adopted in direct response to the persistent discrimination experienced by transgender and gender-expansive youth that causes them serious harm.

1. **Transgender and gender expansive youth continue to face discrimination that harms their physical and mental health, and negatively impacts their academic performance**

Transgender and gender expansive-youth experience levels of discrimination, violence, and harassment that far exceed those experienced by their cisgender peers.[2] In fact, the 2015 and 2022 U.S. Transgender Surveys (USTS), the largest surveys of transgender people to date, found:

- Over three quarters (80%) of respondents who were known or perceived as transgender in grades K-12 reported negative experiences or discrimination at school;[3]

- More than half of transgender students (54%) reported verbal harassment;

---

[2] Joseph G. Kosciw et al., GLSEN, *The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools*, xxvii, 84 (2022), https://www.glsen.org/sites/default/files/2022-10/NSCS-2021-Full-Report.pdf; *see also Improving School Climate for Transgender and Nonbinary Youth: Research Brief*, 1 (2021), https://www.glsen.org/sites/default/files/2021-11/GLSEN_Trans%26Nonbinary_ResearchBrief.pdf; Emily A. Greytak et al., GLSEN, *Harsh Realities: The Experiences of Transgender Youth in Our Nation's Schools*, xi (2009), https://www.glsen.org/sites/default/files/2020-04/Harsh%20Realities.pdf; Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students — 19 States and Large Urban School Districts, 2017*, 68 Morbidity & Mortality Wkly. Rep. 67, 67–70 (2019).

[3] Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *Early Insights: A Report of the 2022 U.S. Transgender Survey*, 22 (2024), https://transequality.org/sites/default/files/2024-02/2022%20USTS%20Early%20Insights%20Report_FINAL.pdf.

- Almost a quarter (24%) reported suffering a physical attack; and

- Approximately one in eight (13%) reported being sexually assaulted.[4]

In a 2022 survey of LGBTQ teenagers, nearly two in three (62.6%) transgender and gender-expansive youth respondents reported being "teased, bullied, or treated badly" at school in the prior year, and more than half (55.6%) of such youth reported being victimized specifically due to their sexual identity, gender identity, or gender expression.[5] In the same survey, nearly six in ten (56.9%) LGBTQ+ youth respondents reported being verbally or physically harassed at least once in the past thirty days.[6] In another 2022 survey, nearly two in three (64%) transgender and nonbinary youth respondents similarly reported being discriminated against because of their gender identity.[7] Students subject to such discrimination, violence, and harassment have reported feeling less connected to their schools, and less of a sense of belonging, than other students.[8] Transgender youth of color, in

---

[4] Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *The Report of the 2015 U.S. Transgender Survey*, 131–35 (2016), https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf.

[5] Shoshana K. Goldberg, et al., Human Rts. Campaign Found., *2023 LGBTQ+ Youth Report* (Aug. 2023), https://reports.hrc.org/2023-lgbtq-youth-report.

[6] *Id.*

[7] The Trevor Project, *2023 U.S. National Survey on the Mental Health of LGBTQ Young People*, 16 (2023), https://www.thetrevorproject.org/survey-2023/assets/static/05_TREVOR05_2023survey.pdf.

[8] Kosciw et al., *supra* note 2, at 88.

particular, face unique difficulties as a result of their intersecting marginalized identities.[9]

Discrimination against transgender youth—including denying them the opportunity to participate in extracurricular activities consistent with their gender identity—can have serious health consequences. Research has demonstrated that discrimination against LGBTQ people, such as discriminatory policies and the denial of opportunities, "increases the risks of poor mental and physical health" outcomes.[10] For example, LGBTQ students who experienced discriminatory policies or practices in school were found to have lower self-esteem and higher levels of depression than students who had not encountered such discrimination.[11] Respondents to the 2015 USTS who reported negative experiences in grades K-12 were more likely than other respondents to be under serious psychological distress, to have experienced homelessness, and to have attempted suicide.[12] Transgender

---

[9] Nhan L. Truong et al., GLSEN, *Erasure and Resilience: The Experiences of LGBTQ Students of Color*, 3 (2020), https://www.glsen.org/sites/default/files/2020-06/Erasure-and-Resilience-Black-2020.pdf.

[10] What We Know Project, Cornell Univ., *What Does the Scholarly Research Say About the Effects of Discrimination on the Health of LGBT People?* (2019), https://whatweknow.inequality.cornell.edu/topics/lgbt-equality/what-does-scholarly-research-say-about-the-effects-of-discrimination-on-the-health-of-lgbt-people/.

[11] Kosciw et al., *supra* note 2, at 43; *see also* April J. Ancheta et al., *The Impact of Positive School Climate on Suicidality and Mental Health Among LGBTQ Adolescents: A Systematic Review*, 37 J. Sch. Nursing 75, 76 (2020).

[12] James et al., *supra* note 4, at 132.

people attempt suicide at a rate nearly nine times that of the general population, and half of transgender and nonbinary youth in a 2022 mental health survey reported having seriously considered attempting suicide in the past twelve months.[13] On the other hand, positive school environments where students are protected and encouraged to express their authentic selves, have been linked to lower suicidality in LGBTQ youth.[14]

In addition to harmful health impacts, discrimination in school settings also negatively affects educational outcomes. A 2021 survey showed that LGBTQ students who had experienced discriminatory policies and practices had lower levels of educational achievement, lower grade point averages, and lower levels of educational aspiration than other students.[15] Discriminatory school climates have also been found to exacerbate absenteeism. In the month before a 2021 survey, LGBTQ students who had experienced discrimination in their schools were almost

---

[13] *See id.* at 114; The Trevor Project, *supra* note 7, at 5.

[14] Ancheta et al., *supra* note 11, at 80; *see also* Cady Stanton, *As 'Don't Say Gay' and similar bills take hold, LGBTQ youths feel they're 'getting crushed'*, USA Today (updated May 11, 2022), https://www.usatoday.com/story/ news/education/2022/05/09/dont-say-gay-lgbtq-youth-reaction/7398468001/ (noting that LGBTQ youths in affirming schools were nearly 40% less likely to attempt suicide than LGBTQ youths in nonaffirming schools).

[15] Kosciw et al., *supra* note 2, at 36–37; *see also* Greytak et al., *supra* note 2, at 25, 27 fig. 15 (showing that more-frequently harassed transgender students had significantly lower grade point averages than other transgender students).

three times as likely (43.3% versus 16.4%) to have missed school because they felt unsafe or uncomfortable.[16]

## 2. Amici States' protections for transgender youth yield broad benefits for all

Amici States' laws allowing transgender students to access facilities and interscholastic activities consistent with their gender identity create school climates that enhance all students' well-being and facilitate their ability to learn.[17] For example, transgender students permitted to live consistently with their gender identity have mental health outcomes comparable to their cisgender peers.[18] These benefits redound to society as a whole because education advances not only the private interests of students, but also prepares them to contribute to society—socially, culturally, and economically. *See, e.g.*, *Brown v. Board of Educ.*, 347 U.S. 483, 493 (1954).

---

[16] Kosciw et al., *supra* note 2, at 36.

[17] *See, e.g.*, Br. of Amici Curiae Sch. Adm'rs from Thirty-One States & D.C. in Supp. of Resp't (Br. of Amici Curiae Sch. Adm'rs), 2017 WL 930055, at *3–4, *Gloucester Cnty. Sch. Bd. v. G.G. ex rel. Grimm*, 580 U.S. 1168 (2017); Office of Elementary & Secondary Educ., U.S. Dep't of Educ., *Safe & Supportive Schools* (May 30, 2023), https://www.ed.gov/about/ed-offices/oese/safe-supportive-schools.

[18] *See* Kristina R. Olson et al., *Mental Health of Transgender Children Who Are Supported in Their Identities*, 137 Pediatrics e20153223, at 5–7 (Mar. 2016); Br. of Amici Curiae Sch. Adm'rs, 2017 WL 930055, at *4, *Gloucester Cnty. Sch. Bd.*, 580 U.S. 1168.

Athletic participation in particular is linked to academic achievement and improved academic performance.[19] Students who participate in interscholastic sports "have higher grades, spend more time on homework, have higher educational aspirations, and are more likely to attend college than are their counterparts."[20] Athletic participation has also been linked to "more successful outcomes in adulthood, such as employment."[21]

The many health benefits of sports participation are well-established. Regular physical activity "decreases the risk of developing diabetes, hypertension, cancer, and obesity, as well as cardiovascular and bone and joint diseases."[22] For youth, "[p]articipation in physical activity during childhood and adolescence has a positive impact on physical health throughout the life span."[23] Mental health benefits also

---

[19] Ryan D. Burns et al., *Sports Participation Correlates With Academic Achievement: Results From a Large Adolescent Sample Within the 2017 U.S. National Youth Risk Behavior Survey*, 127 Perceptual & Motor Skills 448, 459 (2020); Alison R. Snyder et al., *Health-Related Quality of Life Differs Between Adolescent Athletes and Adolescent Nonathletes*, 19 J. Sport Rehab. 237, 238 (2010); Kelly P. Troutman & Mikaela J. Dufur, *From High School Jocks to College Grads: Assessing the Long-Term Effects of High School Sport Participation on Females' Educational Attainment*, 38 Youth & Soc'y 443, 444 (2007).

[20] Troutman & Dufur, *supra* note 19, at 444.

[21] Scott B. Greenspan et al., *LGBTQ+ Youth's Experiences and Engagement in Physical Activity: A Comprehensive Content Analysis*, 4 Adolescent Rsch. Rev. 169, 170 (2019).

[22] Snyder et al., *supra* note 19, at 237–38; *see also* Greenspan et al., *supra* note 21, at 170; Troutman & Dufur, *supra* note 19, at 444.

[23] Ellis Barrera et al., *The Medical Implications of Banning Transgender Youth from Sport Participation*, 176 JAMA Pediatrics 223, 223 (2022); *see also* Landon D. Hughes et al., *Pediatric Provider Perspectives on Laws and Policies*

result from sports participation,[24] including "improved emotion regulation, decreased hopelessness and suicidality, fewer depressive symptoms, and higher self-esteem."[25] For LGBTQ students in particular, sports participation has been linked to higher levels of self-esteem and lower levels of depression.[26]

To that end, several of the Amici States have enacted laws or issued guidance to ensure all students have the right to participate consistent with their gender identity in school activities and sports programs.[27] For example, for nearly two

---

*Impacting Sports Participation for Transgender Youth*, 9 LGBT Health 247, 251 (2022).

[24] Richard Bailey, *Physical Education and Sport in Schools: A Review of Benefits and Outcomes*, 76 J. Sch. Health 397, 398 (2006); Snyder et al., *supra* note 19, at 238, 244.

[25] Caitlin M. Clark & Joseph G. Kosciw, *Engaged or Excluded: LGBTQ Youth's Participation in School Sports and Their Relationship to Psychological Well-Being*, 59 Psych. Schs. 95, 96 (2022) (citations omitted); *see also* Jennifer R. Pharr et al., *Serial Mediation Analysis of the Association of Familiarity with Transgender Sports Bans and Suicidality Among Sexual and Gender Minority Adults in the United States*, 19 Int'l J. Env't Rsch. & Pub. Health 10461, at 11–12 (Aug. 2022).

[26] Caitlin M. Clark et al., GLSEN, *LGBTQ Students and School Sports Participation: Research Brief*, 8 (2021), https://www.glsen.org/sites/default/files/2022-02/LGBTQ-Students-and-School-Sports-Participation-Research-Brief.pdf.

[27] **Connecticut**: Conn. Gen. Stat. § 10-15c (prohibiting discrimination on basis of gender identity in student access to public school activities and programs). **Nevada**: Nev. Constitution, Art. 1, § 24 (broadly ensuring equal rights for all, "regardless of race, color, creed, sex, sexual orientation, gender identity or expression, age, disability, ancestry, or national origin"). **Washington**: Wash. Rev. Code Ann. § 28A.642.010 (prohibiting discrimination based on gender identity in public schools); Washington Off. of Superintendent of Pub. Instruction, *Gender-Inclusive Schools*, https://ospi.k12.wa.us/policy-funding/equity-and-civil-rights/resources-school-districts-civil-rights-washington-schools/gender-inclusive-schools (last visited July 29, 2025) (transgender students in K-12 schools must be

decades, the state of Washington has prohibited discrimination against transgender and gender expansive students in its public schools, including in interscholastic activities such as sports. *See* Wash. Rev. Code § 49.60.030, .040, .500; Wash. Admin. Code 162-28-030; 2006 Wash. Sess. Laws, ch. 4, § 4; *see also* Wash. Const. Art. IX, § 1 (enshrining the constitutional right to an education "without distinction or preference on account of race, color, caste, or sex"). Similarly, California and Massachusetts have long mandated that transgender students in K-12 schools be permitted to participate in school programs and activities—including sports—consistent with their gender identity. *See* Cal. Educ. Code § 221.5(f) (2013); Mass. Gen. Laws ch. 76, § 5 (2011); 603 Mass. Code Regs. 26.06(5). Likewise, New York law expressly prohibits discrimination and harassment of students "on school property or at a school function" on the basis of gender identity in K-12 schools, N.Y. Educ. Law §§ 11(6), 12(1), and the New York State Education Department has made clear that transgender students in K-12 schools should be allowed to access school facilities and participate in activities, consistent with their gender identity.[28]

---

permitted to participate in "physical education and athletics" consistent with their gender identity).

[28] New York State Educ. Dep't, *Creating a Safe, Supportive, and Affirming School Environment for Transgender and Gender Expansive Students: 2023 Legal Update and Best Practices* 21–26 (June 2023), https://nysed.gov/sites/default/files/programs/student-support-services/creating-a-safe-supportive-and-affirming-school-environment-for-transgender-and-gender-expansive-students.pdf.

Interscholastic sports organizations and local school districts in the Amici States have adopted policies and bylaws that ensure transgender students have equal access to sports participation.[29]

As the Amici States' experiences show, allowing transgender girl students to participate on girls' sports teams does not deprive cisgender girl students of the benefits of participating in athletic activities. For example, since 2007, the Washington Interscholastic Activities Association, a voluntary organization that administers interscholastic athletics in the State, has allowed students to participate

---

[29] *See, e.g.*, **California**: California Interscholastic Fed'n, *Constitution, Bylaws, Sport Governing Rules 2025-2026*, 65 (2025), https://www.cifcs.org/information/2025-2026_Orange_Book_PRINT.pdf (transgender students must be afforded opportunity to participate in sports in manner consistent with their gender identity). **Maryland**: Maryland Pub. Secondary Schs. Athletic Ass'n, *MPSSAA Guidance for Participation of Transgender Youth in Interscholastic Athletics*, 1–2 (Aug. 2016), https://mpia.hcpss.org/sites/default/files/2023-06/MPSSAA_Transgender_Guidance_revised_8.16%20%281%29.pdf (same, for interscholastic sports); **Massachusetts**: Massachusetts Interscholastic Athletic Ass'n, *MIAA Handbook July 1, 2023-June 30, 2025: Rules and Regulations Governing Athletics: A Handbook for Principals and Athletic Directors*, 30–31 (2023), https://www.miaa.net/sites/default/files/2024-04/miaa-handbook-23-25.pdf (same). **New York**: New York State Pub. High Sch. Athletic Ass'n, *NYSPHSAA Handbook*, 52–53 (Aug. 2023), https://nysphsaa.org/documents/2023/8/21/NYSPHSAA_Handbook_005.pdf (equal participation by transgender students in all interscholastic sports activities consistent with their gender identity). **Oregon**: Oregon Sch. Activities Ass'n, *2024-2025 Oregon School Activities Association Handbook*, 81–82 (2023), https://www.osaa.org/docs/handbooks/osaahandbook.pdf (same). **Rhode Island**: Rhode Island Interscholastic League, *Rules and Regulations*, art. 33, § 1 (2023) (same). **Washington**: Washington Interscholastic Activities Ass'n, *WIAA Handbook 2024-25* at 37, 86–87 (Feb. 26, 2025), https://assets.wiaa.com/results/handbook/2024-25/handbook.pdf (same).

in the sport category that aligns with their gender identity.[30] The Los Angeles Unified School District, one of the largest school districts in the country, has implemented a transgender-inclusive sports policy for many years "without problems."[31] As a school district official in Los Angeles has reported, the district's policy has led to a positive "transformation" in the district's schools: an experience that "stands in stark contrast" to "expressed concerns that students will abuse the policy."[32] Notwithstanding this lengthy history, Amici States are not aware of evidence that transgender athletes have dominated any sport or competition or have caused scholarship opportunities to be unfairly denied to cisgender competitors. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 614 (4th Cir. 2020) (noting relevance of school districts successfully implementing inclusive policies).

This positive experience is in line with the Amici States' broader, positive experience with inclusive school policies for transgender and gender expansive students, which allow them to participate equally in education while honoring the

---

[30] Washington Interscholastic Activities Ass'n, *supra* note 29*,* at 37; Jayda Evans, *Ten years on, WIAA's transgender policy keeps conversation going,* The Seattle Times (Apr. 4, 2017), https://www.seattletimes.com/sports/high-school/ten-years-on-wiaas-transgender-policy-keeps-conversation-going/.

[31] *See* Patrick McGreevy, *California transgender students given access to opposite-sex programs*, L.A. Times (Aug. 12, 2013) https://www.latimes.com/politics/la-xpm-2013-aug-12-la-me-pc-gov-brown-acts-on-transgender-bill-20130812-story.html.

[32] *See* Judy Chiasson, *Success and Opportunity for Transgender Students*, HuffPost (updated Feb. 2, 2016), https://www.huffpost.com/entry/success-and-opportunity-for-transgender-students_b_3744830.

rights of all students. *See, e.g.*, Wash. Rev. Code § 28A.642.080(3)(b) (directing

public school districts to adopt a "Gender-Inclusive Schools" policy and procedure

that focuses on eliminating discrimination in Washington public schools on the basis

of gender identity and expression; addressing the unique challenges and needs faced

by transgender students in public schools; and applying model policies and

procedures prohibiting harassment, intimidation, and bullying to transgender

students). Taken together, Amici States' laws, policies, and regulations create a

school environment that, like Minnesota's, is beneficial to all students.

**B.      Title IX Does Not Permit the Discriminatory Treatment Appellant Asks
          This Court to Impose Upon Minnesota's Transgender and Gender
          Expansive Youth Athletes**

Appellant FAU's sweeping request for an emergency preliminary injunction

seeks to bar Minnesota from enforcing state laws that protect the right of student-

athletes to play on teams consistent with their gender identity, and to bar the MSHSL

from abiding by the bylaws and policies it has crafted to ensure it complies with

those state laws. *See* Appellant's Emergency Mot. for an Inj. Pending Appeal Under

Fed. R. App. P. 8 (Mot. for Inj.) at 23. Appellant maintains this extraordinary relief

is necessary during the pendency of this appeal because its novel claim that

MSHSL's transgender eligibility policy violates Title IX is likely to succeed on the

merits. Not so. Appellant suggests Title IX's "precedent" and "history" cut in their

favor, yet federal case law overwhelmingly shows transgender inclusive policies fall

squarely within the bounds of Title IX. Appellant's attempt to categorically bar transgender female students from participating in any high school girls' contact sports or sports involving competitive athletic skill, in which their members may participate, is wholly inconsistent with Title IX.

Under Title IX, "[n]o person in the United States shall, *on the basis of sex*, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) (emphasis added). Title IX's implementing regulations confirm that the nondiscrimination mandate applies to school athletics as well, while expressly permitting "separate teams for members of each sex." 34 C.F.R. § 106.41(a)–(b); *see* 28 C.F.R. § 54.450(a)–(b).

In *Bostock v. Clayton County*, the Supreme Court concluded that gender identity discrimination is necessarily sex discrimination under Title VII of the Civil Rights Act of 1964. *See* 590 U.S. 644, 659–62, 666–69 (2020). As the Supreme Court explained in *Bostock*, discriminating against a person for being transgender is sex discrimination because "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Id.* at 660. For example, a female who is discriminated against because she was designated male at birth is necessarily being discriminated against based on sex— i.e., she would not be subject to discrimination if not for the fact that her designated

sex at birth was male. *Id.* In reaching its conclusion, the Supreme Court acknowledged that "transgender status" is a distinct concept from "sex," but observed that sexual harassment and discrimination based on motherhood are also distinct concepts that, unquestionably, still qualify as sex discrimination. *Id.* at 660, 668–670.

Applying much the same reasoning as in *Bostock*, courts have repeatedly and correctly recognized that Title IX's bar against sex discrimination encompasses discrimination against transgender students. *See, e.g., Hecox v. Little*, 104 F.4th 1061, 1077 (9th Cir. 2024), *as amended* (June 14, 2024), *cert. granted,* No. 24-38, 2025 WL 1829165 (U.S. July 3, 2025) ("[i]n addition to having a discriminatory purpose and effect," Idaho law barring transgender girls from female sports was "facially discriminatory against transgender female athletes"); *B.P.J. by Jackson v. West Virginia Board of Education*, 98 F.4th 542, 551 (4th Cir. 2024), *cert. denied sub nom. West Virginia Secondary Sch. Activities Comm'n v. B.P.J. Next Friend Jackson*, 145 S. Ct. 568 (2024, and *cert. granted sub nom. West Virginia v. B.P.J.*, No. 24-43, 2025 WL 1829164 (U.S. July 3, 2025) (state statute preventing transgender student-athletes from playing on the sports team that aligns with their gender identity violated Title IX because it excluded transgender girls from participation in school sports on the basis of sex, denied transgender girls the benefit of sports, and subjected transgender girls to discrimination in connection with school sports);

*Doe v. Horne*, 115 F.4th 1083, 1109 (9th Cir. 2024) (holding Arizona statute prohibiting transgender girls from participating in girls' sports failed to "ensur[e] competitive fairness and equal athletic opportunity for [cisgender] female student-athletes"); *A.C. ex rel. M.C. v. Metropolitan Sch. Dist.*, 75 F.4th 760, 767–68 (7th Cir. 2023) (transgender boys likely to prevail on their claims that school districts' policies of prohibiting them from using the boys restroom violated Title IX by treating them less favorably than cisgender boys); *Grimm*, 972 F.3d at 616 (holding school bathroom policies that prohibit transgender students from using the restroom aligning with their gender identity violated Title IX); *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1046–51 (7th Cir. 2017) (holding that transgender boy was likely to prevail on his claim that school district policy forbidding him from using the boys restroom violated Title IX because policy punished him for his gender non-conformance); *Dodds v. United States Dep't of Educ.*, 845 F.3d 217, 221–22 (6th Cir. 2016) (denying application to stay preliminary injunction ordering school district to allow 11-year-old transgender girl to use the girls restroom, in accordance with Title IX); *Parents for Privacy v. Barr*, 949 F. 3d 1210, 1228–29 (9th Cir. 2020) (holding transgender students' use of sex-segregated restrooms and locker rooms that align with their gender does not violate Title IX rights of cisgender students); *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F. 3d 518, 534–35 (3d Cir. 2018) (same).

Appellant FAU's argument that MSHSL's policy violates Title IX would therefore contradict established federal precedent. A categorical ban on transgender inclusion in sports serves only to stigmatize and exclude transgender students and furthers no legitimate governmental interests in promoting equity in sports. *See Doe v. Horne*, 683 F. Supp. 3d 950, 973 (D. Ariz. July 20, 2023). Moreover, the unequal treatment of transgender *females* alone is itself evidence of discrimination on the basis of sex. *See id.* at 974.

Appellant FAU asks this Court to require Minnesota to adopt its negative views of transgender female athletes, discriminate against them based on their sex assigned at birth, and categorically prohibit them from participating in nearly all high school girls' sports regardless of whether they have any competitive advantage or the level of competition at which they seek to participate. Appellant wants Minnesota to force transgender girls either to forego participation on single-sex sports teams or to participate on teams inconsistent with their gender identity. That sex-based discrimination contravenes a core aspect of transgender people's identities, subjecting them to potential harassment, and violates medical treatment protocols.

The experiences of the Amici States with inclusive and equitable school athletics policies show that such policies do not compromise fairness or reduce opportunities for cisgender athletes and confirm that there is no evidence that any concrete harm will result from permitting transgender students to participate in

female athletics. Interscholastic sports organizations and local school districts in the Amici States have adopted policies to ensure that transgender students will have equal access to sports participation—and, as discussed above, these policies have not resulted in fewer opportunities for cisgender students. *See* supra at 8–11.

Granting FAU's motion would needlessly deny transgender student-athletes something that their cisgender female classmates take for granted: the ability to participate on an athletic team at school with their friends consistent with their lived identity. Appellant's proposed remedy singles out transgender girls based on their sex assigned at birth, denying them participation opportunities available to every other student and subjecting them to severe risks of harassment. Minnesota officials should not be court-ordered to perpetuate such discrimination against its own youth.

## IV.   CONCLUSION

This Court should deny Appellant's Emergency Motion for an Injunction Pending Appeal.

DATED this 30th day of October, 2025.

Respectfully submitted,

NICHOLAS W. BROWN
*Attorney General of Washington*

*/s/ Benjamin Seel*
EMILY C. NELSON, WSBA 48440
BENJAMIN SEEL, WSBA 61165
Assistant Attorneys General
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744
emily.nelson@atg.wa.gov
benjamin.seel@atg.wa.gov

ROB BONTA
*Attorney General*
*State of California*
1300 I Street
Sacramento, CA 95814

ANNE E. LOPEZ
*Attorney General*
*State of Hawai'i*
425 Queen Street
Honolulu, HI 96813

AARON M. FREY
*Attorney General of Maine*
6 State House Station
Augusta, ME 04333-0006

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, NY 10005

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

CHARITY R. CLARK
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, VT 05609

WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KWAME RAOUL
*Attorney General*
*State of Illinois*
115 South LaSalle Street
Chicago, IL 60603

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

AARON D. FORD
*Attorney General*
*State of Nevada*
100 North Carson Street
Carson City, NV 89701

DAN RAYFIELD
*Attorney General*
*State of Oregon*
1162 Court Street N.E.
Salem, OR 97301

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5), because it contains 3,343 words, less than half of the length allowed for principal briefs. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared in Microsoft Word using New Times Roman 14-point font, a proportionally spaced typeface.

DATED this 30th day of October 2025.

*/s/ Benjamin Seel*
BENJAMIN SEEL

**CERTIFICATE OF SERVICE**

I hereby certify that on October 30, 2025, I electronically filed the foregoing documents with the Clerk of the Court by using the Appellate Case Management System. I further certify that the participants in the case are ACMS users, and that service will be accomplished by using the ACMS system.

DATED this 30th day of October 2025.

*/s/ Benjamin Seel*
BENJAMIN SEEL