# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

FEMALE ATHLETES UNITED,
*Plaintiff-Appellant*,

v.

KEITH ELLISON, in his official capacity as Attorney General of Minnesota; REBECCA LUCERO, in her official capacity as Commissioner of the Minnesota Commission on Civil Rights; ERICH MARTENS, in his official capacity as Executive Director of the Minnesota State High School League; WILLIE JETT, in his official capacity as the Minnesota Commissioner of Education; INDEPENDENT SCHOOL DISTRICT NO. 11 SCHOOL BOARD; INDEPENDENT SCHOOL DISTRICT NO. 192 SCHOOL BOARD; AND INDEPENDENT SCHOOL DISTRICT NO. 279 SCHOOL BOARD,
*Defendants-Appellees*.

On Appeal from the United States District Court
for the District of Minnesota
Case No. 0:25-cv-02151-ECT-DLM

## OPENING BRIEF OF APPELLANT

<table>
<tr><td>

John J. Bursch
Suzanne E. Beecher
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
jbursch@adflegal.org
sbeecher@adflegal.org

Jonathan A. Scruggs
Henry W. Frampton, IV
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@adflegal.org
hframpton@adflegal.org

</td><td>

Rory T. Gray
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville GA 30043
(770) 339-0774
rgray@adflegal.org

Renee K. Carlson
Douglas G. Wardlow
TRUE NORTH LEGAL
525 Park Street, Suite 460
St. Paul, MN 55103
(612) 789-8811
rcarlson@truenorthlegalmn.org
dwardlow@truenorthlegal.org

</td></tr>
</table>

*Counsel for Plaintiff-Appellant*

## SUMMARY OF CASE AND REQUEST FOR ORAL ARGUMENT

Title IX requires funding recipients to provide equal athletic opportunity for males and females. To meet that requirement, Minnesota created sex-designated teams, such as baseball for males and softball for females. For decades, that sex-based distinction held. But about 10 years ago, Minnesota began allocating athletic opportunities based on gender identity instead. This change had no impact on males because of their physiological advantage. Yet it was devastating for females, forcing them into unfair and unsafe competition.

Female Athletes United (FAU) has Minnesota members who are accomplished varsity athletes on highly ranked all-female softball teams. But last season, they lost repeatedly to a mixed-sex team with a male player who regularly pitched shut-out games. FAU sued under Title IX and requested a preliminary injunction. The district court denied that request, holding that female athletes can't sue to vindicate their Title IX rights, and that Minnesota didn't violate Title IX by effectively eliminating all-female sports like softball—even though baseball remains effectively all male. This appeal followed.

Due to the novel and complex nature of the issues involved, oral argument would materially assist the Court in resolving this appeal. And given the number of separately represented parties, FAU respectfully requests that the Court allot 30 minutes for argument.

# DISCLOSURE STATEMENT

Plaintiff-Appellant Female Athletes United is a nonprofit corporation organized under Texas law with no parent companies and no stock.

Appellate Case: 25-2899     Page: 3     Date Filed: 11/18/2025 Entry ID: 5579646

# TABLE OF CONTENTS

Summary of Case and Request for Oral Argument..................................i

Disclosure Statement ...............................................................ii

Table of Authorities................................................................v

Jurisdictional Statement............................................................1

Statement of the Issues.............................................................1

Introduction........................................................................2

Statement of the Case...............................................................2

I.      Female Athletes United ....................................................2

II.     The League's bylaws .......................................................3

III.    Background on Title IX ....................................................5

    A.      The statute ......................................................5

    B.      The athletic regulations .........................................5

    C.      Contemporary agency guidance......................................7

IV.     Males' competitive advantage over females ................................9

V.      The bylaws' harm to FAU's members.........................................13

    A.      FAU Athlete 1 ....................................................14

    B.      FAU Athlete 2 ....................................................16

    C.      FAU Athlete 3 ....................................................19

    D.      FAU Athlete 4 ....................................................21

VI.     Procedural history........................................................23

VII.    The federal government finds a Title IX violation ........................26

Summary of the Argument ..................................................... 27

Argument ............................................................................ 28

I.    Standard of review ..................................................... 28

II.   The preliminary-injunction standard ........................... 29

III.  FAU has standing. ...................................................... 31

IV.   FAU has a fair chance, and is likely to prevail, on the merits
      of its Title IX claims. ................................................ 32

      A.    Private parties like FAU may sue based on Title IX and
            the athletic regulations, which sound in disparate
            treatment, not disparate impact. ........................... 33

      B.    The League's bylaws violate Title IX. ..................... 36

            1.    Title IX's definition of "sex" is the biological
                  binary of male or female ............................... 36

            2.    *Bostock* doesn't apply to Title IX. ................ 40

            3.    The bylaws violate the statute's text. ............. 41

            4.    The bylaws violate the athletic regulations. ..... 43

            5.    The bylaws violate contemporary agency
                  guidance regarding the athletic regulations. ..... 45

      C.    Clear notice isn't a barrier. ................................. 47

V.    FAU members face irreparable harm. ........................... 49

VI.   The public interest and balance of harms favor FAU. ...... 50

Conclusion ......................................................................... 52

Certificate of Compliance .................................................... 54

Certificate of Service ......................................................... 55

iv

# TABLE OF AUTHORITIES

## Cases

*A.J.T. ex rel. A.T. v. Osseo Area Schools, Independent School District No. 279*,
605 U.S. 335 (2025) ....................................................................... 46

*Adams ex rel. Kasper v. School Board of St. Johns County*,
57 F.4th 791 (11th Cir. 2022) ................................................. passim

*Alabama v. United States Secretary of Education*,
2024 WL 3981994 (11th Cir. Aug. 22, 2024) .......................... 49, 51

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ........................................................... 12, 44–45

*Anders v. California State University*,
2021 WL 1564448 (E.D. Cal. Apr. 21, 2021) ................................. 45

*Arkansas v. United States Department of Education*,
742 F. Supp. 3d 919 (E.D. Mo. 2024) ................................. 48, 50–52

*Barrett v. West Chester University of Pennsylvania*,
2003 WL 22803477 (E.D. Pa. Nov. 12, 2003) ............................... 45

*Becker v. North Dakota University System*,
112 F.4th 592 (8th Cir. 2024) ..................................................... 42

*Berndsen v. North Dakota University System*,
7 F.4th 782 (8th Cir. 2021) ........................................ 12, 44, 56–57

*Biediger v. Quinnipiac University*,
691 F.3d 85 (2d Cir. 2012) ..................................................... 45–46

*Bostock v. Clayton County*,
590 U.S. 644 (2020) ..................................................................... 51

*Brenden v. Independent School District 742*,
477 F.2d 1292 (8th Cir. 1973) ...................................................... 14

Appellate Case: 25-2899     Page: 6     Date Filed: 11/18/2025 Entry ID: 5579646

*Cannon v. University of Chicago,*
    441 U.S. 677 (1979) ...................................................... 12, 45

*Cape v. Tennessee Secondary School Athletic Association,*
    563 F.2d 793 (6th Cir. 1977) ............................................ 21

*CEZ Prior, LLC v. 755 N Prior Ave. LLC,*
    126 F.4th 1353 (8th Cir. 2025) ....................................... 40

*Chalenor v. University of North Dakota,*
    291 F.3d 1042 (8th Cir. 2002) ......................................... 44

*Clark ex rel. Clark v. Arizona Interscholastic Association,*
    695 F.2d 1126 (9th Cir. 1982) ......................................... 22

*Cohen v. Brown University,*
    101 F.3d 155 (1st Cir. 1996) ........................... 20, 22, 49, 51

*Cohen v. Brown University,*
    809 F. Supp. 978 (D.R.I. 1992) ....................................... 61

*Cohen v. Brown University,*
    991 F.2d 888 (1st Cir. 1993) ........................................... 16

*D.M. ex rel. Bao Xiong v. Minnesota State High School League,*
    917 F.3d 994 (8th Cir. 2019) ..................................... 12, 41

*D.N. ex rel. Jessica N. v. DeSantis,*
    701 F. Supp. 3d 1244 (S.D. Fla. 2023) ........................... 51

*Department of Education v. Louisiana,*
    603 U.S. 866 (2024) ........................................................ 49

*Diamond Alternative Energy, LLC v. EPA,*
    606 U.S. 100 (2025) ........................................................ 42

*EEOC v. Dial Corp.,*
    469 F.3d 735 (8th Cir. 2006) ........................................... 45

*Eggers v. Evnen,*
    48 F.4th 561 (8th Cir. 2022) ........................................... 61

Appellate Case: 25-2899    Page: 7    Date Filed: 11/18/2025 Entry ID: 5579646

*Equity in Athletics, Inc. v. Department of Education,*
    639 F.3d 91 (4th Cir. 2011) ........................................................... 45

*Frontiero v. Richardson,*
    411 U.S. 677 (1973) .................................................................... 50

*Gebser v. Lago Vista Independent School District,*
    524 U.S. 274 (1998) .................................................................... 41

*Grand River Enterprises Six Nations, Ltd v. Beebe,*
    467 F.3d 698 (8th Cir. 2006) ......................................................... 39

*Grandson v. University of Minnesota,*
    272 F.3d 568 (8th Cir. 2001) ......................................................... 59

*Grove City College v. Bell,*
    465 U.S. 555 (1984) .................................................................... 17

*Hillsborough County v. Automated Medical Laboratories, Inc.,*
    471 U.S. 707 (1985) .................................................................... 41

*Horner v. Kentucky High School Athletic Association,*
    43 F.3d 265 (6th Cir. 1994) .......................................................... 46

*In re Admonition Issued in Panel File No. 99-42,*
    621 N.W. 2d 240 (Minn. 2001) ...................................................... 41

*Iowa Migrant Movement for Justice v. Bird,*
    2025 WL 2984379 (8th Cir. Oct. 23, 2025) ...................................... 43

*Jackson v. Birmingham Board of Education,*
    544 U.S. 167 (2005) ................................................................. 58–59

*Kansas v. United States Department of Education,*
    739 F. Supp. 3d 902 (D. Kan. 2024) .................................... 48, 50, 52

*Loper Bright Enterprises v. Raimondo,*
    603 U.S. 369 (2024) .................................................................... 17

*Louisiana v. United States Department of Education,*
    737 F. Supp. 3d 377 (W.D. La. 2024) .................................. 49, 50, 52

Appellate Case: 25-2899    Page: 8    Date Filed: 11/18/2025 Entry ID: 5579646

*Mayerova v. Eastern Michigan University,*
  346 F. Supp. 3d 983 (E.D. Mich. Sept. 27, 2018) .......................... 45

*McCormick ex rel. McCormick v. School District of Mamaroneck,*
  370 F.3d 275 (2d Cir. 2004) ................................................ 44, 49, 61

*Medina v. Planned Parenthood South Atlantic,*
  606 U.S. 357 (2025) ........................................................ 47

*Murthy v. Missouri,*
  603 U.S. 43 (2024) ........................................................ 43

*Neal v. Board of Trustees of California State Universities,*
  198 F.3d 763 (9th Cir. 1999) ........................................... 46

*Neese v. Becerra,*
  2022 WL 1265925 (N.D. Tex. Apr. 26, 2022) ............................... 50

*New Prime Inc. v. Oliveira,*
  586 U.S. 105 (2019) ....................................................... 50

*North Haven Board of Education v. Bell,*
  456 U.S. 512 (1982) ....................................................... 17

*O'Connor v. Board of Education of School District 23,*
  449 U.S. 1301 (1980) ...................................................... 21

*Parker v. Franklin County Community School Corp.,*
  667 F.3d 910 (7th Cir. 2012) ........................................... 45

*Pederson v. Louisiana State University,*
  213 F.3d 858 (5th Cir. 2000) ........................................... 42, 59

*Petrie v. Illinois High School Association,*
  394 N.E.2d 855 (Ill. App. Ct. 1979) .................................... 21

*Planned Parenthood of Minnesota, North Dakota, South Dakota
  v. Rounds,*
  530 F.3d 724 (8th Cir. 2008) ........................................... 41

*Portz v. St. Cloud State University,*
  16 F.4th 577 (8th Cir. 2021) ........................................... 12, 44, 59

Appellate Case: 25-2899    Page: 9    Date Filed: 11/18/2025 Entry ID: 5579646

*Portz v. St. Cloud State University,*
   196 F. Supp. 3d 963 (D. Minn. 2016) ............................................ 61

*Richland/Wilkin Joint Powers Authority v. United States Army
   Corps of Engineers,*
   826 F.3d 1030 (8th Cir. 2016) ................................................. 40, 62

*Soule v. Connecticut Association of Schools, Inc.,*
   90 F.4th 34 (2d Cir. 2023) ........................................................ 51

*St. Louis Effort for AIDS v. Huff,*
   782 F.3d 1016 (8th Cir. 2015) .................................................... 39

*Tennessee v. Cardona,*
   2024 WL 3453880 (6th Cir. July 17, 2024) ................................. 51

*Tennessee v. Cardona,*
   737 F. Supp. 3d 510 (E.D. Ky. 2024) .......................................... 62

*Tennessee v. Cardona,*
   762 F. Supp. 3d 615 (E.D. Ky. 2025) .......................................... 49

*Tennessee v. Department of Education,*
   104 F.4th 577 (6th Cir. 2024) .................................................... 61

*Texas v. Cardona,*
   743 F. Supp. 3d 824 (N.D. Tex. 2024) ................................... 50, 52

*Texas v. United States,*
   740 F. Supp. 3d 537 (N.D. Tex. 2024) ........................................ 52

*Trump v. Boyle,*
   145 S. Ct. 2653 (2025) .............................................................. 49

*United States v. Eagleboy,*
   200 F.3d 1137 (8th Cir. 1999) .................................................... 37

*United States v. Love,*
   20 F.4th 407 (8th Cir. 2021) ...................................................... 37

*United States v. Skrmetti,*
   605 U.S. 495 (2025) .................................................................. 51

Appellate Case: 25-2899    Page: 10    Date Filed: 11/18/2025 Entry ID: 5579646

*Williams v. School District of Bethlehem,*
    998 F.2d 168 (3d Cir. 1993)......................................................46, 49

**<u>Statutes</u>**

20 U.S.C. § 1681 ............................................................... passim

20 U.S.C. § 1687 ....................................................................16

28 U.S.C. § 1292 ....................................................................12

28 U.S.C. § 1331 ....................................................................12

28 U.S.C. § 1343 ....................................................................12

28 U.S.C. § 2107 ....................................................................12

42 U.S.C. § 1983 ....................................................................12

Educ. Amends. of 1974, Pub. L. No. 93-380, § 844, 88 Stat. 484
    (1974) ....................................................................16, 52

Minn. Stat. § 121A.04........................................................14–15

Minn. Stat. § 128C.01............................................................14

Minn. Stat. § 363A.03........................................................41, 48

Minn. Stat. § 8.07 ..................................................................41

**<u>Other Authorities</u>**

*A Policy Interpretation: Title IX and Intercollegiate Athletics*,
    U.S. Dep't of Educ. (Dec. 11, 1979) ...................................... passim

*Diagnostic & Statistical Manual of Mental Disorders Fifth Edition*
    *Text Revision* (2022) ....................................................48

Doriane Lambelet Coleman, et al., *Re-affirming the Value of the*
    *Sports Exception to Title IX's General Non-Discrimination*
    *Rule*, 27 DUKE J. GENDER L. & POL'Y 69 (2020) ..........................24

*Girls Softball Rules, Policies, and Bylaws (2024-2025)*, MSHSL ..........53

Appellate Case: 25-2899    Page: 11    Date Filed: 11/18/2025 Entry ID: 5579646

*Letter of Findings (Notice of Violation)*, U.S. Dep'ts of Educ. & Health & Human Servs. (Sept. 30, 2025) .............................. passim

*Letter to Chief State School Officers, Title IX Obligations in Athletics*, U.S. Dep't of Educ. (Nov. 11, 1975).................... 18–19, 56

Minn.Att'y.Gen.Op.1035 (Feb. 20, 2025) ................................ 35

MSHSL, Sports Physical Form ........................................... 24

MSHSL, *2025-2026 MSHSL Official Handbook*: *Bylaws* ............... 14–15

MSHSL, *Girls Softball State Tournament Champions – 1977-2025* ................................................................. 15, 57

Nw. Suburban Conf., Girls Varsity Softball 2026 Schedule ................ 26

## Rules

Fed. R. App. P. 4 ............................................................. 12

Fed. R. Civ. P. 65 ........................................................... 12

## Regulations

34 C.F.R. § 106.2 ........................................................... 14

34 C.F.R. § 106.32 .......................................................... 51

34 C.F.R. § 106.33 .......................................................... 51

34 C.F.R. § 106.41 ..................................................... passim

34 C.F.R. § 106.6 ........................................................... 41

Exec. Order No. 14168, Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, 90 Fed. Reg. 8615 (Jan. 20, 2025)........................... 34

Exec. Order No. 14201, Keeping Men Out of Women's Sports, 90 Fed. Reg. 9279 (Feb. 5, 2025) .................................... 34

Appellate Case: 25-2899    Page: 12    Date Filed: 11/18/2025 Entry ID: 5579646

## JURISDICTIONAL STATEMENT

Female Athletes United brought claims pursuant to Title IX under 42 U.S.C. § 1983. The district court had jurisdiction over those claims under 28 U.S.C. §§ 1331 and 1343.

This Court has jurisdiction to review the district court's order denying FAU's motion for a preliminary injunction under 28 U.S.C. § 1292(a)(1).

The district court entered an order denying the motion for a preliminary injunction on September 19, 2025. App. 733; R. Doc. 134. FAU timely filed its Notice of Appeal on September 22, 2025, App. 800; R. Doc. 136, within the 30-day period set by 28 U.S.C. § 2107(a) and Fed. R. App. P. 4(a)(1)(A).

## STATEMENT OF THE ISSUES

The issues on appeal are:

1. Whether the district court erred in denying Plaintiff-Appellant Female Athletes United's motion for a preliminary injunction. Fed. R. Civ. P. 65; *D.M. ex rel. Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994 (8th Cir. 2019).

2. Whether private parties may sue based on Title IX's athletic regulations. 20 U.S.C. § 1681; 34 C.F.R. § 106.41; *Cannon v. Univ. of Chi.*, 441 U.S. 677 (1979); *Alexander v. Sandoval*, 532 U.S. 275 (2001); *Portz v. St. Cloud State Univ.*, 16 F.4th 577 (8th Cir. 2021); *Berndsen v. N.D. Univ. Sys.*, 7 F.4th 782 (8th Cir. 2021).

1

## INTRODUCTION

This Court has a stark choice. Either side with Female Athletes United, the federal government, and other courts by upholding Title IX's athletic regulations and athletes' right to enforce them. Or side with Defendants by rejecting the regulations as inconsistent with Title IX (despite Congress's seal of approval on them)—effectively invalidating them and making Title IX enforcement functionally unavailable to individual athletes. The right answer is clear.

So is the answer to the merits question. The federal government recently concluded that Minnesota violated Title IX by forcing females to compete against male athletes. That's correct. All this Court needs to do is enforce Title IX as Congress intended—to ensure female athletes can compete fairly and safely in their own sports. With the softball season fast approaching, FAU's female members will have to compete against a male and forever lose their right to equal and safe athletic opportunity. Because irreparable harm is imminent, the Court should reverse and order a preliminary injunction without delay.

## STATEMENT OF THE CASE

### I.  Female Athletes United

Female Athletes United (FAU) is a nonprofit membership organization that defends women's sports and advocates for women to have equal opportunities on a fair and safe playing field. FAU promotes girls-only sports because males have physical advantages that make it unfair

2

and unsafe for females to compete against them. FAU members include current Minnesota athletes, some of whom play for schools that receive Title IX funding. So FAU has a strong interest in showing that Title IX reserves girls' sports for females. App. 25–30; R. Doc. 1 ¶¶ 10–39.

## II.    The League's bylaws

Under Minnesota law, public school districts may delegate control over interscholastic athletic competition to the Minnesota State High School League (MSHSL or the League). Minn. Stat. § 128C.01. Because the State exercises substantial control and oversight over the League, it "act[s] under color of state law." *Brenden v. Indep. Sch. Dist. 742*, 477 F.2d 1292, 1295 (8th Cir. 1973) (citation modified). Plus, the State, local school districts, and the League operate educational programs that receive federal funds. 20 U.S.C. § 1681(a). So they are all subject to Title IX. 34 C.F.R. § 106.2 (defining "Recipient").

For decades, the League met its Title IX obligation to provide equal athletic opportunity by operating sex-designated varsity competition, such as boys' baseball and girls' softball. *E.g.*, MSHSL, *2025-2026 MSHSL Official Handbook*: *Bylaws*, 402.00, 504.00, 515.00, perma.cc/HZ84-6PGF ("Bylaws"); *accord* Minn. Stat. § 121A.04, subd. 4 (requiring sex-designated teams when necessary to provide girls equal athletic opportunity). The League may have allowed a rare female to participate in boys' baseball if she could best males at tryouts. *Accord*

3

Minn. Stat. § 121A.04, subd. 3(d) (reserving "one … team[ ]" for the "sex whose overall athletic opportunities have previously been limited" and opening "the other team" to "either sex"). But girls' softball remained exclusively female for nearly 40 years. MSHSL, *Girls Softball State Tournament Champions – 1977-2025*, perma.cc/WAK4-XKRR ("Minn. Softball Champions").

Roughly ten years ago, the rules changed. Acting on a recommendation by the Minnesota Department of Education, the League enacted eligibility bylaws that disregard athletes' biological sex. The League now allows students to participate in "athletics" based on "their gender identity or expression" and redefines "equal opportunity" in those terms. Bylaws 300.00(3)(A); *accord* Doc. 65 at 3. These concepts have no analogue in Title IX or its mandatory regulations.

The League's bylaws take no account of *objective* factors, such as an athlete's natal sex, hormone levels, or testosterone suppression. What matters is that an athlete's *subjective* "gender identity" is "sincerely held as part of the student's core identity." Bylaws 300.00(3)(B)(1). Plus, only determinations of athletic "*ineligibility*" based on gender identity are subject to appeal. *Id.* (emphasis added). Findings of *eligibility* based on gender identity are deemed final.

4

### III. Background on Title IX

#### A. The statute

In Title IX of the Education Amendments of 1972, Congress declared that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under" federally funded "education program[s] or activit[ies]." 20 U.S.C. § 1681(a).

Atypically, Congress then ordered the Department of Education's predecessor to issue implementing regulations that "include with respect to intercollegiate *athletic activities* reasonable provisions considering the *nature of particular sports*." Educ. Amends. of 1974, Pub. L. No. 93-380, § 844, 88 Stat. 484, 612 (1974) (emphasis added) ("Javits Amend."). Roughly a dozen years later, Congress passed the Restoration Act to ensure that courts applied Title IX to athletic programs. *Cohen v. Brown Univ.*, 991 F.2d 888, 894 (1st Cir. 1993) (discussing 20 U.S.C. § 1687).

So the text and Congress's intent is clear: Title IX applies to recipients' athletics programs. That means students can't be excluded from participation, denied equal benefits, or otherwise be discriminated against in athletic programs based on sex.

#### B. The athletic regulations

Following the Javits Amendment, the Department of Education's predecessor developed Title IX athletic regulations through notice and

5

comment, and President Ford signed and submitted the result to Congress. *A Policy Interpretation: Title IX and Intercollegiate Athletics* at 1.B, U.S. Dep't of Educ. (Dec. 11, 1979), perma.cc/FVR6-RATY ("Interpretation"). Congress held hearings, carefully considered whether the final regulations were consistent with Congress's intent in enacting the statute, and allowed the regulations to go into effect. *Id*. The Supreme Court has "recognized the probative value of Title IX's unique post[-]enactment history." *Grove City Coll. v. Bell*, 465 U.S. 555, 567 (1984)); *accord N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 535 (1982) ("presumably the legislative intent has been correctly discerned") (citation modified). Because the implementing regulations were "issued roughly contemporaneously with enactment of the statute" and have remained "consistent over time," they deserve great "respect." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024).

The athletic regulations have three main components. First, they establish a general rule that bars sex discrimination in "interscholastic, intercollegiate, club or intramural athletics," including providing "athletics separately." 34 C.F.R. § 106.41(a). Second, "[n]otwithstanding" this general rule, the regulations typically allow "separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." *Id*. § 106.41(b). Last, the regulations establish an overriding principle that funding recipients "shall provide equal athletic opportunity for

6

members of both sexes" to comply with Title IX. *Id.* § 106.41(c). One key measure of equal athletic opportunity is "[w]hether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes." *Id.* § 106.41(c)(1).

So the athletic regulations allow recipients to operate sex-designated teams for contact sports or sports that involve competitive skill—like boys' baseball and girls' softball. But there's a caveat: sex-designated teams *must* provide equal athletic opportunity for females, a key component of which is effectively accommodating females' interests and abilities.

### C. Contemporary agency guidance

On the heels of the athletic regulations, the Department of Education's predecessor offered clarity in two guidance documents.

First, the Director of the Office for Civil Rights sent a letter to chief state school officers, superintendents, and university presidents that explained for contact or competitive sports, the decision "whether to have single sex teams or teams composed of both sexes" depends on "the interests of both sexes" and "the relative abilities of members of each sex." *Letter to Chief State School Officers, Title IX Obligations in Athletics*, U.S. Dep't of Educ. (Nov. 11, 1975), perma.cc/HJ7N-EHS7 ("Letter"). For instance, abolishing "women's teams" and opening up "men's teams to women" doesn't effectively accommodate females'

7

"interests and abilities" if "only a few women … quali[f]y for the men's teams." *Id.*

Likewise, if funding recipients base scholarships on athletic "'ability'" and "the range of ability in a particular sport … differs widely between the sexes," then "separate norms must be developed for each sex." *Id.*

Second, the Department of Education's predecessor issued a policy interpretation "to provide a framework" for resolving Title IX complaints in the college context and to offer "additional guidance" on Title IX's requirements for "intercollegiate athletic programs." Interpretation at II. The interpretation was "designed specifically for intercollegiate athletics." *Id.* at III. But the agency said that "its *general principles* will often apply to … interscholastic athletic programs" and "may be used for guidance" in that context "when appropriate." *Id.* (emphasis added).

Generally, the policy interpretation lists three principles—or "Overall Determination of Compliance" factors—to gauge equal athletic opportunity and effective accommodation, which may apply in the K-12 context. Interpretation at VII.B.5 & C.6. Those factors are: (1) whether a funding recipient's policies are "discriminatory in language or effect"; (2) whether "disparities of a substantial and unjustified nature" exist in the "benefits, treatment, services, or opportunities" that a recipient affords "male and female athletes" in the "program as a whole"; and (3) whether such disparities in "individual segments" of a recipient's

8

program are "substantial enough in and of themselves to deny equality of athletic opportunity." *Id.*

Specifically, the policy interpretation clarifies that—for non-contact sports—"[e]ffective accommodation means" that if a recipient sponsors a team for "one sex," "it *must* do so for members of the other sex" if several prerequisites are met. Interpretation at VII.C.4.b (emphasis added). Those conditions are: (a) opportunities for "the excluded sex have historically been limited"; (b) "sufficient interest and ability" exists among "members of the excluded sex to sustain a viable team and a reasonable expectation of intercollegiate competition"; and (c) "the excluded sex" doesn't "possess sufficient skill to be selected for a single integrated team, or to compete actively on such a team if selected." *Id.*

## IV. Males' competitive advantage over females

Male competitive advantage is the reason the League sponsored separate boys' and girls' athletic competition to begin with. *Accord* App. 135; R. Doc. 8-2 at 15 (recognizing that males' "large performance ana-tomical, and physiological advantages" are why "most athletic compe-titions are separated by sex"). That advantage turns on sex, not gender identity: regardless of whether male athletes socially identify as girls, they "are male based on their biology." App. 133; R. Doc. 8-2 at 13. And "in the athletics context," sex is a "[ ]relevant characteristic." *Cohen v.*

Appellate Case: 25-2899     Page: 21     Date Filed: 11/18/2025 Entry ID: 5579646

*Brown Univ.*, 101 F.3d 155, 178 (1st Cir. 1996). Gender identity, by contrast, has "no known biologically based test" and does not negate sex-based performance advantages. App. 133; R. Doc. 8-2 at 13; *accord* App. 432–33; R. Doc. 117 ¶¶ 33–36; App. 477, 519–25; R. Doc. 118 ¶¶ 13.a.iii, 110–29.

Courts have recognized for over 40 years that females are at a "substantial physical disadvantage" in competition against males and that even "isolated instances of male participation upon girls' teams create[s] an advantage for those teams." *Petrie v. Ill. High Sch. Ass'n*, 394 N.E.2d 855, 861 (Ill. App. Ct. 1979); *accord O'Connor v. Bd. of Educ. of Sch. Dist. 23*, 449 U.S. 1301, 1307 (1980) (Stevens, J., in chambers) ("Without a gender-based classification in competitive contact sports, there would be a substantial risk that boys would dominate the girls' programs and deny them an equal opportunity to compete in interscholastic events.").

Under Title IX, the usual remedy is separating "play and compe-tition … by sex," so that most females aren't "quickly … eliminated from participation and denied any meaningful opportunity for athletic involvement." *Cape v. Tenn. Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977) (per curiam).

Varsity athletics in Minnesota is no exception. The League's *only* means of ensuring equal opportunity—before and now—is sex-desig-nated sports teams that "allocate opportunities separately for male and

female students." *Cohen*, 101 F.3d at 177. The League's exchange of sex for gender identity rends a giant hole in this safety net, elevating personal identity over "the physiological fact that males … have an undue advantage competing against women." *Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982).

Males perform better in almost all sports than equally aged, trained, and talented females, App. 127; R. Doc. 8-2 at 7, because males have—for example—(1) higher cardiac outputs, App. 164–65, 202–04; R. Doc. 8-2 ¶¶ 106, 194; (2) greater bone density, App. 202, 204–05; R. Doc. 8-2 ¶¶ 193, 195, 198; (3) more skeletal muscle and less fat, App. 132–33, 158–62, 202–05; R. Doc. 8-2 ¶¶ 8, 80, 86, 93–98, 194, 198; (4) larger maximal oxygen consumption, App. 202–04; R. Doc. 8-2 ¶ 194; and (5) greater height and better economy of motion, App. 156–58; R. Doc. 8-2 ¶¶ 71–81. *Accord Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 819–20 (11th Cir. 2022) (en banc) (Lagoa, J., specially concurring) (summarizing male athletic advantage). Plus, the whole of male athletic advantage is greater than the sum of its parts. *E.g.*, App. 142–43; R. Doc. 8-2 ¶ 31.

Even pre-puberty, males run faster, jump farther, and have greater upper-body strength than comparable females. App. 165–85, 184–92, 196–97; R. Doc. 8-2 ¶¶ 109–48, 154–65, 175–77; App. 430–32; R. Doc. 117 ¶¶ 22–34. They already have "sex-based advantages in lean body mass, bone mineral density, heart size and function, and lung size

11

and function (among other factors)." App. 202; R. Doc. 8-2 ¶ 193. That makes a real difference in sports like softball. Males enjoy substantial advantages over females in upper-body strength, throwing velocity and distance, and acceleration and change-of-direction, which are key to pitching, batting, fielding, and baserunning. App. 173–75, 178–80; R. Doc. 8-2 ¶¶ 126–32, 142–43; App. 439–40; R. Doc. 117 ¶ 65. And "male prepubertal sex-based advantages in physical fitness have persisted for more than five decades in spite of the tremendous improvements in access to, and acceptance of, female sports." App. 168; R. Doc. 8-2 ¶ 112; *accord* App. 180–81; R. Doc. 8-2 ¶ 144.

Puberty blockers, testosterone suppression, and cross-sex hormones don't bridge the gap. Even on puberty blockers and cross-sex hormones, males grow to about the same *male* height predicted at birth and enjoy the athletic advantages of greater height and longer limbs. App. 209–10; R. Doc. 8-2 ¶¶ 209–12, 214; App. 440; R. Doc. 117 ¶ 66. Compared to females, they also have more lean body mass, less body fat, and greater grip strength—a standard proxy for overall strength— all of which enhances males' athletic performance. App. 207–10, 220; R. Doc. 8-2 ¶¶ 204–08, 213–14, 236; App. 460; R. Doc. 117 ¶ 162. So males undergoing "puberty suppression" likely have "physiological and performance advantages over females somewhere between those possessed by pre-pubertal boys[ ] and those who have gone through full male puberty." App. 206–07; R. Doc. 8-2 ¶ 203.

Dedicated males engaged in "intensive training and nutrition strategies" often "call on their biological advantage" to outperform females forced "to compete against them" in girls' sports. App. 641; R. Doc. 119 at 15. So Minnesota's decision to redefine female to "'include[ ] individuals of both sexes'" and "'disallow[ ] any distinctions among [males and females] on the basis of sex[ ] is by definition and in effect a rejection of Title IX's equality goals.'" *Adams*, 57 F.4th at 820 (Lagoa, J., specially concurring) (quoting Doriane Lambelet Coleman, et al., *Reaffirming the Value of the Sports Exception to Title IX's General Non-Discrimination Rule*, 27 DUKE J. GENDER L. & POL'Y 69, 133 (2020)).

All agree that transgender-identifying athletes "have the right to compete in sports," but females "have the right to compete in a protected category," App. 137; R. Doc. 8-2 at 17 (quotations omitted), as sports-governing bodies confirm, App. 426–47; R. Doc. 117 ¶¶ 5–12. Making these eligibility determinations is simple: the League's own physical form—developed, in part, by the American Academy of Pediatrics—*already records* athletes' birth sex and gender identity. MSHSL Sports Physical Form at 2, perma.cc/Q7K7-NS33; *accord* App. 639–40, 642; R. Doc. 119 at 13–14, 16.

## V. The bylaws' harm to FAU's members

Four FAU members are varsity athletes at public schools in Minnesota. They are talented softball players, on highly ranked all-female

Appellate Case: 25-2899     Page: 25     Date Filed: 11/18/2025 Entry ID: 5579646

teams, who have spent much of their lives striving to excel in the hope of winning in high-level competition, making a college team, and earning an athletic scholarship. But the League's bylaws force them into unfair and unsafe competition.

### A.  FAU Athlete 1

FAU Athlete 1 is a female senior who began playing softball at eight years old; she also honed her skills on club softball teams from the age of 13 to make a college team, including the top club team in her area. App. 309–10; R. Doc. 48-2 ¶¶ 2, 7–8; App. 392; R. Doc. 113 ¶ 6. She lifts weights and runs to stay in shape, and plays softball nearly year-round, including during the summer and fall club season. App. 311; R. Doc. 48-2 ¶¶ 14–15; App. 392; R. Doc. 113 ¶¶ 7–10.

During the school season, Athlete 1's all-female team plays in the same softball section as a team that includes Athlete Doe—a male who is one of the best pitchers in the State. App. 312; R. Doc. 48-2 ¶ 27. Athlete 1's team plays Doe's team once during the regular season and in sectional (post-season) competition. App. 312; R. Doc. 48-2 ¶ 27. Only one sectional winner advances to the state tournament. *Id.* Athlete 1 only recently learned that Doe is male. App. 311; R. Doc. 48-2 ¶¶ 19–20.

In the 2024 season, Athlete 1's team lost to Doe's team in both regular-season and sectional competition. App. 313; R. Doc. 48-2 ¶ 29. Doe pitched *every* inning, giving up only a few runs. App. 393; R. Doc.

113 ¶¶ 17–18. History repeated itself in the 2025 season: Athlete 1's team lost to Doe's team again in regular-season and sectional competition—with Doe again pitching *every* inning. App. 393–94; R. Doc. 113 ¶¶ 21–25. And Athlete 1's team didn't make the state championship. App. 394–95; R. Doc. 113 ¶¶ 28–29.

This season Athlete 1 plans to play varsity softball. App. 395; R. Doc. 113 ¶¶ 30–31. Her team is *already scheduled* to play Doe's team again in late April, three weeks earlier than originally planned, and Athlete 1 is ready to compete in that game. Nw. Suburban Conf., Girls Varsity Softball 2026 Schedule, perma.cc/4JSD-RP3C; App. 395; R. Doc. 113 ¶ 33. The result of that competition will affect not only Athlete 1's ability to advance to the section and state tournaments, but also her ability to get noticed by scouts, play at the college level, and obtain an athletic scholarship. App. 395–96; R. Doc. 113 ¶¶ 35–46. And this season is Athlete 1's last chance to fulfill her dream of succeeding in—and potential winning—the state high school tournament. App. 396; R. Doc. 113 ¶¶ 41, 46–48.

Athlete 1 feels "overwhelmed" facing Athlete Doe. App. 311–12; R. Doc. 48-2 ¶ 21. Even though she is an experienced hitter who competes successfully against talented female pitchers who are slated to play at the collegiate level, Doe's speed and movement on the ball is unlike anything Athlete 1 has experienced from female pitchers. App. 313; R. Doc. 48-2 ¶¶ 28, 30, 35; App. 393; R. Doc. 113 ¶¶ 19–20. "When the ball

came at [Athlete 1]," she "could not see it very well" and "grounded out." App. 313; R. Doc. 48-2 ¶ 31. And Doe's "greater stamina" meant that Doe "pitched the whole game" and threw pitches that were "noticeably stronger and faster as [the game] went on," unlike female pitchers who "tire[ ] out as the game progresses." *Id.*; App. 314; R. Doc. 48-2 ¶ 38.

Athlete 1 is "afraid to try to hit in a competitive game when a male is pitching," given the greater "risk of injury." App. 314; R. Doc. 48-2 ¶¶ 44–45. She also finds it psychologically "defeating" to be forced to "play[ ] against a male player" whose pitches "are almost unhittable," App. 314–15; R. Doc. 48-2 ¶¶ 37, 39, 46. No matter how hard she works, Athlete 1 lacks a level playing field and equal chance to excel and advance to higher levels of competition. App. 315; R. Doc. 48-2 ¶¶ 46– 47.

### B.    FAU Athlete 2

FAU Athlete 2 is a female senior who began playing softball at age seven and has developed her athletic skills through years of hard work. App. 321; R. Doc. 48-3 ¶¶ 7, 10. She has competed on the varsity high school team since eighth grade and has been playing for advanced club teams since the year before. App. 321–22; R. Doc. 48-3 ¶¶ 9, 18; App. 402; R. Doc. 114 ¶¶ 20–22. Her teammates also play club softball, and they all "work hard to stay fit and keep [their] skills sharp year-round." App. 402; R. Doc. 114 ¶ 22. Athlete 2's years of hard work resulted in St.

16

Cloud State recruiting her and granting her an athletic scholarship. App. 401; R. Doc. 114 ¶¶ 6–7.

Athlete 2 is a talented female pitcher. App. 322–23; R. Doc. 48-3 ¶¶ 18, 23–24. In the 2025 season, her all-female team played Athlete Doe's team in a pre-season scrimmage. Because many females on Athlete 2's team found it "intimidating, unsafe, and unfair" to play against a male, the coaches for each team agreed not to field their best pitchers—Doe and Athlete 2, respectively. App. 324; R. Doc. 48-3 ¶¶ 36–37. This caused Athlete 2 to lose playing time. *Id.* And her team still lost when Doe "brought the opposing team to victory" by "hitting a two-run homerun." App. 324; R. Doc. 48-3 ¶ 39. In the regular season, Athlete 2's team won a section tournament, advanced to state, and came one game away from possibly competing against Doe's team. App. 401; R. Doc. 114 ¶¶ 10–11.

This season, Athlete 2 plans to play varsity softball and will likely be the starting pitcher. App. 401; R. Doc. 114 ¶¶ 5–6. Her team is likely to compete against Doe's team in a pre-season scrimmage, same as last year, and Athlete 2 is ready to compete in that game. App. 401; R. Doc. 114 ¶ 9. Because Athlete 2's team was highly ranked last year, retained seven returning players, and added several solid new players, it will likely advance to the state tournament again, just as Doe's team will likely advance due to Doe's pitching dominance. App. 401–02; R. Doc.

Appellate Case: 25-2899    Page: 29    Date Filed: 11/18/2025 Entry ID: 5579646

114 ¶¶ 12–15. Athlete 2 is also ready to compete against Doe's team at state. App. 402; R. Doc. 114 ¶ 16.

Athlete 2 has competed against Doe for years but only recently learned that Doe is male. App. 322–23; R. Doc. 48-3 ¶¶ 18–28. She watched Dow rapidly grow "much taller" and develop "much longer arms," resulting in "exponential improvement" between one season and the next. App. 322; R. Doc. 48-3 ¶¶ 21–22. As a pitcher, Athlete 2 knows that larger "limbs and hand size" gives Doe "greater control and more pronounced spin on the ball" than female pitchers. App. 404; R. Doc. 114 ¶ 33. Plus, Athlete 2 has witnessed Doe's unparalleled "stamina and efficiency," such as pitching 87% of innings of the sectional and state tournaments—including 100% of innings at the state championship and allowing only two runs. App. 403–04; R. Doc. 114 ¶¶ 29–31. Athlete 2 isn't able to pitch as many consecutive innings—she pitched 73% of post-season competition (14% less than Doe). App. 403–04; R. Doc. 114 ¶¶ 29, 31. Doe also has exceptional "ability to control the ball" based on "larger hand size." App. 404; R. Doc. 114 ¶ 32. Last year, Doe gave up only eight walks, whereas Athlete 2 gave up 24 walks. *Id.*

Athlete 2 finds it "heartbreaking to see opportunities and a level playing field taken from girls by males who have physiological advantages." App. 323; R. Doc. 48-3 ¶ 31. Even if Athlete 2's team makes it to state, she "would feel defeated before" taking the field because her all-female team lacks "a fair shot at victory" and faces "unfair and unsafe"

18

competition from a mixed-sex team. App. 325; R. Doc. 48-3 ¶¶ 44, 46. Lacking "a fair chance to win" is mentally "discouraging and upsetting" to Athlete 2 because she has "dedicated so many years to" softball and this is her *last opportunity* to excel, make the state high school championship, and potentially win. App. 403–04; R. Doc. 114 ¶¶ 23, 35.

### C.   FAU Athlete 3

FAU Athlete 3 is a female junior who has played softball from a young age, including on club teams that compete against some of the country's best softball teams. App. 331; R. Doc. 48-4 ¶¶ 5–6, 9–10. She lifts daily and practices more than once most days to be the best athlete she can be and make a college team. App. 331; R. Doc. 48-4 ¶¶ 6, 13. During the summer, she had "softball tournaments nearly every weekend" and likely "played over 50 games." App. 411; R. Doc. 115 ¶ 33.

Athlete 3 has played with or against Athlete Doe for years but only recently learned that Doe is male. App. 332; R. Doc. 48-4 ¶¶ 14–17. Last season, Athlete 3's all-female team played an inside game against Doe's team in the pre-season. App. 332; R. Doc. 48-4 ¶ 22. Her team lost after Doe hit a home run that knocked the far side of the dome—a feat Athlete 3 has never seen a female accomplish. App. 333; R. Doc. 48-4 ¶¶ 25–26. Athlete 3 knows firsthand the difficulty of facing Doe's pitches, which spin in unpredictable ways that are difficult for skilled female players to counteract, allowing Doe to "often rack[ ] up more

than ten strikeouts in a game." App. 332; R. Doc. 48-4 ¶¶ 19–21. This remains true even though Athlete 3 is a catcher skilled at predicting spin and where the ball is likely to go. App. 410; R. Doc. 115 ¶¶ 24–27.

When Athlete 3 faced Doe in club competition, she was hit by one of Doe's throws, which hurt much worse than female pitches. App. 333; R. Doc. 48-4 ¶¶ 29–30. This is due to Doe's combined force, speed, and spin, which in Athlete 3's experience not even some of the nation's top female pitchers match. App. 332–33; R. Doc. 48-4 ¶¶ 20, 30–31. So Athlete 3 considers forcing females to play against males "not only unfair" but "unsafe" because females "are made differently," which is "why all-female teams exist." App. 333; R. Doc. 48-4 ¶ 32.

This season Athlete 3 plans to play varsity softball and is a starter in most games. App. 408; R. Doc. 115 ¶¶ 5–6. Her team is likely to play against Doe's team in a pre-season scrimmage again—like last year— and she is ready to compete in that game. App. 408; R. Doc. 115 ¶¶ 8–9. Plus, Athlete 3's team is likely to compete in the state tournament again this year because there are seven returning players—including one Division I and one Division II commit—in addition to talented new players. App. 408–09; R. Doc. 115 ¶¶ 12–16. Doe's team likely will make state too because Doe is "a dominant pitcher" and that "role is pivotal." App. 409; R. Doc. 115 ¶¶ 17–18. Athlete 3 is ready to compete against Doe's team in the state tournament, something she narrowly missed doing last season. App. 408–09; R. Doc. 115 ¶¶ 10–11, 19.

Athlete 3 finds it heartbreaking that after years of hard work, she can lose athletic opportunities and recognition to males. App. 334; R. Doc. 48-4 ¶ 40. Seeing Doe win "an award at the state level for playing girls' softball" communicates to Athlete 3 that females' years of hard work and athletic opportunities don't matter—but males' do. App. 334–35; R. Doc. 48-4 ¶¶ 38, 41–42. Fixing that inequality is crucial because Athlete 3 needs a level playing field to excel during her junior season, which is when colleges usually make recruitment and scholarship decisions, especially as Division I teams have already expressed interest in signing her. App. 411–12; R. Doc. 115 ¶¶ 35–38, 42.

### D.    FAU Athlete 4

FAU Athlete 4 is a female junior who began playing softball at eight years old and now plays at the varsity and club levels. App. 416; R. Doc. 116 ¶¶ 6, 8–9. She has also played in the U.S. Specialty Sports Association's All American Games twice, including on the winning softball team last year. App. 416; R. Doc. 116 ¶ 12. Athlete 4 has "made sacrifices since [she] was a little girl to be the best [athlete she] can be." App. 422; R. Doc. 116 ¶ 51. Her goal is to play at the college level, and she has reached out to college coaches and attended showcases to demonstrate her skills to them. App. 416; R. Doc. 116 ¶ 12.

In the 2025 season, Athlete 4's team won a competitive sectional contest and made the state tournament. App. 417; R. Doc. 116 ¶ 14.

Athlete 4's team played against Athlete Doe's team at state, which was discouraging because Doe regularly pitched shutout games. App. 417–18; R. Doc. 116 ¶¶ 17–20. Because of Doe's pitching, Athlete 4's team lost 5-0 without getting any extra-base hits and only advancing a runner past first base twice—ending Athlete 4's chance to make the state championship. App. 418; R. Doc. 116 ¶¶ 20–21. Athlete 4 was "emotionally crushed but not surprised" by this loss due to Doe's record, which included shutting out four of five teams near the end of the season. App. 418; R. Doc. 116 ¶ 26. Doe's pitching carried the opposing team in the state matchup. App. 419; R. Doc. 116 ¶¶ 31–32.

This season Athlete 4 plans to play varsity softball again. App. 420–21; R. Doc. 116 ¶¶ 40–42. Her school hosts a regular-season tournament that Doe's team has attended in the past and will likely attend this year. App. 421; R. Doc. 116 ¶ 43. Athlete 4's team is likely to play against Doe's team at this competition and in the state tournament—as they did last year—and she is ready to compete in both games. App. 421; R. Doc. 116 ¶¶ 43–44. Indeed, all but two varsity players are returning, and this continuity makes Athlete 4's team more likely to excel and again reach the state tournament. App. 421; R. Doc 116 ¶¶ 47–48.

Athlete 4 is "dishearten[ed] and discourage[d]" because she doesn't "have a fair chance to win" and "can never get that opportunity back." App. 422; R. Doc. 116 ¶¶ 52, 57. She also has "significant safety

concerns" about batting against or pitching to Doe. Athlete 4 has played against many talented players and is an experienced pitcher herself, but Doe's abilities are in a different class: Doe's greater hand size and strength enable greater spin on the ball, Doe's greater height gives pitches more drive and releases the ball closer to the plate, and Doe's longer arms generate more whip. App. 419; R. Doc. 116 ¶¶ 27–28. Leveling the playing field is key to Athlete 4 standing out this softball season, ensuring her safety, boosting her visibility, and maximizing her chances of making a college team and obtaining an athletic scholarship. App. 421; R. Doc. 116 ¶¶ 45–46.

## VI. Procedural history

Before the 2025 softball season, President Trump issued executive orders (1) specifying that "'sex' … refer[s] to an individual's immutable biological classification as either male or female," not "'gender identity,'" Exec. Order No. 14168, Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, 90 Fed. Reg. 8615, 8615 (Jan. 20, 2025), and (2) clarifying "that women's sports are reserved for women," Exec. Order No. 14201, Keeping Men Out of Women's Sports, 90 Fed. Reg. 9279, 9279 (Feb. 5, 2025). *Accord* App. 38–39; R. Doc. 1 ¶¶ 91–94.

At the League's request, the Minnesota Attorney General issued a formal legal opinion rejecting these executive orders because complying

23

with Title IX would "violate the MHRA." Minn.Att'y.Gen.Op.1035 at 2 (Feb. 20, 2025), perma.cc/T4RP-H7PK. The Commissioner of the Minnesota Department of Human Rights ("MDHR") made a similar argument in state court, contending that the Minnesota Human Rights Act ("MHRA") bars public accommodations from "prohibiting someone from participating in [women's] sports because of their gender identity" and that it makes no difference if athletic competition in the female category "is 'fair.'" MDHR.Comm'r.Amicus.Br. at 4, 13, *Cooper v. USA Powerlifting*, Nos. A23-0373, A23-0621 (Minn. Aug. 30, 2024), perma.cc/U5U5-ZBHB. So the League opted to maintain its eligibility bylaws. *Accord* App. 54, 56–57; R. Doc. 1 ¶¶ 158, 166–69.

FAU filed suit less than two weeks after one of its members was harmed by this decision—specifically, after FAU Athlete 1's all-female softball team lost to Athlete Doe's team. App. 26–27; R. Doc. 1 ¶¶ 20, 148. The complaint alleged that the League's bylaws violated Title IX and the athletic regulations by failing to provide females equal treatment and opportunities or to effectively accommodate females' interests and abilities. App. 60–63; R. Doc. 1 ¶¶ 178–91. The next day, FAU requested a preliminary injunction barring Minnesota from allowing males to compete with or against FAU members in female-designated sports that involve competitive skill or are contact sports. App. 72; R. Doc. 6 at 2; *accord* App. 31; R. Doc. 1 ¶¶ 43–44.

Appellate Case: 25-2899    Page: 36    Date Filed: 11/18/2025 Entry ID: 5579646

After Defendants requested time to obtain rebuttal experts, the district court laid down parameters for a hearing on FAU's motion, and the resulting schedule precluded injunctive relief for the 2025 season. R. Docs. 36, 37. The court heard oral argument—predominantly on standing—on August 20, 2025, App. 650, and denied the motion for preliminary injunction a month later, App. 798; R. Doc. 134 at 66.

The court's primary conclusions were threefold. First, the court recognized that at least one of FAU's members has standing to challenge the League's bylaws under Title IX. Second, even though no one had raised the issue, the court held that private parties like FAU can't sue under Title IX's athletic regulations. Finally, the court held that effectively abolishing all-female sports like softball—while essentially maintaining all-male sports like baseball—doesn't per se treat female athletes unequally or fail to accommodate their interests and abilities. App. 761–66, 769–89; R. Doc. 134 at 29–34, 37–57.

FAU immediately appealed, App. 800; R. Doc. 136, and sought an injunction pending appeal before the start of the 2026 softball season from the district court and this Court, App. 808; R. Doc. 141. Defendants countered with a motion to stay the appeal. The Court denied both motions and expedited FAU's appeal for a January 2026 hearing.

## VII. The federal government finds a Title IX violation

After the lower court ruled and FAU filed a notice of appeal, the U.S. Department of Education and U.S. Department of Health and Human Services issued a letter of findings that declares Minnesota "in violation of Title IX." *Letter of Findings (Notice of Violation)* at 1, U.S. Dep'ts of Educ. & Health & Human Servs. (Sept. 30, 2025), perma.cc/BBC6-VXN7 ("Findings"). These findings are subject to judicial notice on appeal because the agencies' letter is a public record. *E.g.*, *United States v. Love*, 20 F.4th 407, 412 (8th Cir. 2021); *United States v. Eagleboy*, 200 F.3d 1137, 1140 (8th Cir. 1999).

Under Title IX, the federal government concluded that sex separation is allowed but "cannot disadvantage either sex." Findings at 6. So when recipients provide "sex-separated athletic teams, the teams *must remain separated by sex* with only a clearly defined limited exception" that applies when no team is available "'for members of one sex'" and that sex's "'athletic opportunities … have previously been limited." *Id.* (quoting 34 C.F.R. § 106.41(b)) (emphasis added). Yet Minnesota "'create[d] a special exemption … for gender identity,'" which "throw[s] out the biological justification for sex separation" and only *partly* "separat[es] the sexes without a valid basis." *Id.* at 16.

The agencies also found that Minnesota violated Title IX by effectively eliminating "all-female interscholastic athletic[s]" and "treating women worse than men." *Id.* at 17, 27. "While men get sex-

26

separated teams where they are competing against their physical equals, women get teams where they are facing unfair and unsafe competition from men with a physical advantage." *Id.* at 17. That denies *equal athletic opportunity*. *Id.* Plus, the agency resolved that depriving females of "competitive opportunities that account for the physiological differences between males and females" fails to *effectively "accommodate* women['s]" interests and abilities. *Id.* at 48 (emphasis added).

## SUMMARY OF THE ARGUMENT

The normal injunction standard applies because this suit concerns Title IX and the League's bylaws, not the MHRA, which is subject to impossibility preemption regardless. FAU also has standing to seek prospective relief because its members were irreparably harmed by competition against Athlete Doe *last* season and every indication is that history will repeat itself *this* season. And overwhelming precedent supports private parties' right to sue under the athletic regulations, which sound in disparate treatment, as do FAU's claims.

On the merits, *erasing* all-female sports like softball, which are now effectively mixed-sex, while essentially *maintaining* all-male sports like baseball, discriminates based on sex, denies females equal athletic opportunity, and fails to effectively accommodate females' athletic interests and abilities. The Title IX violation is clear whether one looks to the statute's text, the athletic regulations, or contemporary guidance.

27

Plus, recipients had clear notice that policies like the bylaws violate Title IX when—in the real world—they treat females worse than males.

Concerning the other injunction factors, FAU members face irreparable harm because the 2026 softball season is fast approaching, and once they're forced to compete against a dominant male player, the harm is done—there are no "do-overs." The public interest favors FAU because if boys' baseball teams are effectively sex-separated and boys enjoy fair and safe competition, then Title IX requires that girls' softball teams be sex-separated too (as they were for decades) to provide them equal athletic opportunities and benefits. The balance of harms also weighs in FAU's favor: an injunction will maximize members' chances of success, advancement to the college level, and scholarship grants. But no harm results from holding Minnesota to Title IX's bargain.

## ARGUMENT

### I.  Standard of review

This Court generally reviews "the denial of a preliminary injunction for abuse of discretion." *Grand River Enters. Six Nations, Ltd v. Beebe*, 467 F.3d 698, 701 (8th Cir. 2006). But this appeal centers on "purely legal questions" about Title IX, which this Court reviews "de novo" with "no special deference to the district court." *St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1021 (8th Cir. 2015) (citation modified). The district court accepted—and Defendants can't seriously

28

dispute—the basic science of male athletic advantage and its application to Athlete Doe. App. 762–65; R. Doc. 134 at 30–33. This appeal concerns how Title IX applies given that advantage.

## II. The preliminary-injunction standard

Preliminary-injunction decisions turn on four factors: (1) "the threat of irreparable harm to the movant," (2) "the balance between this harm and the injury that granting the injunction will inflict on other … litigants," (3) "the probability that the movant will succeed on the merits," and (4) "the public interest." *CEZ Prior, LLC v. 755 N Prior Ave. LLC*, 126 F.4th 1353, 1358 (8th Cir. 2025) (citation modified). But "the most significant" is likelihood of merits success. *Id.* (citation modified).

Normally, "a reasonable probability of success" or "fair chance of prevailing on the merits" is sufficient. *Id.* (quotation omitted). But a likely-to-prevail test applies when plaintiffs "seek[ ] to enjoin the enforcement of a state statute" that resulted from "presumptively reasoned democratic processes." *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1040 (8th Cir. 2016) (quotation omitted).

Though FAU passes either standard, the lower standard applies for three reasons. First, disputes regarding the League's bylaws don't

29

trigger the likely-to-prevail standard. *D.M.*, 917 F.3d at 999–1001. And bylaws provisions are what this case is about.

Second, the Attorney General can't raise the bar by citing *his own* "advisory opinion[ ]" that the MHRA requires the League's policy. *In re Admonition Issued in Panel File No. 99-42,* 621 N.W. 2d 240, 244 (Minn. 2001) (per curiam) (citing Minn. Stat. § 8.07). This manipulation is inconsistent with *Rounds*. Plus, the Attorney General's opinion is an "administrative action[ ]" formulated without public debate or other aspects "of the democratic process." *Planned Parenthood of Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 n.6 (8th Cir. 2008) (en banc) (quotation omitted); *accord D.M.*, 917 F.3d at 1000. So it receives no deference. And "the MHRA exempts single-sex athletic teams." App. 768; R. Doc. 134 at 36 n.13 (citing Minn. Stat. § 363A.03, subd. 13).

Last, FAU seeks to enforce Title IX and the athletic regulations, which *resulted* from the democratic process, and Minnesota's voluntary "*promise* … not to discriminate" based on sex in exchange for federal funds, whatever state law otherwise commands. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998) (emphasis added). Impossibility preemption applies to Title IX compliance. So the MHRA's requirements are irrelevant. *Accord Hillsborough Cnty. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 713 (1985); 34 C.F.R. § 106.6(b).

## III. FAU has standing.

Because FAU's members are "objects of the action (or forgone action) at issue" (i.e., the League's eligibility bylaws), they are injured by the inclusion of males in girls' sports, and a ruling "preventing … [that] action will redress" their injuries. *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 112 (2025) (citation modified). So FAU has standing to challenge the bylaws.

Specifically, in "set-aside programs"—like sex-separated sports—the "injury in fact" is the League's "discriminatory" bylaws, which effectively create all-male competition for boys and mixed-sex competition for girls. *Pederson v. La. State Univ.*, 213 F.3d 858, 871 (5th Cir. 2000) (quotations omitted). The bylaws, in practice, "create[ ] a barrier" to fair and safe athletic competition "for female[s]" that males don't face. *Id.*; *accord Becker v. N.D. Univ. Sys.*, 112 F.4th 592, 596–97 (8th Cir. 2024) (relying on *Pederson*). That's sex discrimination.

FAU's members are eligible for varsity softball, and they are "'able and ready' to play" against Doe's otherwise all-female team "if the opportunity arises," as they did last year. *Becker*, 112 F.4th at 596 (quoting *Pederson*, 213 F.3d at 871); *accord supra* Statement Part V. So their Title IX injuries are ongoing *now*.

Those injuries will become even more concrete and particularized in the *future*. FAU Athlete 1's all-female team is now scheduled to play Athlete Doe's mixed-sex team in late April. And FAU Athletes 2–4 are

Appellate Case: 25-2899     Page: 43     Date Filed: 11/18/2025 Entry ID: 5579646

likely to face Doe's team in pre-season, regular season, or post-season competition. *Supra* Statement Part V.

FAU members' lopsided defeats in the face of Doe's pitching *last season* are a "launching pad for a showing of imminent future injury" *this season. Murthy v. Missouri*, 603 U.S. 43, 59 (2024). The same crushing defeats will "*likely* occur" again, *id.* at 69 (quotation omitted), assuming FAU's "allegations are true and view[ing] them most favorably to" its members, *Iowa Migrant Movement for Just. v. Bird*, __ F.4th __, No. 24-2263, 2025 WL 2984379, at *2 (8th Cir. Oct. 23, 2025). That's plenty: Article III doesn't require certainty. So the district court correctly found that FAU has standing. App. 764–66; R. Doc. 134 at 32–34.

## IV. FAU has a fair chance, and is likely to prevail, on the merits of its Title IX claims.

The League's bylaws essentially eliminate the female sports category. But effectively sponsoring *all-male* boys' baseball and *mixed-sex* girls' softball fails to provide females equal athletic opportunity, doesn't accommodate females' interests and abilities, and violates Title IX. So FAU has a fair chance, and is likely to prevail, on the merits. The district court got it wrong by employing novel reasoning that contradicts Title IX, the athletic regulations, contemporary agency guidance, and precedent.

**A.    Private parties like FAU may sue based on Title IX and the athletic regulations, which sound in disparate treatment, not disparate impact.**

Out of the blue, the district court held that Minnesota may abolish women-only sports, and there's nothing private parties like FAU can do about it. The theory is that the athletic regulations go beyond Title IX and forbid disparate impact, so private parties can't sue under them. App. 769–78; R. Doc. 134 at 37–46. That's wrong for five reasons.

First, this Court has repeatedly allowed parties to sue based on Title IX and the athletic regulations. *E.g.*, *Portz*, 16 F.4th at 579–580; *Berndsen*, 7 F.4th at 784; *Chalenor v. Univ. of N.D.*, 291 F.3d 1042, 1043–45 (8th Cir. 2002). Those decisions should have bound the lower court.

Second, while the lower court grounded its theory in *Alexander v. Sandoval*, 532 U.S. 275 (2001), App. 773–74; R. Doc. 134 at 41–42, that case's logic doesn't apply here. *Sandoval* dealt with disparate-impact regulations promulgated under Title VI's § 602 that went beyond the statute's privately enforceable ban on intentional discrimination in § 601. 532 U.S. at 284–91. Yet Title IX and the athletic regulations—which Congress uniquely mandated, reviewed, and allowed to go into effect—*both* have "the rights-creating," "no person … shall" language mirrored in Title VI's § 601. 20 U.S.C. § 1681(a); 34 C.F.R. § 106.41(a); *accord McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 286–88 (2d Cir. 2004). And *Sandoval* said such language

33

*supports* a private right of action, whereas Title VI's § 602 and its implementing regulations' *dissimilar* terms do not. 532 U.S. at 288–89; *accord Cannon*, 441 U.S. at 690–94.

Third, overwhelming precedent establishes that Title IX's athletic regulations—or the policy interpretation of them—involve disparate *treatment*. The Second, Fourth, and Seventh Circuits have rejected any suggestion that they involve disparate *impact*. *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 97–98 (2d Cir. 2012); *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 102–04 (4th Cir. 2011); *Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 919–20 (7th Cir. 2012). So have district courts in the Third, Sixth, and Ninth Circuits. *Barrett v. W. Chester Univ. of Pa.*, No. Civ.A.3-CV-4978, 2003 WL 22803477, at *11– 12 (E.D. Pa. Nov. 12, 2003); *Mayerova v. E. Mich. Univ.*, 346 F. Supp. 3d 983, 989–91 (E.D. Mich. Sept. 27, 2018); *Anders v. Cal. State Univ.,* No. 1:21-cv-179-AWI-BAM, 2021 WL 1564448, at *6 (E.D. Cal. Apr. 21, 2021). The district court here stands alone, and this Court should not create a circuit split where there is not one.

Fourth, FAU's claims based on Title IX and the athletic regulations sound in disparate *treatment*. The lower court ignored that "discriminatory intent can be inferred from the mere fact of differences in treatment," *EEOC v. Dial Corp.*, 469 F.3d 735, 741 (8th Cir. 2006), and that "deliberate indifference" is a proven form of "intentional discrimination"—grounded in Title IX "caselaw"—that requires no

34

"showing of … ill will or animosity," *A.J.T. ex rel. A.T. v. Osseo Area Schs., Indep. Sch. Dist. No. 279*, 605 U.S. 335, 344–45 & n.4 (2025) (citation modified). *Accord* App. 777; R. Doc. 134 at 45 (nearly requiring animus to show intentional discrimination).

So FAU's allegations that the bylaws, in the real world, treat females worse than males and that Defendants made no effort to remedy the sex-based inequality concern disparate *treatment. Contra* App. 776–77; R. Doc. 134 at 44–45. They show Defendants "disregarded a strong likelihood that [the bylaws] would result in a violation of federally protected [Title IX] rights." *A.J.T.*, 605 U.S. at 345 (citation modified).

Finally, it's a shell game to rule out disparate treatment because the bylaws' gender-identity provision "draws no distinction between males and females." App. 776; R. Doc. 134 at 44. That provision applies only to *sex-designated* teams, which are sex conscious, not sex neutral. *Accord Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 772 n.8 (9th Cir. 1999) (noting that "athletics require a [sex] conscious allocation of opportunities"). Plus, facial equality isn't enough: Title IX demands "real [athletic] opportunities [for females], not illusory ones." *Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 175 (3d Cir. 1993); *accord Biediger*, 691 F.3d at 93*; Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 274 (6th Cir. 1994).

The lower court missed another crucial point. FAU shows that the bylaws violate Title IX's text, even apart from the athletic regulations. *Infra* Part IV.B.3. And that private cause of action is ironclad. *Accord Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 369 n.1 (2025).

**B.    The League's bylaws violate Title IX.**

Under Title IX, sex refers to the biological binary of male or female. So the statute's text, the athletic regulations, and contemporary agency guidance all point in the same direction. The League's bylaws discriminate against females based on sex and violate Title IX.

**1.    Title IX's definition of "sex" is the biological binary of male or female**

Title IX and the athletic regulations don't define "sex." But their text shows that "sex" means the biological binary of male or female.

Title IX, by its express terms, doesn't apply when certain institutions transition from admitting "only students of one sex" to admitting "students of both sexes." 20 U.S.C. § 1681(a)(2). And the law makes special provisions for male-dominated military academies and female-dominated beauty pageants. *Id.* §§ 1681(a)(4), (a)(9). Title IX also exempts male "social fraternit[ies]" and female "social sororit[ies]," and youth organizations like the "Young Men's Christian Association" and "Young Women's Christian Association." *Id.* § 1681(a)(6). Plus, the statute carves out "Boys State conference" and "Girls State conference" programs, *id.* § 1681(a)(7), and allows for "father-son or mother-

36

daughter activities," so long as those given "one sex" are "reasonably comparable" to those given "the other sex," *id.* § 1681(a)(8). *Accord* 20 U.S.C. § 1686 (allowing "separate [sex-based] living facilities").

The athletic regulations Congress approved go further, referring explicitly to "male and female teams," 34 C.F.R. § 106.41(c). The regulations also discuss what to do, in certain cases, when there is a sports team for "one sex" but no equivalent team for "the other sex." *Id.* § 106.41(b). And the regulations require "equal athletic opportunity for … both sexes," as well as effective accommodation of "the interests and abilities … of both sexes." *Id.* § 106.41(c) & (c)(1).

So the statutory and regulatory text shows that "'sex' refers to the traditional binary concept of biological sex." *Kansas v. U.S. Dep't of Educ.*, 739 F. Supp. 3d 902, 920 (D. Kan. 2024); *accord Arkansas v. U.S. Dep't of Educ.*, 742 F. Supp. 3d 919, 942 (E.D. Mo. 2024). That definition rules out gender identity, which is an unlimited or *non-binary* "social identity" that includes "male, female, some category in between (i.e. *gender fluid*), or a category other than male or female (i.e., *gender neutral*)." *Diagnostic & Statistical Manual of Mental Disorders Fifth Edition Text Revision* 511 (2022). Minnesota's description of "gender identity" is a perfect example: it encompasses "a person's inherent sense of being a man, woman, *both*, *or neither*." Minn. Stat. § 363A.03, subd. 50 (emphasis added).

37

Consistent with a biological definition of sex, all nine U.S. Supreme Court Justices indicated in an interim order last year that "sex discrimination" under Title IX *does not* "include discrimination on the basis of … gender identity." *Dep't of Educ. v. Louisiana*, 603 U.S. 866, 867 (2024) (per curiam). And that interim order "inform[s] how [this Court] should exercise its equitable discretion in like cases," *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025), including this one.

Holding otherwise would "render Title IX's many sex-based exceptions meaningless and 'would provide more protection against discrimination on the basis of transgender status … than it would against discrimination on the basis of sex.'" *Alabama v. U.S. Sec'y of Educ.*, No. 24-12444, 2024 WL 3981994, at *4 (11th Cir. Aug. 22, 2024) (quoting *Adams*, 57 F.4th at 813–14); *accord Louisiana v. U.S. Dep't of Educ.*, 737 F. Supp. 3d 377, 399 (W.D. La. 2024).

That peculiar result "turns Title IX on its head," *Tennessee v. Cardona*, 762 F. Supp. 3d 615, 624 (E.D. Ky. 2025), as Congress passed Title IX to end—not amplify—"discrimination against women," *McCormick*, 370 F.3d at 286. *Accord Cohen*, 101 F.3d at 175 (acknowledging that "Title IX's remedial focus is, quite properly, … on … women"); *Williams*, 998 F.2d at 175 (the athletic regulations were motivated by "the historic emphasis on boys' athletic programs to the exclusion of girls' athletic programs in high schools as well as colleges").

38

Biological sex also reflects the "ordinary meaning" of "sex" in 1972 when "Congress enacted" Title IX. *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019) (citation modified). Examples are legion, but two stand out. First, dictionaries of the period define "sex" as "biological sex," *Adams*, 57 F.4th at 812 (citing examples), or the "physiological differences between men and women—particularly with respect to reproductive functions," *Neese v. Becerra*, No. 2:21-CV-163-Z, 2022 WL 1265925, at *12 (N.D. Tex. Apr. 26, 2022) (same). *Accord Texas v. Cardona*, 743 F. Supp. 3d 824, 871–72 (N.D. Tex. 2024) (citing dictionary examples); *Kansas*, 739 F. Supp. 3d at 919–20 (same); *Louisiana*, 737 F. Supp. 3d at 398 & n.50 (same). Second, immediately following Title IX's passage, the Supreme Court characterized "sex" as "an immutable characteristic determined solely by the accident of birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973).

The upshot is that Title IX bars "discrimination" between males and females but "expressly permits separating the sexes." *Adams*, 57 F.4th at 815. What matters is "comparative equality." *Texas*, 743 F. Supp. 3d at 835; *cf.* 20 U.S.C. § 1681(a)(8) (requiring "reasonably comparable" activities). So Title IX supports—even "encourage[s]"—the "[r]ecognition of innate biological differences," while barring "treatment that disfavors, denies, excludes, or otherwise treats one biological sex worse than the other." *Texas*, 743 F. Supp. 3d at 873; *accord Arkansas*, 742 F. Supp. 3d at 943; *Kansas*, 739 F. Supp. 3d at 921.

39

## 2.  *Bostock* doesn't apply to Title IX.

*Bostock* doesn't support importing gender identity into Title IX for three reasons. First, *Bostock*'s concern was "intentionally treat[ing] a person worse because of sex." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 658 (2020). Yet Title IX treats males and females the same, and the statute delineates "girls' teams, boys' teams, and co-ed teams" based on biology, not "'on how students act or identify.'" *D.N. ex rel. Jessica N. v. DeSantis*, 701 F. Supp. 3d 1244, 1259 (S.D. Fla. 2023) (quoting *Adams*, 57 F.4th at 809); *accord Cohen*, 101 F.3d at 177.

Second, the Supreme Court hasn't applied "*Bostock*'s reasoning … beyond the Title VII context." *United States v. Skrmetti*, 605 U.S. 495, 520 (2025); *accord Bostock* 590 U.S. at 681 (stating no "other laws are before us").

Finally, there are key differences in the language and context of Title IX and Title VII. *E.g.*, *Alabama*, 2024 WL 3981994, at *5 (distinguishing Title IX from Title VII and *Bostock*); *Tennessee v. Cardona*, No. 24-5588, 2024 WL 3453880, at *2–3 (6th Cir. July 17, 2024) (same); *Soule v. Conn. Ass'n of Schs., Inc.*, 90 F.4th 34, 62–64 (2d Cir. 2023) (Menashi, J., concurring) (same); *Adams*, 57 F.4th at 808–09 (same); *Arkansas*, 742 F. Supp. 3d at 942–44 (same). Title IX often allows sex-based distinctions in ways that Title VII doesn't contemplate. *E.g.*, 20 U.S.C. § 1681(a)(2)–(9); 34 C.F.R. § 106.32(b); 34 C.F.R. § 106.33; 34 C.F.R. § 106.41(b). So *Bostock* isn't on point and doesn't

alter Title IX's biological binary definition of "sex." *E.g.*, *Texas v. United States*, 740 F. Supp. 3d 537, 546–50 (N.D. Tex. 2024) (refusing to import gender identity into Title IX); *Kansas*, 739 F. Supp. 3d at 920–23 (same); *Louisiana*, 737 F. Supp. 3d at 397–400 (same).

### 3. The bylaws violate the statute's text.

Congress declared in Title IX that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under" federally funded "education program[s] or activit[ies]." 20 U.S.C. § 1681(a). So athletic "programs" must provide equal "participation" and "benefits," and cannot otherwise "discriminat[e]" based on sex. *Id.* And practicalities, such as "the nature of particular sports," matter. Javits Amend. § 844.

So the statute requires "comparative equality" between males and females. *Texas*, 743 F. Supp. 3d at 835; *accord* 20 U.S.C. § 1681(a)(8) (requiring "reasonably comparable" activities). And it bars "differential treatment that disfavors, denies, excludes, or otherwise treats one biological sex worse than the other." *Texas*, 743 F. Supp. 3d at 873; *accord Arkansas*, 742 F. Supp. 3d at 943. Yet the bylaws effectively eliminate all-female sports like softball, while retaining essentially all-male sports like baseball, which treats females worse than males.

41

Biological differences mean that females have little chance of making the boys' baseball team, and there's no record evidence of it happening. Even if an exceptional female makes the boys' team, she has no physiological advantage, so play remains fair and safe. The same isn't true of males in girls' softball. Males who can best females in strength, speed, and endurance are a dime a dozen. So they have a strong chance of making the girls' team. And male competitive advantage renders play unfair and unsafe. *Supra* Statement Part IV.

Plus, team selection and playing time are zero-sum games. Softball teams are limited to 18 players; only 9 can play on the field; and only one can pitch at a time. *Girls Softball Rules, Policies, and Bylaws (2024-2025)* at 6, MSHSL, perma.cc/5M2Y-URUJ. So any male on the roster, field, or pitchers' mound, by definition, deprives females of athletic opportunities and benefits.

The practical result is preserving a level playing field for boys' baseball, leaving those athletic opportunities and benefits for males. By contrast, girls' softball becomes effectively mixed-sex; males take participation opportunities, playing time, and visibility away from females; and females are forced to compete on unequal and unsafe conditions, where they routinely lose to a dominant male. *Supra* Statement Part V. So females gain fewer sports awards or titles, and their statistics and rankings suffer, while males receive more awards or titles, and their records excel. Together, this creates a hurdle to females

attracting recruiters, making college teams, and obtaining scholarships that males don't face.

In sum, the bylaws deny females comparable athletic participation and benefits, discriminate based on sex, and violate Title IX's text.

### 4. The bylaws violate the athletic regulations.

The athletic regulations allow "*separate teams for … each sex*" in contact or competitive sports—like baseball and softball. 34 C.F.R. § 106.41(b) (emphasis added). In addition, every recipient "shall provide *equal athletic opportunity* for members of both sexes," including "sports and levels of competition [that] *effectively accommodate* the interests and abilities of … both sexes." *Id.* § 106.41(c) & (c)(1) (emphasis added).

The bylaws don't make it past the first inquiry. Minnesota does not create "separate teams for members of each sex" because it has not consistently sex-separated baseball and softball. 34 C.F.R. § 106.41(b). Girls' softball is now effectively a *combined*-sex sport, as the bylaws allow "male trans-identifying individuals to participate." Findings at 44. So girls' softball and boys' baseball aren't fully sex separated, and the fundamental sex-based distinction between them lacks "a valid basis," *id.*, infringing the regulation's general ban on "provid[ing] …athletics separately," 34 C.F.R. § 106.41(a).

The district court countered that the bylaws render *both* boys' baseball and girls' softball co-ed, and § 106.41(b) allows co-ed teams.

43

*E.g.*, App. 779–80, 787–88; R. Doc. 134 at 47–48, 55–56. That's incorrect. Minnesota has never declared these sports officially and uniformly co-ed. Indeed, Minnesota still forbids *males who identify as males* from competing in girls' softball. So from the perspective of Title IX and its biological understanding of sex, Minnesota continues to exclude some students based on sex in athletics in violation of § 106.41(a); Minnesota has not created uniform co-ed leagues; and Minnesota does not fall under the § 106.41(b) safe harbor of consistent sex-separated athletics. That's decisive.

Even beyond that failure, denying females the benefits of single-sex competition in softball—while granting them to males in baseball—fails to "provide equal athletic opportunity … [to] both sexes." 34 C.F.R. § 106.41(c). Under the bylaws, "while male sports maintain fair and safe competition, females are forced to participate in unfair and unsafe competition, where female athletes risk injuries, are displaced from podiums …, lose opportunities for advancement to regional and national competitions, and miss out on critical visibility for college scholarships and recognition." Findings at 17. These "disparities of a substantial and unjustified nature in the benefits, treatment, … and educational opportunities afforded to female athletes" violate Title IX. *Id.* at 44; *accord supra* Statement Part V.

Plus, Defendants have "effectively conceded" male competitive advantage "by offering sex-separated interscholastic athletic programs"

44

in the past. *Id.* at 47. Yet the bylaws "disregard[ ] the real biological differences between" males and females, taking only gender identity into account. *Id.* at 47; *accord supra* Statement Part II. So females "have materially fewer athletic opportunities than they previously enjoyed, because they no longer can compete in fair, exclusively female competition." Findings at 47. That "create[s] unfair and unsafe advantages for males," "displace[s] women and girls," and "make[s] it impossible for the educational athletic interests and abilities of female students to be fully and effectively accommodated." *Id.*

### 5. The bylaws violate contemporary agency guidance regarding the athletic regulations.

Two guidance documents have clarified the athletic regulations nearly from their inception. *Supra* Statement Part III.C; *accord Berndsen*, 7 F.4th at 787, 789. Both show that the bylaws violate Title IX.

First, the 1975 guidance letter shows that, under the athletic regulations, recipients never had the unfettered ability to choose between "single sex teams or teams composed of both sexes." Letter. That decision has always turned on "the *interests* of both sexes in the sports to be offered" and, for contact or competitive sports, "the *relative abilities* of members of each sex for each such sport offered." *Id.* (emphasis added). Yet the bylaws effectively render softball mixed-sex without accounting for females' athletic interests or females' relative

45

*inability* to compete against males in softball given their greater size, strength, speed, and endurance. *Supra* Statement Part II. Defendants' actions have effectively rendered softball mixed-sex, even though male competitive advantage is why baseball and softball were sex-separated to begin with. *Accord* App. 137; R. Doc. 8-2 at 17. Under the 1975 guidance letter, that violates Title IX, as an all-female baseball equivalent (*i.e.*, softball) is *required*.

Second, the 1979 policy interpretation demands the same result. It clarifies that recipients *"must"* provide a sex-separated, female equivalent to boys' baseball if the following conditions are met: (1) the excluded sex's opportunities "have historically been limited," (2) the excluded sex has "sufficient interest and ability" to field "a viable team" in inter-school competition, and (3) the excluded sex lacks "sufficient skill to be selected for a single integrated team, or to compete actively on such a team if selected." Interpretation at VII.C.4.b (emphasis added); *accord Berndsen*, 7 F.4th at 789.

Girls' softball meets all three factors. Females' athletic opportunities have historically been limited in Minnesota. *E.g.*, Findings at 22–23. Females have demonstrated their interest and ability to play softball in inter-school competition for nearly 40 years. Minn. Softball Champions. And due to male competitive advantage, the vast majority of females lack sufficient ability to make the baseball team or actively compete in baseball if they prevailed against males at

46

tryouts. So the policy interpretation also *mandates* an all-female softball team, as a baseball equivalent.

Considering the policy interpretation's "Overall Determination of Compliance" factors leads to the same result. The bylaws collectively "discriminat[e] in language [and] effect" by partially separating the sexes without a valid basis and disadvantaging females. Interpretation at VII.B.5 & C.6. And the bylaws' intentional disregard of male athletic advantage results in females receiving substantially inferior "benefits, treatment, [and] opportunities" both in the League's "program as a whole" and in the softball "segment[ ]" that are "substantial enough" to "deny equality of athletic opportunity." *Id.*; *accord supra* Statement Parts II and IV.

## C. Clear notice isn't a barrier.

Defendants had clear notice of their Title IX obligations without the statute "specifically identif[ying] … each condition" of equal athletic opportunity. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005). The athletic regulations "have been on the books for nearly [50] years," as have the guidance letter and policy interpretation. *Id.* And the federal government explained how the regulations apply to the bylaws in detail. Findings at 42–44; App. 56–59, R. Doc. 1 ¶¶ 165–73.

Plus, "recipients have been on notice that they could be subjected to private suits for intentional sex discrimination under Title IX since

47

1979." *Jackson*, 544 U.S. at 182. Official policies like the bylaws are "always—by definition—intentional." *Id.* at 183. Here, Defendants "acted with deliberate indifference to the condition of [the League's] female athletics program." *Pederson*, 213 F.3d at 882. Whether they "*intended* to violate Title IX" is irrelevant. *Id.* at 881 (emphasis added). Drafting, applying, and maintaining the bylaws despite females' lack of equal opportunity was intentional (not an "accident") and "treat[s] women differently," *id.* (citation modified), which "violates the clear terms of the statute," *Jackson*, 544 U.S. at 183 (quotation omitted).

Defendants can't pretend they lacked clarity. The guidance letter and policy interpretation were widely available *decades* before the League changed the bylaws. And both *require* the League to offer a sex-separated, all-female equivalent to baseball. *Supra* Part III.B.5.

The district court said that a clear-notice requirement applies to injunctions that impose substantial financial costs. App. 794; R. Doc. 134 at 62. This Court has never applied a notice requirement to prospective relief. *E.g.*, *Portz*, 16 F.4th at 579–80, 585 (making no mention of notice despite an injunction imposing substantial monetary costs); *Grandson v. Univ. of Minn.*, 272 F.3d 568, 575 (8th Cir. 2001) (applying a notice requirement to damages claims but not referencing prospective relief). Even assuming this statement of law is correct, clear notice doesn't apply here because FAU's requested injunction imposes no significant monetary costs. The League's physical form *already*

Appellate Case: 25-2899      Page: 60      Date Filed: 11/18/2025 Entry ID: 5579646

*records* biological sex, and that's the only means of enforcing sex separation that FAU requests. *Supra* p. 24.

## V.  FAU members face irreparable harm.

The 2026 softball season is approaching fact, and FAU members face irreparable harm. After tryouts in March, the pre-season and regular season begin, extending through April and May. That's when FAU Athlete 1's team is calendared to play Athlete Doe's team. FAU Athletes 2-4 are also likely to do so. *Supra* Statement Part V.

Sectionals and the state tournament run from May to June. At a minimum, FAU Athlete 1 will compete with Athlete Doe's team to be the one sectional team that advances to state. Plus, FAU Athletes 2, 3, and 4 are all on strong teams again this year, so they are well-positioned to return to the state tournament. In all likelihood, Athlete Doe's team will compete against one or both of their all-female teams at the state tournament, as Athlete 4's team did last season. *Supra* Statement Part V. These post-season games are high profile and practically certain to attract scouts' attention.

Equal athletic opportunity is essential so that FAU members can play their best, advance to higher levels of competition, get noticed, stay safe, and attract offers to play for Division I or II colleges (and the scholarships that go with them). Otherwise, they will lose to Athlete Doe's team again, depressing their records, rankings, and visibility

Appellate Case: 25-2899     Page: 61     Date Filed: 11/18/2025 Entry ID: 5579646

further. And this is FAU Athlete 1 and 2's senior year—their last chance to excel and make the state high school championship.

Being "treated unequally in violation of Title IX" again this season is irreparable harm "given the fleeting nature of [high school] athletics." *Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963, 972–73 (D. Minn. 2016) (citation modified). Once Defendants "deprive[ ]" FAU members of an equal "chance" to excel and reach or win "[r]egional and [s]tate [c]hampionship competition," there's no going back. *McCormick*, 370 F.3d at 302 n.25.

## VI. The public interest and balance of harms favor FAU.

Consideration of the public interest and balance of harms merges in suits against the government or state officials. *Eggers v. Evnen*, 48 F.4th 561, 564–65 (8th Cir. 2022). Both factors favor FAU.

Minnesota agreed to "the correct application of [Title IX]" in exchange for federal funds, which is where "the public's *true* interest lies." *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 614 (6th Cir. 2024) (citation modified). The State properly maintained sex-separated sports teams for decades and still effectively does so for males. Holding Minnesota to its equal-athletic-opportunity promise fulfills Congress's longstanding expectations. *Accord Cohen v. Brown Univ.*, 809 F. Supp. 978, 982, 1001 (D.R.I. 1992). By contrast, the State's recent efforts to "mov[e] beyond a biological understanding of 'sex'" have no support in

50

Title IX and the athletic regulations, *Adams*, 57 F.4th at 814, which "have been unchanged for approximately 50 years," *Tennessee v. Cardona*, 737 F. Supp. 3d 510, 569 (E.D. Ky. 2024).

No harm results from holding Minnesota to Title IX's bargain. If the State wishes to prioritize gender identity over sex, it can do so without federal funds. But FAU members have no escape hatch. Last season, they were forced to play against a mixed-sex team, resulting in crushing defeats, lost opportunities, depressed records, and reduced publicity—harming their ability to make college teams and obtain scholarships. They shouldn't be forced to do so again.

Plus, Athlete Doe *doesn't* qualify to play college softball or obtain an athletic scholarship, and Doe stopped playing on a club team to avoid harming teammates' chances of advancing to the collegiate level. App. 340–41; R. Doc. 80 ¶ 21. But FAU members *do* qualify for college softball and have sacrificed for years to see that dream become reality. So even if the impact on Doe (a non-party) is relevant, the balance of harms favors FAU members.

Because FAU's requested injunction imposes no meaningful costs, FAU is a non-profit member organization, and an injunction serves the public interest, the Court should not require a bond. *Richland/Wilkin*, 826 F.3d at 1043 (approving bond waiver based on public interest).

## CONCLUSION

Female athletes have the right to a level playing field where they can safely play—and win—girls' sports competitions. For the above reasons and those stated in the federal government's finding, the Court should reverse and order a preliminary injunction that bars Defendants from allowing males to compete with, or against, FAU members in female-designated contact or competitive sports.

Appellate Case: 25-2899    Page: 64    Date Filed: 11/18/2025 Entry ID: 5579646

Dated: November 17, 2025

Respectfully submitted,

*/s/ Rory T. Gray*

John J. Bursch
Suzanne E. Beecher
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
jbursch@adflegal.org
sbeecher@adflegal.org

Jonathan A. Scruggs
Henry W. Frampton, IV
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@adflegal.org
hframpton@adflegal.org

Rory T. Gray
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville GA 30043
(770) 339-0774
rgray@adflegal.org

Renee K. Carlson
Douglas G. Wardlow
TRUE NORTH LEGAL
525 Park Street, Suite 460
St. Paul, MN 55103
(612) 789-8811
rcarlson@truenorthlegalmn.org
dwardlow@truenorthlegal.org

*Counsel for Plaintiff-Appellant*

53

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because it contains 12,114 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f), as determined by the word counting feature of Microsoft Office 365.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Word 365 using a proportionally spaced typeface, 14-point Century Schoolbook.

This brief has been scanned for viruses with the most recent version of a commercial virus scanning program, Cortex XDR, Agent version 7.8.1, and according to the program is free of viruses.

Dated: November 17, 2025

*s/Rory T. Gray*
Rory T. Gray
*Counsel for Appellant*

Appellate Case: 25-2899    Page: 66    Date Filed: 11/18/2025 Entry ID: 5579646

# CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

*s/Rory T. Gray*
Rory T. Gray
*Counsel for Appellant*

Appellate Case: 25-2899    Page: 67    Date Filed: 11/18/2025 Entry ID: 5579646