No. 25-2899

# IN THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

FEMALE ATHLETES UNITED,

*Plaintiff-Appellant,*

v.

KEITH ELLISON, in his official capacity as Attorney General of Minnesota, et al.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Minnesota
No. 0:25cv2151

## AMICI CURIAE BRIEF OF THE AMERICAN CIVIL LIBERTIES UNION, THE AMERICAN CIVIL LIBERTIES UNION OF MINNESOTA, AND GENDER JUSTICE IN SUPPORT OF APPELLEES AND AFFIRMANCE

Andrew W. Davis
    *Counsel of Record*
Joshua Poertner
Grace Pilz
Stinson LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
(612) 335-1500
andrew.davis@stinson.com
joshua.poertner@stinson.com
grace.pilz@stinson.com

Sruti J. Swaminathan
Jennesa Calvo-Friedman
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Fl.
New York, NY 10004
(212) 549-2569
sswaminathan@aclu.org
jcalvo-friedman@aclu.org

Jess Braverman
GENDER JUSTICE
663 University Ave. W., Suite 200
St. Paul, MN 55103
(651) 789-2090
jess.braverman@genderjustice.us

Teresa Nelson
Catherine Ahlin-Halverson
David P. McKinney
AMERICAN CIVIL LIBERTIES UNION
OF MINNESOTA
P.O. Box 14720
Minneapolis, MN 55414
(651) 645-4097
tnelson@aclu-mn.org
dmckinney@aclu-mn.org
cahlin@aclu-mn.org

*Counsel for Amici Curiae the American Civil Liberties Union,
American Civil Liberties Union of Minnesota, and Gender Justice*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1 and 29(a)(4)(A) of the Federal Rules of Civil Procedure, *amici curiae* the American Civil Liberties Union, American Civil Liberties Union of Minnesota, and Gender Justice state that they do not have parent corporations and that no publicly held corporation owns 10% or more of their stock.

Dated: December 23, 2025

/s/ Andrew W. Davis
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF AUTHORITIES .................................................. iv

INTEREST OF AMICI CURIAE ............................................ vii

INTRODUCTION .................................................................. 1

BACKGROUND ................................................................... 2

I. Title IX and Implementing Regulations ......................... 2

II. Minnesota Human Rights Act ...................................... 5

ARGUMENT ........................................................................ 8

I. FAU Has Not Shown It Has a Fair Chance of Prevailing on the Merits of Its Title IX Claim. ................................... 8

    A. Title IX does not require sex-separated teams. ....................... 8

    B. FAU has not shown that it has been denied effective accommodation or been subjected to unequal treatment under the 1979 policy interpretation. ................ 11

        1. FAU has not been denied effective accommodation. ........................................... 12

        2. FAU has not shown a fair chance of prevailing on its Title IX equal treatment claim. ......................... 20

            a. FAU fails to meet the governing test. ................ 20

            b. FAU's allegations do not constitute equal treatment, as mixed-sex teams are permitted under Title IX .................................. 23

II. Title IX Does Not Prohibit Minnesota from Enforcing Its Laws .......................................................................... 25

CONCLUSION .................................................................... 29

CERTIFICATE OF COMPLIANCE........................................................31

CERTIFICATE OF SERVICE..............................................................32

# TABLE OF AUTHORITIES

**Cases**          **Page(s)**

*B.P.J. v. W. Va. State Bd. of Educ.,*
98 F.4th 542 (4th Cir. 2024) .......................................viii, 10

*Berndsen v. N.D. Univ. Sys.,*
7 F.4th 782 (8th Cir. 2021) ................................... 12, 13, 14

*Bostock v. Clayton Cnty.,*
590 U.S. 644 (2020) .............................................................. 18

*Chalenor v. Univ. of N.D.,*
291 F.3d 1042 (8th Cir. 2002) ..................................... 16, 17

*Cohen v. Brown Univ.,*
101 F.3d 155 (1st Cir. 1996) ........................................ 1, 10

*Cooper v. USA Powerlifting,*
26 N.W.3d 604 (Minn. 2025) ................................... *passim*

*D.M. by Bao Xiong v. Minn. State High Sch. League,*
917 F.3d 994 (8th Cir. 2019) ............................................. 8

*Force by Force v. Pierce City R-VI Sch. Dist.,*
570 F. Supp. 1020 (W.D. Mo. 1983) ................................ 10

*Grove City Coll. v. Bell,*
465 U.S. 555 (1984) ............................................................. 5

*Hecox v. Little,*
104 F.4th 1061 (9th Cir. 2024) ......................................viii

*Horner v. Kentucky High Sch. Athletic Ass'n,*
43 F.3d 265 (6th Cir. 1994) ............................................ 13

*McCormick v. Sch. Dist. of Mamaroneck,*
370 F.3d 275 (2d Cir. 2004) ...................................... 21, 22

*N. Haven Bd. of Educ. v. Bell,*
456 U.S. 512 (1982) ........................................................ 3, 5

*N.H. v. Anoka-Hennepin Sch. Dist. No. 11*,
    950 N.W.2d 553 (Minn. Ct. App. 2020) ...................................... *passim*

*Ollier v. Sweetwater Union High Sch. Dist.*,
    858 F. Supp. 2d 1093 (S.D. Cal. 2012), *aff'd*, 768 F.3d 843
    (9th Cir. 2014) ................................................................................. 22

*OutFront Minnesota v. Piper*,
    No. 62-CV-15-7501, 2016 WL 11898980
    (Minn. Dist. Ct. Nov. 14, 2016) ........................................................ viii

*Portz v. St. Cloud State Univ.*,
    16 F.4th 577 (8th Cir. 2021) ...................................................... *passim*

*State of Tennessee v. Dep't of Educ.*,
    104 F.4th 577 (6th Cir. 2024) ........................................................ 2, 10

*Thomas v. Regents of Univ. of Cal.*,
    No. 19 Civ. 6463, 2020 WL 3892860
    (N.D. Cal. July 10, 2020) .................................................................. 18

*Yellow Springs Exempted Vill. Sch. Dist. Bd. of Educ. v.*
    *Ohio High Sch. Athletic Ass'n*, 647 F.2d 651 (6th Cir. 1981) .............. 10

## Statutes

Title IX of the Education Amendments of 1972,
    20 U.S.C. § 1681, *et seq.* .......................................................... *passim*

Act of May 19, 2023, ch. 52, art 19, § 48, 2023 Minn. Laws 1,
    (codified at Minn. Stat. § 363A.03, subd. 50 (2024)) ........................ 6, 7

Minnesota Human Rights Act (MHRA),
    Minn. Stat. Ch. 363A ................................................................ *passim*

Pub. L. No. 93–380, § 844, 88 Stat. 484 (1974) ........................................ 3

## Rules and Regulations

34 C.F.R. § 106.41 ...................................................................... *passim*

44 Fed. Reg. 71,413, 71,415 (Dec. 11, 1979) ("Interpretation") ...... *passim*

**Other Authorities**

Op. Att'y Gen. 1035 (Feb. 20, 2025) .......................................................27

Paisley Currah & Shannon Minter, *Unprincipled Exclusions:
The Struggle to Achieve Judicial and Legislative Equality for
Transgender People*, 7 Wm. & Mary J. Women & L. 37, 46
(2000).................................................................................................5

# INTEREST OF AMICI CURIAE[1]

The American Civil Liberties Union ("ACLU") is a nationwide, non-partisan, nonprofit organization with more than six million members, supporters, and activists. Since its founding in 1920, the ACLU has been dedicated to the principles of liberty and equality embodied in the Constitution and our nation's civil rights laws, including Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*. Founded in 1952, the American Civil Liberties Union of Minnesota ("ACLU of Minnesota") is a statewide affiliate of the ACLU and is a non-partisan, non-profit organization dedicated to the preservation and enhancement of civil liberties and civil rights in Minnesota.

Amici ACLU has participated in many of the most consequential cases impacting the rights of women in American history, both as direct counsel and as amici curiae. The ACLU Women's Rights Project, co-founded in 1972 by Ruth Bader Ginsburg, uses policy advocacy and

---

[1] Pursuant to Federal Rule of Appellate Procedure Rule 29 amici certify that no person or entity, other than amicus, their members, or their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part.

litigation to ensure women's and girls' full equality in society. The ACLU LGBTQ & HIV Project has specifically represented transgender female athletes in challenges to discriminatory state laws restricting participation in sports in West Virginia and Idaho. *See B.P.J. v. W. Va. State Bd. of Educ.*, 98 F.4th 542 (4th Cir. 2024); *Hecox v. Little*, 104 F.4th 1061 (9th Cir. 2024).

The ACLU-MN has significant expertise in the protections provided by the Minnesota Constitution and Minnesota Human Rights Act ("MHRA"), especially with respect to its protections based on sexual orientation and gender identity. Both the ACLU and ACLU-MN have participated as counsel or amicus in numerous cases addressing discrimination against LGBT people in this state. *See, e.g., N.H. v. Anoka-Hennepin Sch. Dist. No. 11*, 950 N.W.2d 553 (Minn. Ct. App. 2020); *OutFront Minnesota v. Piper*, No. 62-CV-15-7501, 2016 WL 11898980 (Minn. Dist. Ct. Nov. 14, 2016).

Amici Gender Justice is a non-profit legal advocacy organization that has been operating in Minnesota since 2010. It advocates for gender equality through the law. As part of its public interest mission, Gender Justice helps courts, employers, schools, and the public better

understand the causes and consequences of gender discrimination. Both through direct representation and by advising courts as amicus curiae, Gender Justice advocates for legal interpretations that properly account for all forms of gender bias and effectively ensure equity. As part of its impact litigation program, Gender Justice represents clients in Minnesota who have experienced gender-based discrimination, including but not limited to transgender and cisgender athletes and students. *See Cooper v. USA Powerlifting*, 26 N.W.3d 604, 608 (Minn. 2025); *N.H. v. Anoka-Hennepin Sch. Dist. No. 11*, 950 N.W.2d 553 (Minn. Ct. App. 2020).

**INTRODUCTION**

Plaintiff-Appellant Female Athletes United's ("FAU") Title IX claims are based on a fundamentally flawed premise: that, under Title IX, schools must always provide separate athletic teams for men and women as the exclusive means of providing equal athletic opportunity. According to FAU, transgender girls are "boys," not "girls," for the purposes of Title IX, and allowing transgender girls to participate on girls' softball teams violates Title IX because such a policy forces cisgender girls to compete on teams with "biological males," and thereby denies them equal athletic opportunity.

But, setting aside FAU's erroneous and textually unsupported claim that transgender girls are "boys" for the purposes of Title IX, Title IX does not require schools to provide athletic opportunities exclusively through sex-separated teams. As circuit courts have long-recognized, "[w]hile the Title IX regime *permits* institutions to maintain gender-segregated teams, the law does not *require* that student-athletes attending institutions receiving federal funds must compete on gender-segregated teams." *Cohen v. Brown Univ.*, 101 F.3d 155, 177 (1st Cir. 1996) (emphasis added). Indeed, just last year the Sixth Circuit

explained that Title IX and its regulations "permit, but do not require, aid recipients to organize their athletics programs and facilities by biological sex. Schools could, for example, choose coeducational teams and facilities. It follows that they could also separate programs and facilities by gender identity." *State of Tennessee v. Dep't of Educ.*, 104 F.4th 577, 610–11 (6th Cir. 2024). Thus, even assuming for argument's sake that inclusion of transgender girls transformed a girls' softball team into a "co-ed" team, that would still not violate Title IX. Pursuant to the Minnesota Human Rights Act, which prohibits discrimination based on sexual orientation and gender identity in employment, housing, public accommodations, public services, and education, Minnesota has chosen to provide athletic opportunities in a manner that allows all students—including girls who are transgender—to fully participate in school sports. Nothing in Title IX prevents Minnesota from making that choice.

## BACKGROUND

## I.     Title IX and Implementing Regulations

In 1972 Congress passed Title IX, providing that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to

discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). This language is broad and generally prohibits exclusion of any person from an education program or activity because of sex. As the Supreme Court concluded in 1982, there is "no doubt that 'if we are to give [Title IX] the scope that its origins dictate, we must accord it a sweep as broad as its language.'" *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521 (1982) (brackets in original).

Two years after Title IX's initial passage, Congress voted down proposals to exempt athletics from the broad prohibition on sex discrimination and instead passed a separate statute, known as the Javits Amendment, to provide greater flexibility in applying Title IX in the athletics context. The statute delegates responsibility to the U.S. Department of Health, Education, and Welfare ("HEW") to adopt regulations "implementing Title IX," including "reasonable provisions considering the nature of particular sports." Education Amendments of 1974, Pub. L. No. 93–380, § 844, 88 Stat. 484 (1974).

Using the flexibility provided by the Javits Amendment to adopt "reasonable provisions," HEW promulgated athletic regulations with

three major elements. First, the regulations generally prohibit schools from providing "athletics separately" on the basis of sex. 34 C.F.R. § 106.41(a). Second, the regulations state that schools "may" (but need not) "operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(b). Third, the regulations require that however a school structures its athletic program—whether through co-ed teams, sex-separated teams, or a combination of both— the school must provide "equal athletic opportunity to members of both sexes." 34 C.F.R. § 106.41(c). Finally, a longstanding "policy interpretation" adopted by HEW in 1979 sets forth detailed standards for measuring equal athletic opportunity under which "identical benefits, opportunities, or treatment are not required provided the overall effect of any differences is negligible." 44 Fed. Reg. 71,413, 71,415 (Dec. 11, 1979) ("Interpretation").

Notably, not only did Congress delegate to HEW the responsibility of determining what are "reasonable provisions considering the nature of particular sports," Congress also ensured it had the opportunity to review the proposed regulations, and overturn them if they were

inconsistent with Title IX. *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 531–32 (1982). Congress did not disapprove the Title IX regulations, which the Supreme Court has explained "strongly implies that [they] accurately reflect congressional intent." *Grove City Coll. v. Bell*, 465 U.S. 555, 568 (1984).

## II. Minnesota Human Rights Act

In 1993, Minnesota became the first state to expressly protect transgender individuals from discrimination on the basis of their gender identity. *See* Paisley Currah & Shannon Minter, *Unprincipled Exclusions: The Struggle to Achieve Judicial and Legislative Equality for Transgender People*, 7 Wm. & Mary J. Women & L. 37, 46 (2000). The inclusion of protections for transgender people was intentional. The bill's Senate sponsor, Senator Allan Spear, had originally introduced a version of the legislation in 1975 that did not include protections for transgender people, but in 1993, he and Representative Karen Clark ultimately sponsored a bill that did. *See* Joshua Preston, *Senator Allan Spear and the Minnesota Human Rights Act*, Minn. History, Fall 2016, at 76, 81 (describing bill sponsors' strategic decision to include protections for transgender people).

The legislature's inclusion of gender identity within the definition of "sexual orientation" was clear:

> "Sexual orientation" means . . . having or being perceived as having a self-image or identity not traditionally associated with one's biological maleness or femaleness.

Minn. Stat. § 363A.03, subd. 44 (2018); *see generally* Minn. Stat. §§ 363A.08–.09, .11–.13 (2018) (prohibiting discrimination based on sexual orientation in employment, housing, public accommodations, public services, and education). Discrimination based on sexual orientation thus includes discrimination because a person's "self-image or identity" differs from their "biological maleness or femaleness." *Id.*

In 2023, the legislature updated the MHRA and, as in 1993, made clear that gender identity refers to a person's perception of their sex. The legislature removed gender identity from the definition of "sexual orientation" and added a separate freestanding definition:

> "Gender identity" means a person's inherent sense of being a man, woman, both, or neither. A person's gender identity may or may not correspond to their assigned sex at birth or to their primary or secondary sex characteristics. A person's gender identity is not necessarily visible to others.

Act of May 19, 2023, ch. 52, art 19, § 48, 2023 Minn. Laws 1, 328 (codified at Minn. Stat. § 363A.03, subd. 50 (2024)). Thus, the 2023 updates to the

MHRA did not substantively change the MHRA's protections based on sexual orientation and gender identity, but rather updated and clarified the language to more accurately reflect the distinct concepts of sexual orientation and gender identity. *Cooper v. USA Powerlifting*, 26 N.W.3d 604, 608 (Minn. 2025). A person is transgender if their gender identity does not match their sex assigned at birth. Minn. Stat. § 363A.03, subd. 50. Under both the original and amended statute, "the Legislature has directed that a person or entity that discriminates on the basis of transgender status violates the MHRA unless a statutory defense or exemption applies." *Cooper*, 26 N.W.3d at 615. That is, treating a transgender girl differently than a girl assigned female at birth violates the MHRA.

Similarly, the highest court to address the issue has found that government discrimination against transgender people constitutes an equal protection violation under Article I, Section 2 of the Minnesota Constitution. Minn. Const. art. I, § 2; *N.H.*, 950 N.W.2d at 572 (holding that a public school's exclusion of a transgender student from the locker room aligning with his gender identity is actionable as a violation of the Minnesota Constitution's Equal Protection Clause).

Discrimination against transgender Minnesotans is prohibited by Minnesota Statute and the Minnesota Constitution.

## ARGUMENT

I.  **FAU Has Not Shown It Has a Fair Chance of Prevailing on the Merits of Its Title IX Claim.**

FAU has not shown a fair chance of prevailing[2] on its claims for denial of effective accommodation and denial of equal treatment under Title IX. Even assuming for argument's sake that the inclusion of a transgender girl on the girls' softball team transformed softball into a "co-ed" sport, Title IX does not require Minnesota to provide athletic opportunities solely through sex-separated teams.

The District Court judgment should be affirmed.

A.  **Title IX does not require sex-separated teams.**

Title IX did not create a right for students to play exclusively on sex-separated teams. Far from mandating sex-separated teams, Title IX regulations in place since 1975 establish a "[g]eneral" rule *prohibiting*

---

[2] Because FAU has not shown it can meet the more lenient fair-chance-of-prevailing standard, this Court need not decide whether the more rigorous likely-to-prevail-on-the-merits standard, which applies to government action that involves the democratic process, is appropriate here. *See, e.g., D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1001 (8th Cir. 2019).

schools from "provid[ing] . . . athletics separately" on the basis of sex. 34 C.F.R. § 106.41(a). Subsection (b) of the regulations carves out an exception to that general prohibition, stating "a recipient *may* operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." *Id.* § 106.41(b) (emphasis added). Subsection (b) mandates only that "where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited," members of the "excluded sex must be allowed to try-out" unless it is a contact sport. *Id.* Subsection (c) requires schools to provide "equal athletic opportunity," listing factors relevant to whether "equal athletic opportunity" is available, but not including sex separation as a factor for consideration. *Id.* § 106.41(c). The text of Title IX and its implementing regulations make it clear that Title IX allows for, but does not require, sex separation in sports.

In accordance with the regulation's plain text, courts have held that "while the Title IX regime permits institutions to maintain gender-

segregated teams, the law does not require that student-athletes attending institutions receiving federal funds must compete on gender-segregated teams." *Cohen v. Brown Univ.*, 101 F.3d 155, 177 (1st Cir. 1996); *accord Tennessee v. Dep't of Educ.*, 104 F.4th 577, 610–11 (6th Cir. 2024) (explaining that under the regulations "[s]chools could" still "choose coeducational teams"); *Yellow Springs Exempted Vill. Sch. Dist. Bd. of Educ. v. Ohio High Sch. Athletic Ass'n*, 647 F.2d 651, 656 (6th Cir. 1981) (striking high school athletic association rule mandating sex separation for all teams as inconsistent with Title IX); *Force by Force v. Pierce City R-VI Sch. Dist.*, 570 F. Supp. 1020, 1024–25 (W.D. Mo. 1983) (holding that Title IX did not require sex separation for contact sports and "simply takes a neutral stand on the subject").

The Sixth Circuit recently applied these principles in the context of transgender athletes and held that Title IX's athletics regulations allowed schools to separate athletics "in accordance with one's biological sex without accommodating gender identity." *Tennessee*, 104 F.4th at 610; *contra B.P.J.*, 98 F.4th at 564. But the Sixth Circuit accredited the flexibility created by the regulations and held that they "do not require" schools to separate teams based on sex. *Tennessee*, 104 F.4th at 610.

"Schools could, for example, choose coeducational teams and facilities. It follows that they could also separate programs and facilities by gender identity." *Id.* at 610–11. FAU does not—and cannot—present any authority under Title IX or its regulatory frameworks prohibiting Minnesota from making the same choice.

The district court correctly concluded that "[b]ased on that content and structure, the regulation cannot reasonably be understood to say that requiring female athletes to compete against male athletes—or more specifically, a girls' team to compete against a mixed-sex team—amounts to a per se Title IX violation." R. Doc. 145, at 49. Thus, even assuming for argument's sake that inclusion of transgender girls on girls' teams could render these teams no longer "sex-separated"—an assumption that amici strongly dispute—FAU cannot show that Title IX is per se violated if teams are not "sex-separated."

**B.    FAU has not shown that it has been denied effective accommodation or been subjected to unequal treatment under the 1979 policy interpretation.**

Under Eighth Circuit precedent, Title IX claims for denial of equal athletic opportunity are governed by a controlling 1979 policy interpretation. Title IX of the Education Amendments of 1972; a Policy

Interpretation; Title IX and Intercollegiate Athletics, 44 Fed. Reg. 71413–71423 (1979) (the "Interpretation"); *Berndsen v. N.D. Univ. Sys.*, 7 F.4th 782, 785–88 (8th Cir. 2021). To assess whether there is equal opportunity, the Interpretation directs institutions to (1) effectively accommodate the interests and abilities of students and (2) provide equitable treatment and benefits. *Berndsen*, 7 F.4th at 785; *Portz v. St. Cloud State Univ.*, 16 F.4th 577, 580–81 (8th Cir. 2021). The district court correctly concluded that FAU did not show a fair chance of prevailing on its Title IX claims under either framework. R. Doc. 145, at 56–57.

### 1. FAU has not been denied effective accommodation.

FAU has not shown a fair chance of prevailing on its Title IX claim based on ineffective accommodation. An effective accommodation claim considers "[w]hether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes." 34 C.F.R. § 106.41(c)(1); Interpretation at 71417; *see Berndsen*, 7 F.4th at 785. The two types of claims under effective accommodation are "Selection of Sports," Interpretation at

71417–18, and "Participation Opportunities," part of the assessment of levels of competition, Interpretation at 71418.

**Selection of Sports.** FAU does not come close to showing that its members have been denied effective accommodation under the Interpretation's "Selection of Sports" provision, which is the only provision that mandates sex-separate teams in enumerated narrow contexts. *See Berndsen*, 7 F.4th at 789 (discussing Interpretation at 71417–18). The Interpretation states, "[W]here an institution sponsors a team in a particular sport for members of one sex, it may be required *either* to permit the excluded sex to try out for the team *or* to sponsor a separate team for the previously excluded sex." Interpretation at 71418 (emphases added).

In non-contact sports, like softball,[3] institutions can "permit the excluded sex to try out for the team" rather than "sponsor a separate team for the previously excluded sex" unless, among other things,

---

[3] Softball is a non-contact sport. Under the Title IX regulation, contact sports are those which "the purpose or major activity of which involves bodily contact," such as "boxing, wrestling, rugby, ice hockey, football, basketball". 34 C.F.R. § 106.41(b); *see Horner v. Kentucky High Sch. Athletic Ass'n*, 43 F.3d 265, 274 (6th Cir. 1994) (applying the non-contact sports provision of the Interpretation in evaluating Title IX claims related to participation in softball).

"[m]embers of the excluded sex do not possess sufficient skill to be selected for a single integrated team or to compete actively on such a team if selected." Interpretation at 71418.[4]

FAU does not have a fair chance of prevailing in its effective accommodation claim based on "Selection of Sports" because it has failed to show that its members are not sufficiently skilled to be selected for a single integrated team nor that they are unable to "compete actively" on a mixed team. *See* Interpretation at 71418. The record reflects that the FAU members identified in the suit have all been selected for the varsity softball teams at their respective high schools, and each of their high school softball teams has had successes, with a few members even earning individual awards for their performances in the latest season. (R. Doc. 68, at 10–12). Therefore, "effective

---

[4] Only for contact sports, does effective accommodation require that an institution that sponsors a team for members of one sex must do so for members of the other sex, and then only if the opportunities for members of the excluded sex have historically been limited and there is sufficient interest to sustain a viable team. Interpretation at 71418. *See Berndsen*, 7 F.4th at 789 (8th Cir. 2021) (explaining that the Interpretation "unambiguously requires an institution sponsoring a single-sex contact sports team (e.g., men's ice hockey) to sponsor a team for the other sex (e.g., women's ice hockey)" if its two conditions are met).

accommodation" does not require "a separate team for the previously excluded sex." Interpretation at 71417–18.

FAU argues that allowing transgender girls to participate on girls' teams decreases opportunities for cisgender girl athletes to compete and win awards, thereby violating Title IX. R. Doc. 1, at 39. But that is not a valid effective accommodation claim. FAU fails to engage with the relevant standard while also painting an inaccurate story. Any argument that FAU members were unable to "be selected for" the team or to "compete actively" on a team with a transgender girl is belied by facts incorporated in the Complaint. R. Doc. 1, at 4–9 (describing participation on varsity and other teams). FAU also argues that its members have been denied effective accommodation due to the "inherent physiological advantages that male athletes have over females." R. Doc. 1, at 2. But that is not the test under the Interpretation, and this Court should reject FAU's efforts to improperly rewrite the Interpretation into a per se rule.

***Participation Opportunities.*** FAU likewise has not shown a fair chance of prevailing on its effective accommodation claim based on lack of "Participation Opportunities." *See* Interpretation at 71418. As

articulated by the Department of Education and as adopted by this Court, the applicable three-prong test that institutions must survive provides "three individual avenues" to comply with Title IX's effective accommodation mandate with respect to "Participation Opportunities":

> 1) "'participation opportunities' provided to male and female students [which are] 'substantially proportionate' in numbers 'to their respective enrollments'"; or
>
> 2) "a 'history and continuing practice of program expansion' 'responsive to the developing interests and abilities of the members of that sex'"; or
>
> 3) an existing program that "has 'fully and effectively accommodated' 'the interests and abilities of the members of that sex.'"

*Portz*, 16 F.4th at 581 (citations omitted) (emphasis omitted); *see also* Interpretation at 71418. "If an institution has met any part of the three-part test, [the Department's Office for Civil Rights] will determine that the institution is meeting this requirement." *Chalenor v. Univ. of N.D.*, 291 F.3d 1042, 1046 (8th Cir. 2002) (quoting Department of Education, Office for Civil Rights, Clarification of Intercollegiate Athletics Policy

Guidance: The Three-Part Test (Jan. 16, 1996)). Because FAU has not shown that the League's policy violates prong one, it fails to establish a violation of effective accommodation. *See id.* ("Compliance with the first prong of the test 'affords an institution a 'safe harbor' for establishing that it provides nondiscriminatory participation opportunities.'") (quoting Letter from Norma V. Cantú, Assistant Secretary for Civil Rights, Department of Education (Jan. 16, 1996)).

The Interpretation instructs that equal athletic opportunity will be measured, in large part, by determining whether boys and girls are participating in athletics in numbers that are substantially proportionate to their enrollment at the institution. *See* Interpretation at 71418. Schools do not have to offer both a boys' team and a girls' team in every sport as long as the total overall number of athletic opportunities are roughly equal. *See* Interpretation at 71421. The Interpretation takes a unique approach to implementing Title IX because they protect "equal athletic opportunity" by comparing overall athletic opportunities for boys and girls as groups. *See* Interpretation at 71418. As the Eighth Circuit has held, in evaluating an institution for compliance, its athletics program should be viewed in whole.

*Portz*, 16 F.4th at 581. Accordingly, "Participation Opportunities" are evaluated on a program-wide basis and are determined by the number of players on a team, not by the number of post-season competitions an individual athlete qualifies for, nor the number of wins or losses when athletes and teams enter into competition. *See, e.g., id.; Thomas v. Regents of Univ. of Cal.*, No. 19 Civ. 6463, 2020 WL 3892860, at *9 (N.D. Cal. July 10, 2020) (effective accommodation claim regarding "systemwide imbalance in athletic opportunities for women").

Outside the context of athletics, Title IX prohibits unequal treatment of individuals on the basis of sex even when "motivated by a wish to achieve classwide equality." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 663–64 (2020). But, pursuant to the Javits Amendment, HEW concluded that, in the unique contexts of sports, "the rights of individuals [are] protected" adequately under the group-based approach because "[i]f women athletes, as a class, are receiving opportunities and benefits equal to those of male athletes, individuals within the class should be protected thereby." Interpretation at 71421.

FAU does not even attempt to engage with the proper test—its members do not claim that the League's policy deprived them of

opportunities to be team members, practice, or access institutional support. And FAU fails to present any evidence that the League's policy creates an imbalance on a program-wide basis, as is required for a participation opportunities claim. *See Portz*, 16 F.4th at 581. And, indeed, they could not make such a claim given that *Doe* is the only transgender athlete identified by FAU in the League, she does not participate on any of the three identified FAU member teams, and FAU members have continued to participate on their respective teams with great success. R. Doc. 68, at 10–12.

Instead, FAU argues that any transgender girl or woman "on the roster, field, or pitchers' mound, by definition, deprives females of athletic opportunities and benefits." Opening Br. of Appellant at 42, Entry ID 5579646. But even if the Court were to accept FAU's inaccurate cataloging of transgender women as "male" under this test (it should not), FAU has failed to even attempt to show that the successes of ***one*** transgender girl means that the "participation opportunities" provided to male and female students is not

"substantially proportionate" in numbers "to their respective enrollments." *Portz*, 16 F.4th at 581. That is the relevant test.[5]

Given that FAU cannot show that Defendants-Appellees have failed to comply with the first prong of the three-part test, the analysis need not go further. FAU does not have a fair chance of prevailing on its denial of effective accommodation based on lack of "Participation Opportunities."

> **2.    FAU has not shown a fair chance of prevailing on its Title IX equal treatment claim.**
>
> **a.    FAU fails to meet the governing test.**

Under the Interpretation, a school may be liable for denial of equal treatment "[i]f comparisons of program components reveal that treatment, benefits, or opportunities are not equivalent in kind, quality or availability," for "members of both sexes." *See* Interpretation at 71415. To determine whether an institution is providing equitable

---

[5] Even if facts short of systemwide imbalance are relevant to a participation claim, the district court's conclusion that FAU failed to even make that showing was not an abuse of discretion. *See* R. Doc. 134, at 57 n.20 (concluding "FAU has not shown that Doe's 2026 participation is likely to deprive any FAU member of a roster spot, an honor or award, recognition, or a scholarship" and it is "speculative proposition" that "Athlete 1's team is likely to lose to Doe's team when they play in May 2026").

treatment and benefits to male and female athletes, courts look to factors two through ten of the regulations. *McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 288 (2d Cir. 2004). Those factors are: (2) The provision of equipment and supplies; (3) Scheduling of games and practice time; (4) Travel and per diem allowance; (5) Opportunity to receive coaching and academic tutoring; (6) Assignment and compensation of coaches and tutors; (7) Provision of locker rooms, practice and competitive facilities; (8) Provision of medical and training facilities and services; (9) Provision of housing and dining facilities and services; and (10) Publicity. 34 C.F.R. § 106.41(c)(2)–(10); *Portz*, 16 F.4th 577 at 580; Interpretation at 71415. The Interpretation identifies tests for each of these factors. Interpretation at 71416–17.

"[I]n evaluating a program's distribution of treatment and benefits, a court may find a program-wide violation (global) when 'substantial and unjustified' disparities exist." *Portz*, 16 F.4th 577 at 581. A court may also find a violation where disparities in "individual segments of the program" (i.e., a specific [factor listed in § 106.41(c)(2)–(10)])) "are substantial enough in and of themselves" to deny "equality of athletic opportunities." *Id*. "Under the Policy Interpretation, a

disparity is a difference, on the basis of sex, in benefits, treatment, services, or opportunities that has a negative impact on athletes of one sex when compared with benefits, treatment, services, or opportunities available to athletes of the other sex." *McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 293 (2d Cir. 2004). *See, e.g.*, *Ollier v. Sweetwater Union High Sch. Dist.*, 858 F. Supp. 2d 1093, 1112–13 (S.D. Cal. 2012) (finding violation of equal treatment and benefits under Title IX by evaluating recruiting, locker rooms, practice and competition facilities; equipment, uniforms and storage; scheduling benefits; access to coaching; medical and training services; publicity and promotional support; and fund-raising benefits), *aff'd*, 768 F.3d 843 (9th Cir. 2014).

FAU has not shown that the League's policy likely results in either a global disparity nor disparities in individual segments of the program, and therefore has not shown it has a fair chance of prevailing on a Title IX denial of equal treatment claim. In fact, FAU entirely fails to engage with the relevant factors. FAU has not alleged that its members' teams had inadequate equipment and supplies, less favorable scheduling, less opportunity for coaching and academic tutoring, less publicity, or any of the other considerations under the Interpretation as

compared to a boys' team. *See* R. Doc. 68, at 37. Notably, FAU's opening

brief on appeal mentions "equal treatment" just once—and that is to

describe what was alleged in the complaint. Opening Br. of Appellant at

24, Entry ID 5579646. Without any evidence on the enumerated factors,

FAU does not, and cannot show, that disparities exist within any

individual segments of the program or program-wide.

Having failed to engage with any of the enumerated factors, FAU

does not have a fair chance of prevailing on its equal treatment claim.

> **b.    FAU's allegations do not constitute equal treatment, as mixed-sex teams are permitted under Title IX.**

Instead of even attempting to show that it meets the governing

test for a denial of equal treatment claim, FAU argues that its members

have been denied equal treatment because the policy "allows students

to participate in 'athletics' based on 'their gender identity or

expression,'" Opening Br. of Appellant at 4, Entry ID 5579646, and that

such a policy "effectively create[s] all-male competition for boys and

mixed-sex competition for girls" in violation of Title IX. Opening Br. of

Appellant at 31, Entry ID 5579646. Even if such a showing could be

relevant to a Title IX equal treatment claim, the district court did not

abuse its discretion in concluding that FAU failed to make that showing. As the district court explained, "[t]he challenged bylaw's requirement that 'all students' be allowed to participate in athletics and fine arts 'consistent with their gender identity or expression' draws no distinction between males and females. The requirement applies equally to both." R. Doc. 134, at 44 (internal citations omitted); *see* R. Doc. 68, at 7, citing R. Doc. 71, at 61 (explaining policy allows transgender girls to play on girls' teams, and it also allows transgender boys to play on boys' teams).

More fundamentally, however, even if FAU could establish such facts, it still would not be likely to establish an equal treatment claim. As the district court correctly observed, nothing in Title IX, the implementing regulations, or the Interpretation "forbid[s] a recipient that sponsors single-sex teams from also sponsoring mixed-sex teams." R. Doc. 134, at 55. Thus, even if the participation of one transgender girl on the softball team makes that team mixed-sex under Plaintiffs' definition of sex, there is no per se denial of equal treatment if the recipient also sponsors other single sex teams. Plaintiffs-Appellants

assert their own view of the facts but do not show the district court's conclusion was an abuse of discretion.

This Court should reject FAU's attempt to rewrite the standard to sweep in its baseless objection to the inclusion of *one* transgender athlete. Such a cry falls short of the well-established tests for denial of equal treatment under Title IX.

## II. Title IX Does Not Prohibit Minnesota from Enforcing Its Laws.

FAU asks this Court to impose an unprecedented and incorrect interpretation of Title IX—that Title IX requires, rather than permits, sex segregated teams. This argument not only flouts the plain language of Title IX and decades of precedent, but also undermines key protections guaranteed by Minnesota law. There is no fundamental conflict between the Minnesota Human Rights Act (MHRA) and Minnesota Constitution, both of which protect transgender students from discrimination in sex segregated spaces, and Title IX, which allows but does not require schools to create sex segregated sports teams. This Court should decline FAU's invitation to override state law where, as here, there is no actual conflict.

Students in Minnesota depend on the anti-discrimination protections in the state's civil rights law, and the MHRA expressly prohibits gender-identity discrimination in education. Minn. Stat. § 363A.13. The statute provides that "[i]t is an unfair discriminatory practice to discriminate in any manner in the full utilization of or benefit from any educational institution, or the services rendered thereby to any person because of . . . gender identity." Minn. Stat. § 363A.13, subd. 1. Sports are one of many "benefits" or "services" that schools provide, so schools cannot discriminate against transgender student athletes. *See, e.g., N.H.*, 950 N.W.2d at 562–65 (school violated MHRA by refusing to allow transgender student to access locker room that aligned with the student's gender identity).

The League's policy of including transgender girls in girls' sports and transgender boys in boys' sports is required by the MHRA, while FAU's requested relief violates the MHRA. This is clear based on common sense, buttressed by the Attorney General's opinion, and recently affirmed by the Minnesota Supreme Court.

First, FAU's complaint and its requested relief puts the MHRA at issue, but the plain text of the MHRA prohibits discrimination based on

gender identity and compels the League's policy allowing students to participate on sports teams that align with their gender identity. Minn. Stat. § 363A.13. And sports organizations and schools in Minnesota have an affirmative duty to abide by the MHRA. *Cooper,* 26 N.W.3d at 609 (finding USAPL violated the MHRA by adopting and enforcing a policy banning transgender women from women's sports); *N.H.,* 950 N.W.2d at 561 (finding that schools violate the MHRA when they "segregate or separate" transgender boys from cisgender boys and transgender girls from cisgender girls). FAU does not seek merely to rescind the League's bylaw; it asks this Court to exclude transgender athletes in violation of state law. Opening Br. of Appellant at 51, Entry ID 5579646 (asserting that banning Athlete Doe for her senior season is either irrelevant or minimal). FAU's so-called remedy would result in an unequivocal violation of the MHRA.

Second, the Minnesota Attorney General has issued a formal legal opinion that reinforces the common-sense principle that because the MHRA prohibits discrimination based on gender identity, the Minnesota State High School League cannot discriminate based on transgender status. Minn. Op. Att'y Gen. 1035 (Feb. 20, 2025). While

not all bylaws are premised on state statutes, this one is. Accordingly, the bylaw prohibiting gender identity discrimination is required by the MHRA (and the Minnesota Constitution).

Third, the Minnesota Supreme Court, in *Cooper*, recently decided that the MHRA bars discrimination against transgender individuals in sports. In *Cooper*, the Court found USA Powerlifting's policy of excluding transgender women from competing in the women's division to be discriminatory on its face. *Cooper*, 26 N.W.3d at 616. The Court rejected USAPL's proffered justification based on the erroneous assumption that "every transgender woman has a competitive advantage in the women's division," and concluded that such alleged justifications did not make the exclusion "any less discriminatory" under the MHRA. *Id.* at 609. This Court should similarly reject FAU's unsupported allegations and attempt to circumvent Minnesota law to discriminate against transgender students. FAU also faulted the State below for "rely[ing] on [its] own interpretation of the MHRA, not a court's," stating that only a court could "have the last word" on how the MHRA applies to school athletics. R. Doc. 120, at 19. The Minnesota Supreme Court has now spoken that last word: sporting organizations

in Minnesota that discriminate against transgender athletes violate the MHRA. The public accommodation analysis in *Cooper* is analogous to the educational analysis here. Sports benefit the citizens of Minnesota, and the MHRA guarantees them the right to participate. *N.H.*, 950 N.W.2d at 562–65 (finding that MHRA and Minnesota constitution require schools to treat transgender boys and girls in accordance with their gender identity in sex segregated activities). Like Title IX, the MHRA stands for opportunity, not exclusion.

## CONCLUSION

For all of these reasons, the Court should affirm the judgment below.

Dated: December 23, 2025

Respectfully submitted,

Sruti J. Swaminathan
Jennesa Calvo-Friedman
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Fl.
New York, NY 10004
(212) 549-2569
sswaminathan@aclu.org
jcalvo-friedman@aclu.org

*/s/ Andrew W. Davis*
*Counsel of Record*
Andrew W. Davis
Joshua Poertner
Grace Pilz
STINSON LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
(612) 335-1500
andrew.davis@stinson.com
joshua.poertner@stinson.com
grace.pilz@stinson.com

Jess Braverman
GENDER JUSTICE
663 University Ave. W., Suite 200
St. Paul, MN 55103
(651) 789-2090
jess.braverman@genderjustice.us

Teresa Nelson
Catherine Ahlin-Halverson
David P. McKinney
AMERICAN CIVIL LIBERTIES UNION
OF MINNESOTA
P.O. Box 14720
Minneapolis, MN 55414
(651) 645-4097
tnelson@aclu-mn.org
dmckinney@aclu-mn.org
cahlin@aclu-mn.org

*Counsel for Amici Curiae the American Civil Liberties Union,
American Civil Liberties Union of Minnesota, and Gender Justice*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Fed. R. App. P. 29(a)(5) because it contains 6,095 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f), as determined by the word counting feature of Microsoft Office 365.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Word 365 using a proportionally spaced typeface, 14-point Century Schoolbook.

This brief has been scanned for viruses and is free of viruses.

Dated:  December 23, 2025

/s/ Andrew W. Davis

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

Dated: December 23, 2025

/s/ Andrew W. Davis