No. 25-2899

Female Athletes United,

Plaintiff-Appellant,

vs.

Keith Ellison, et al.

Defendants-Appellees,

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
Case No. 0:25-cv-02151 (ECT/DLM)

**REDACTED BRIEF OF STATE APPELLEES**

KEITH ELLISON
Attorney General
State of Minnesota

LIZ KRAMER (#0325089)
Solicitor General
PETER J. FARRELL (#0393071)
Deputy Solicitor General
ANNA VEIT-CARTER (#0392518)
MAURA ALLEN (#0504790)
KATHERINE BIES (#0401675)
Assistant Attorneys General

445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2131
(651) 757-1010 (Voice)
liz.kramer@ag.state.mn.us

*Attorneys for State Defendants-Appellees*

## SUMMARY OF CASE AND REQUEST FOR ORAL ARGUMENT

This is an appeal from the denial of a preliminary injunction that seeks to block enforcement of longstanding Minnesota law and policy on transgender participation in youth sports. Ten years ago, Appellee Minnesota State High School League (the League) adopted a bylaw that allows all Minnesota youth to participate in sports and fine arts activities according to their gender identity. The League's bylaw reflects the requirements of the Minnesota Human Rights Act, a state anti-discrimination law that prohibits discrimination in education based on gender identity.

In 2025, Plaintiff-Appellant Female Athlete United (FAU) sued several Minnesota schools and entities, claiming that the League's bylaw violates Title IX. The case centers on a single transgender athlete who plays high-school softball. According to FAU, the athlete's participation denies their softball-playing members equal treatment, as compared to baseball-playing boys, and does not effectively accommodate their interests. FAU asked the district court to preliminarily enjoin the bylaw and bar all transgender girls from playing girls' sports.

In a thorough, 66-page opinion, the district court denied the injunction. The court concluded that at least one FAU member had standing, but that FAU had not carried its burden on any of the preliminary-injunction factors.

The Court has set oral argument for January 15, 2026.

# TABLE OF CONTENTS

**Page**

SUMMARY OF CASE AND REQUEST FOR ORAL ARGUMENT ....................i

TABLE OF AUTHORITIES ...............................................................................v

ISSUES ...........................................................................................................1

INTRODUCTION ............................................................................................2

STATEMENT OF THE CASE..........................................................................3

I.     REGULATORY BACKGROUND. ...........................................................3

       A.     The League's Bylaw and the MHRA......................................3

       B.     Title IX. ...................................................................................5

II.    DOE. ..............................................................................................7

III.   FAU. ..............................................................................................9

IV.    THE SCIENCE ON ATHLETIC ADVANTAGE IS DISPUTED BUT THE HARM TO
       TRANSGENDER GIRLS FROM EXCLUSION IS NOT. ..........................11

V.     PROCEDURAL HISTORY...............................................................14

SUMMARY OF ARGUMENT ........................................................................16

ARGUMENT ................................................................................................18

I.     FAU LACKS STANDING AND ITS CLAIMS ARE NOT RIPE................18

II.    THE STANDARD OF REVIEW IS ABUSE OF DISCRETION, AND THE COURT
       SHOULD NOT CONSIDER THE FEDERAL AGENCIES' FINDINGS. ......20

       A.     The Standard of Review Is Abuse of Discretion—Not De Novo.......21

       B.     The Court Should Not Consider the Federal Agencies' Findings,
              Which Are Not Part of the Record on Appeal or Subject to
              Judicial Notice....................................................................22

III.    FAU Dɪᴅ Nᴏᴛ Sʜᴏᴡ Pʀᴏʙᴀʙɪʟɪᴛʏ ᴏғ Sᴜᴄᴄᴇss ᴏɴ ᴛʜᴇ Mᴇʀɪᴛs..................25

    A.    The Likely-To-Prevail Standard Applies to FAU's Claims. ..............26

    B.    FAU Brings Disparate Impact Claims that Title IX Does Not Allow. .......................................................................................28

        1.    There is no private right of action to enforce disparate impact claims under Title IX. ...................................28

        2.    FAU's complaint challenges a facially neutral policy under a disparate impact theory. ...............................31

        3.    The cases FAU cites underscore the fact that FAU has alleged disparate impact and not disparate treatment claims. ...................................................................32

    C.    FAU Is Unlikely to Succeed on Its Effective Accommodation and Equal Treatment Claims Anyway. ...............................35

        1.    Effective Accommodation. ......................................37

        2.    Equal Treatment. ....................................................39

    D.    Title IX Does Not Preempt Minnesota Law or Otherwise Forbid Minnesota from Allowing Transgender Girls to Play Girls' Sports. .......................................................................................40

    E.    If Title IX Forbids Minnesota Law and Policy, Appellees Lacked Clear Notice Under the Spending Clause............................43

IV.    FAU Fᴀɪʟᴇᴅ ᴛᴏ Sʜᴏᴡ Tʜᴀᴛ ᴛʜᴇ Oᴛʜᴇʀ Iɴᴊᴜɴᴄᴛɪᴏɴ Fᴀᴄᴛᴏʀs Fᴀᴠᴏʀᴇᴅ Rᴇʟɪᴇғ. .......................................................................................45

    A.    FAU Failed to Show Irreparable Harm. ...............................45

        1.    The League's bylaw does not prevent FAU's members from playing softball. ................................................46

        2.    FAU's delay in seeking relief and dilatory litigation tactics further undermine any claim of irreparable harm....................47

    B.    FAU Did Not Show That the Balance of the Equities and the Public Interest Supported a Preliminary Injunction...........................49

V.    IF THE COURT FINDS ERROR, IT SHOULD REMAND FOR FURTHER
PROCEEDINGS ON THE SCOPE OF THE INJUNCTION AND A BOND
DETERMINATION. ............................................................................ 50

    A.    FAU's Requested Injunction Is Overbroad ........................................ 51

    B.    FAU Should Provide a Bond ............................................................ 52

CONCLUSION ......................................................................................... 53

# TABLE OF AUTHORITIES

**Page**

**Federal Cases**

*A.C. by M.C. v. Metro Sch. Dist. of Martinsville*
  75 F.4th 760 (7th Cir. 2023) ................................................................ 41

*Alexander v. Sandoval*
  532 U.S. 275 (2001) ......................................................... 1, 28, 29, 30

*B.P.J. v. W. Va. State Bd. of Educ.*
  98 F.4th 542 (4th Cir. 2024) ................................................................ 40

*Barbier v. Connolly*
  113 U.S. 27 (1884) ................................................................ 42

*Barrett v. W. Chester Univ. of Pa. of State Sys. of Higher Educ.*
  No. CIV.A. 03-CV-4978, 2003 WL 22803477 (E.D. Pa. Nov. 12, 2003) .......... 30

*Benisek v. Lamone*
  585 U.S. 155 (2018) ................................................................ 47

*Berndsen v. N.D. Univ. Sys.*
  7 F.4th 782 (8th Cir. 2021) ................................................................ 33, 37

*Biediger v. Quinnipiac Univ.*
  691 F.3d 85 (2d Cir. 2012) ................................................ 30, 31, 33

*Bostock v. Clayton Cnty.*
  590 U.S. 644 (2020) ................................................................ 29

*Cannon v. Univ. of Chi.*
  441 U.S. 677 (1979) ................................................................ 29

*Carney v. Adams*
  592 U.S. 53 (2020) ................................................................ 19

*Carson v. Simon*
   978 F.3d 1051 (8th Cir. 2020) .................................................................. 50

*Chalenor v. Univ. of N.D.*
   291 F.3d 1042 (8th Cir. 2002) .................................................................. 33

*Cigna Corp. v. Bricker*
   103 F.4th 1336 (8th Cir. 2024) ................................................................ 49

*Clapper v. Amnesty Int'l, USA*
   568 U.S. 398 (2013) ................................................................................. 18

*Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*
   459 F.3d 676 (6th Cir. 2006) ............................................................. 33, 34

*Collins v. Metro. Life Ins.*
   117 F.4th 1010 (8th Cir. 2024) ........................................................... 25, 43

*Const. Party of S.D. v. Nelson*
   639 F.3d 417 (8th Cir. 2011) .................................................................... 16

*Cont'l Res., Inc. v. N.D. Bd. of Univ. & Sch. Lands*
   136 F.4th 778 (8th Cir. 2025) ................................................................... 23

*Cummings v. Premier Rehab Keller, PLLC*
   596 U.S. 212 (2022) ................................................................................. 43

*D.M. by Bao Xiong v. Minn. State High Sch. League*
   917 F.3d 994 (8th Cir. 2019) .................................................................... 46

*Dataphase Sys., Inc. v. C.L. Sys, Inc.*
   640 F.2d 109 (8th Cir. 1981) .................................................................... 22

*Doe by & through Doe v. Boyertown Area Sch. Dist.*
   897 F.3d 518 (3d Cir. 2018) ..................................................................... 41

*Econ Dev. Corp. v. Model Cities Agency*
   519 F.2d 740 (8th Cir. 1975) .................................................................... 23

*EEOC v. Dial Corp.*
469 F.3d 735 (8th Cir. 2006)...................................................... 34

*Firearms Regul. Accountability Coal., Inc. v. Garland*
112 F.4th 507 (8th Cir. 2024) ...................................................... 51

*Grandson v. Univ. of Minn.*
272 F.3d 568 (8th Cir. 2001)...................................................... 35

*Grimm v. Gloucester Cnty. Sch. Bd.*
972 F.3d 586 (4th Cir. 2020)...................................................... 41

*Home Instead, Inc. v. Florance*
721 F.3d 494 (8th Cir. 2013)...................................................... 51

*Hotchkiss v. Cedar Rapids Cmty. Sch. Dist.*
115 F.4th 889 (8th Cir. 2024) ............................................... 22, 45

*Int'l Bhd. of Teamsters v. United States*
431 U.S. 324 (1977) ...................................................... 31

*Jackson v. Birmingham Bd. of Educ.*
544 U.S. 167 (2005) ...................................................... 43

*Loper Bright Enters. v. Raimondo*
603 U.S. 369 (2024) ...................................................... 23

*Love v. United States*
949 F.3d 406 (8th Cir. 2020)...................................................... 24

*Mayerova v. E. Mich. Univ.*
346 F. Supp. 3d 983 (E.D. Mich. 2018)................................... 30, 33

*McCormick v. School District of Mamaroneck*
370 F.3d 275 (2d Cir. 2004)............................................... 46, 47

*McIvor v. Credit Control Servs., Inc.*
773 F.3d 909 (8th Cir. 2014)...................................................... 25

*Minn. Chapter of Associated Builders & Contractors, Inc. v. Blissenbach*
   155 F.4th 1015 (8th Cir. 2025) ..................................................... 21, 26

*Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*
   78 F.4th 1011 (8th Cir. 2023) ..................................................... 45, 49

*Murthy v. Missouri*
   603 U.S. 43 (2024) ................................................................ 1, 18, 19

*Neal v. Bd. of Trs. of Cal. State Univs.*
   198 F.3d 763 (9th Cir. 1999) ........................................................... 33

*Ng v. Bd. of Regents of Univ. of Minn.*
   64 F.4th 992 (8th Cir. 2023) ........................................... 22, 24, 25, 47

*Padda v. Becerra*
   37 F.4th 1376 (8th Cir. 2022) ........................................................... 21

*Parents for Privacy v. Barr*
   949 F.3d 1210 (9th Cir. 2020) .......................................................... 41

*Parker v. Franklin Cnty. Cmty. Sch. Corp.*
   667 F.3d 910 (7th Cir. 2012) ...................................................... 30, 34

*Pharm. Rsch. & Mfrs. Ass'n of America v. McClain*
   95 F.4th 1136 (8th Cir. 2024) ........................................................... 42

*Planned Parenthood of Minn., N.D., S.D. v. Rounds*
   530 F.3d 724 (8th Cir. 2008) ............................................................ 26

*Poloceno v. Dallas Indep. Sch. Dist.*
   826 F. App'x 359 (5th Cir. 2020) ............................................ 31, 32, 34

*Portz v. St. Cloud State Univ.*
   196 F.Supp.3d 963 (D. Minn. 2016) ................................................. 46

*Portz v. St. Cloud State Univ.*
   16 F.4th 577 (8th Cir. 2021) ....................................................*Passim*

*Roe v. Critchfield*
    137 F.4th 912 (9th Cir. 2025) ........................................................ 43-45

*Rogers v. Scurr*
    676 F.2d 1211 (8th Cir. 1982)........................................................ 51

*S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*
    696 F.3d 771 (8th Cir. 2012)........................................................ 49

*Sch. of the Ozarks, Inc. v. Biden*
    41 F.4th 992 (8th Cir. 2022) ........................................................ 18

*Soule v. Connecticut Ass'n of Sch.*
    755 F. Supp. 3d 172 (D. Conn. 2024)........................................ 34, 35

*Tennessee v. Dep't of Educ.*
    104 F.4th 577 (6th Cir. 2024) .................................................. 41, 42

*Trump v. CASA, Inc.*
    606 U.S. 831 (2025) ................................................................ 1, 51

*Trump v. New York*
    592 U.S. 125 (2020) .............................................................. 17, 18

*Union Pac. R.R. Co. v. Surface Transp. Bd.*
    113 F.4th 823 (8th Cir. 2024) ...................................................... 23

*United States v. Lopez*
    514 U.S. 549 (1995) .................................................................. 42

*Winter v. Nat. Res. Def. Council, Inc.*
    555 U.S. 7 (2008) .............................................................. 22, 47

*Wolfe v. Fayetteville, Arkansas Sch. Dist.*
    648 F.3d 860 (8th Cir. 2011)................................................ 32, 34

**State Cases**

*Cooper v. USA Powerlifting*
    26 N.W.3d 604 (Minn. 2025)................................................ 5, 27

*Israel v. W. Va. Secondary Schs. Activities Comm'n*
  388 S.E.2d 480 (W. Va. 1989) ............................................................. 38

**Constitutional Provisions**

U.S. Const. art. I, § 8 cl. 1 ..................................................................... 43

**Federal Statutes**

20 U.S.C. § 1681 ........................................................... 1, 6, 29, 30

20 U.S.C. § 1682 ...................................................................... 30

42 U.S.C. § 2000d ................................................................... 29

42 U.S.C. § 2000d–1 .............................................................. 29

**State Statutes**

Minn. Stat. § 8.07 ..................................................................... 5

Minn. Stat. § 363A.03 ......................................................... 4, 27

Minn. Stat. § 363A.11 .............................................................. 27

Minn. Stat. § 363A.13 ......................................................... 4, 27

Minn. Stat. § 363A.23 .............................................................. 27

Minn. Stat. § 363A.24 .............................................................. 27

1993 Minn. Laws ch. 22, §§ 2, 10, 15 ...................................... 4

2023 Minn. Laws ch. 52, art. 19 §§ 47-48, 65 ....................... 4-5

**Federal Rules**

Fed. R. Civ. P. 65 ............................................................ 1, 15, 48, 52

Fed. R. Evid. 201 ........................................................................ 24

**Federal Regulations**

34 C.F.R. § 106.41 ...............................................................*Passim*

34 C.F.R. § 106.6 ...................................................................... 42

**Other Authorities**

15A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure*
   § 3904 (3d ed.) ..................................................................... 16

44 Fed. Reg. 71413 (Dec. 11, 1979) ...............................................37-39

86 Fed. Reg. 27984 (May 25, 2021) .................................................. 6

86 Fed. Reg. 32637 (June 22, 2021) ................................................. 6

Exec. Order No. 14201, Keeping Men Out of Women's Sports,
   90 Fed. Reg. 9279 (Feb. 5, 2025) ............................................... 6

First Am. Compl., *Minnesota v. Trump, et al.*
   No. 25-cv-01608-ECT-DLM (filed D. Minn. Dec. 2, 2025), Dkt. No. 53 .... 23, 35

Br. of Amicus Curiae United States, *West Virginia v. B.P.J.*
   No. 24-43 (filed Sept. 19, 2025) ................................................ 40

*Letter of Findings (Notice of Violation)*, U.S. Dep'ts of Educ. & Health & Hum.
   Servs. (Sept. 30, 2025) ......................................................22-23

**ISSUES**

I.      Did FAU establish standing to seek a preliminary injunction?

       <u>Apposite Authorities</u>
       *Murthy v. Missouri*, <u>603 U.S. 43</u> (2024)

II.     Did the district court abuse its discretion when it denied FAU's request to preliminarily enjoin the League's bylaw, which has been in effect for over ten years?

       <u>Apposite Authorities</u>
       <u>20 U.S.C. § 1681</u>
       <u>34 C.F.R. § 106.41</u>
       *Alexander v. Sandoval*, <u>532 U.S. 275</u> (2001)
       *Portz v. St. Cloud State Univ.*, <u>16 F.4th 577</u> (8th Cir. 2021)

III.    If the district court erred in applying the *Dataphase* factors, should the Court remand for further proceedings on the scope of the injunction and a bond determination?

       <u>Apposite Authorities</u>
       *Trump v. CASA, Inc.*, <u>606 U.S. 831</u> (2025)
       <u>Fed. R. Civ. P. 65(c)</u>

## INTRODUCTION

In 2015, Appellee Minnesota State High School League (the League) first adopted a bylaw that allows all students to participate in high-school sports and fine arts activities according to their gender identity. The League's bylaw is required by the Minnesota Human Rights Act (MHRA), which prohibits gender-identity discrimination in education.

Over a decade later, Plaintiff-Appellant Female Athletes United (FAU) sued the League and several state and local entities in Minnesota.[1] It claims the bylaw violates Title IX. FAU's case focuses on a single transgender girl, Doe, who competes in high-school softball. FAU asserts that Doe's participation creates an "uneven playing field." It sought an injunction that would, among other things, require Minnesota schools to exclude all transgender girls from girls' sports. In a comprehensive and well-reasoned opinion, the district court denied the preliminary injunction, concluding that all the *Dataphase* factors cut against injunctive relief.

This Court should affirm. On the merits, Title IX does not provide a private action for FAU's claims, which sound in disparate impact. Even if FAU's Title IX

---

[1] "State Appellees" refers to Minnesota Attorney General Keith Ellison; Commissioner of the Minnesota Department of Human Rights, Rebecca Lucero; and Commissioner of the Minnesota Department of Education, Willie Jett. FAU also named as defendants the Executive Director of the League, Erich Martens; and Independent School District Nos. 11, 192, and 279. This brief collectively refers to all the parties listed in this footnote as "Appellees."

claims were permitted, FAU failed to show that the League's bylaw violates Title IX's athletic regulations. On the equities, the only person who will be excluded from softball if FAU obtained an injunction would be Doe. FAU has not shown that Doe's participation "is likely to deprive any FAU member of a roster spot, an honor or award, recognition, a scholarship, or any similar benefit." Add. 65; App. 797; R. Doc. 134, at 65.

Most fundamentally, FAU offers no reason—and no viable claim—for this Court to upset the status quo in Minnesota with the extraordinary remedy of a preliminary injunction. There is a robust debate about whether Title IX permits states to exclude transgender girls from girls' sports. The Supreme Court will provide guidance on that question soon. FAU asks this Court to go further and hold that Title IX forbids Minnesota from allowing transgender girls to play sports according to their gender identity. On this preliminary record, this Court should not be the first to take that step.

## STATEMENT OF THE CASE

### I. REGULATORY BACKGROUND.

#### A. The League's Bylaw and the MHRA.

In 2015, the League adopted a formal bylaw permitting transgender students to compete in high-school athletics according to their gender identity. The League's

bylaw "allows participation for all students consistent with their gender identity or expression . . . in athletics and fine arts."[2] Appellees App. 237; R. Doc. 72-1, at 4.[3]

The League's bylaw is necessary to comply with the MHRA. The MHRA is Minnesota's principal anti-discrimination law, and it prohibits gender-identity discrimination in education. Minn. Stat. § 363A.13. This prohibition stretches back to 1993, when Minnesota first outlawed gender-identity discrimination. *See* 1993 Minn. Laws ch. 22, §§ 2, 10, 15 (amending Minn. Stat. §§ 363.01 and 363.03, subds. 3, 8a (1992)). At the time, the Minnesota legislature incorporated gender-identity protections into the MHRA's definition of "sexual orientation." *Id.* § 2. That term was defined to include "having or being perceived as having a self-image or identity not traditionally associated with one's biological maleness or femaleness." *Id.*

In 2023, the Minnesota legislature expanded these longstanding protections. The legislature amended the MHRA to define gender identity and sexual orientation as two different protected classes. 2023 Minn. Laws ch. 52, art. 19 §§ 47-48 (codified at Minn. Stat. § 363A.03, subd. 50). In doing so, the legislature enacted a new, separate definition of "gender identity." *Id.* It also amended most of the

---

[2] The League oversees several "fine arts" activities, such as debate, speech, music, and visual arts.

[3] This brief cites to Defendant-Appellees' Appendix as "Appellees App." and Plaintiff-Appellant's Appendix as "App."

MHRA's substantive prohibitions—including the prohibition on education discrimination—to outlaw discrimination "because of . . . gender identity." *Id.* § 65.

Consistent with the MHRA's sweep, Minnesota's executive and judicial branches have both interpreted the MHRA to provide expansive protections for transgender people. In 2025, Appellee Minnesota Attorney General issued a formal legal opinion declaring that prohibiting students from participating in extracurricular activities consistent with their gender identity would violate the MHRA. Appellees App. 282-83; R. Doc. 72-2, at 4-5. The Attorney General's opinion is binding on Minnesota schools until a court says otherwise. Minn. Stat. § 8.07 (noting binding effect). And just one month after the district court denied the preliminary injunction here, the Minnesota Supreme Court held that prohibiting a transgender woman from participating in powerlifting competitions according to her gender identity violated the public accommodations provision of the MHRA. *See Cooper v. USA Powerlifting*, 26 N.W.3d 604, 621-22 (Minn. 2025).

**B. Title IX.**

The League's bylaw has been in effect for over a decade, and the MHRA's prohibition on gender-identity discrimination in education for even longer. In contrast, the federal government's interpretation of Title IX—and how it applies to gender-identity discrimination—has whipsawed between different Presidential administrations.

Under Title IX, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). From 2014 to 2016, the U.S. Department of Education (DOE) said that Title IX's sex-discrimination prohibition applied to gender-identity discrimination. Appellees App. 109; R. Doc. 66-1, at 12 (2014 guidance); Appellees App. 151-53; R. Doc. 66-1, at 54-56 (2015 letter); Appellees App. 155-62; R. Doc. 66-1, at 58-65 (2016 letter). In 2017, however, DOE and the U.S. Department of Justice (DOJ) changed course. Appellees App. 164-65; R. Doc. 66-1, at 67-68. They rescinded prior guidance on gender-identity discrimination but took no position on the meaning of Title IX. *Id.* The federal agencies instead stressed that "there must be due regard for the primary role of the States and local school districts in establishing educational policy." *Id.*

Four years later, in 2021, multiple federal agencies concluded that Title IX prohibits discrimination against transgender individuals. *E.g.*, 86 Fed. Reg. 32637 (June 22, 2021) (DOE); 86 Fed. Reg. 27984 (May 25, 2021) (U.S. Department of Health & Human Services (HHS)). Four years after that, in 2025, the current administration reversed course: those same federal agencies, at the President's direction, now claim that Title IX forbids transgender girls from playing girls' sports. *E.g.*, Exec. Order No. 14201, 90 Fed. Reg. 9279 (Feb. 5, 2025).

## II. DOE.

Doe is a transgender girl from Minnesota who loves to play softball. App. 343; R. Doc. 80, at 7. ████████████████████████████████████

████████████████ Appellees App. 480-84; R. Doc. 79, at 1-4. Doe ████████

████████████████████████████████████████████████████████

████████. *Id.* Since then, Doe has ████████████████████████████████. *Id.*

████████████████ *Id.* She has ████████████████. *Id.* And she has

████████████████████████. *Id.*

████████████████████████████ *Id.* Doe ████████████████

████████████████████████████████████████████████████████

████ *Id.* Doe ████████████████████ *Id.*

████████████████████.[4] *Id.* ████, Doe ████████████████

████████████████████████. *Id.* Doe's ████████████████

████████████████████████████████. *Id.*

████████████████████████████████████████

████████████████████ App. 337-39; R. Doc. 80, at 1-3. ████████

████████████████████████████████████████ App. 337-40, 342;

R. Doc. 80, at 1-4, 6.

---

[4] ████████████████████████████████████████████████

████████████████████████████████ Appellees App. 237; R. Doc. 70, at 20.

Doe is a talented softball player but nowhere near the best in Minnesota. She is ██████████████. Appellees App. 461; R. Doc. 75, at 4. ████████████ ████████████████████████████████████████████ Appellees App. 470-71; R. Doc. 76, at 5-6. In the 2025 season, for instance, ████████████ ██████████████████████████████████. *Id.* ████████ ████████████████ *Id.* And she ████████████████████. *Id.* Indeed, ████████████████████. Appellees App. 459-61; R. Doc. 75, at 2-4. ████████ ████████████████████ *Id.* As Doe's high-school coach explained, Doe honed ████████████████████████████—through "relentless effort." *Id.*

Critical to Doe's success is her exceptional team. Appellees App. 461-62; R. Doc. 76, at 4-5. ████████████████████████████ ████████████ Appellees App. 463; R. Doc. 75, at 6. ████████████ ████████████████████████████████████████ ████████ Appellees App. 462-63; R. Doc. 75, at 5-6. It had ████████████ ████████████████ in Minnesota. *Id.*

Doe is a high-school senior this year. App. 343; R. Doc. 80, at 7. Because of a recent NCAA rule change, ████████████████████████████ ████████. *Id.* ████████████████████ *Id.*

## III. FAU.

FAU is an organization that seeks to exclude transgender girls like Doe from girls' sports. App. 25; R. Doc. 1, at 4. FAU claims that the League's bylaw violates Title IX because Doe—a single transgender athlete in a team sport—participates in high-school softball. App. 60-62; R. Doc. 1, at 39-42. FAU seeks relief on behalf of four members: Athletes 1, 2, 3, and 4.[5]

**Athlete 1.** Athlete 1 is a high-school senior who plays for ██████████ in Appellee Independent School District 279. App. 26; R. Doc. 1, at 5. ██████████ is in the ██████████████████████, which is the same conference as ██████████. ██. Appellees App. 347-48; R. Doc. 71-2, at 2-3. Last season, ██████████ ████████████████████████████████████. *Id.* ██████████████████ ██████████ *Id.* ██████████ played ██████████ twice in 2025: once in the regular season, and once in a post-season sectional tournament. App. 393-94; R. Doc. 113, at 4-5. ██████████ won both games, and Doe pitched in both games. *Id.* Athlete 1 is a strong player: ████████████████████████████████ ██████████. Appellees App. 429; R. Doc. 71-15, at 3; Appellees App. 431; R. Doc. 71-16, at 2. Athlete 1 has also played well against Doe; ██████████ ██████████████████████████████████. App. 340; R. Doc. 80, at 4.

---

[5] The Complaint sues on behalf of three members. App. 26-30; R. Doc. 1, at 5-9. But FAU submitted a declaration from a fourth member during the preliminary injunction briefing. App. 414-23; R. Doc. 116, at 1-10.

In 2026, ████████████ is scheduled to play ████████████. App. 395; R. Doc. 113, at 6.

**Athletes 2 and 3.** Athletes 2 and 3 are high-school seniors, both of whom play for ████████████, a school in Appellee Independent School District 192. App. 27-29; R. Doc. 1, at 6-7. Athlete 2 is an exceptional softball player: ████████████ ████████████████████████████████████████████████████ ████████████. Appellees App. 365-66; R. Doc. 71-7, at 3-4; Appellees App. 381, 391; R. Doc. 71-10, at 2, 12. Athlete 3 also had a strong season in 2025: ████████████ ████████████████████████████. Appellees App. 420-21; R. Doc. 71-13, at 2-3; Appellees App. 425; R. Doc. 71-14, at 4.

In 2025, ████████████ had a pre-season scrimmage against ████████████ but did not play against Doe's team in the regular season or the state tournament. App. 401; R. Doc. 114, at 2. In 2026, ████████████ and ████████████ will not play each other in the regular season because they are in different conferences. *See* Appellees App. 344-45; R. Doc. 71-1, at 2-3; Appellees App. 347-48; R. Doc. 71-2, at 2-3. Still, Athletes 2 and 3 believe it is "very likely" that ████████████ will compete against Doe's team in the 2026 state tournament. App. 401-02; R. Doc. 114, at 3-4; App. 408; R. Doc. 115, at 3. They claim that ████████████ and ████████████ will both qualify for the state tournament again and—unlike last season—play each other. *Id.*

**Athlete 4.** Athlete 4 is a high-school junior who plays for █████, a school in Independent School District 196. App. 415; R. Doc. 116, at 2. She has achieved several athletic accolades in her high-school softball career to date. App. 420-21; R. Doc. 114, at 7-8. ████████████████████████████████████████████ ██████████████████████████████ *Id.*

████████████████████████████████████ and does not play ████████████ during the regular season. Appellees App. 344-45; R. Doc. 71-1, at 2-3. In 2025, ██████ played ████████████████████████ and lost. App. 417-18; R. Doc. 116, at 4-5. Doe pitched; ████████████████████████. App. 419; R. Doc. 116, at 6. Athlete 4 says that she "could" play Doe in the 2026 state tournament if both teams qualify again. App. 421; R. Doc. 116, at 8. She also says her team and Doe's team "will potentially play against each other" if ████████████ chooses to compete in a regular season tournament hosted by █████. *Id.*

## IV. THE SCIENCE ON ATHLETIC ADVANTAGE IS DISPUTED BUT THE HARM TO TRANSGENDER GIRLS FROM EXCLUSION IS NOT.

Both sides filed expert declarations in the district court, and on key issues there was no dispute. For example, no party contended that the League's policy decreased girls' participation in Minnesota sports. Instead, cisgender girls' participation in high-school athletics in Minnesota increased until the COVID-19 pandemic (and it has started to rise since 2022). Appellees App. 178-79; R. Doc. 69, at 13-14. Transgender youth, by contrast, participate in high-school sports in

11

Minnesota at extremely low levels (less than 1 percent of student athletes). Appellees App. 230-32; R. Doc. 70, at 13-15.

There is also no dispute that transgender girls suffer when they are categorically excluded from playing sports consistent with their gender identity. *See, e.g.*, Appellees App. 172-78; R. Doc. 69, at 7-13. Minnesota's educational policy expert, Mollie McQuillan, Ph.D., testified about the pervasive discrimination and bullying faced by transgender youth.[6] Appellees App. 171-72; R. Doc. 69, at 6-7. That prejudice translates to more anxiety, depression, and suicides by transgender youth as compared to their cisgender peers. *Id.*

Sports mitigate those risks. Sports participation according to gender identity decreases rates of anxiety, depression, and suicidality for transgender youth. Appellees App. 175-77; R. Doc. 69, at 10-12. It improves academic performance and physical health too. *Id.* For these reasons, leading medical and youth-focused organizations—including the American Academy of Pediatrics, the American Medical Association, and National Federation of State High School Associations—

---

[6] Two of FAU's experts, Dr. Stephen B. Levine and Dr. Chad Thomas Carlson, submitted rebuttal declarations that, in part, addressed Dr. McQuillan. *See* App. 467-624 (Dr. Levine), 625-49 (Dr. Carlson); R. Docs. 118-19. The district court refused to consider the rebuttal declarations because they were submitted "for the first time" with FAU's reply brief. Add. 16 n.9; App. 748 n.9; R. Doc. 134, at 16 n.9. Although FAU cites the rebuttal declarations on appeal, it does not argue that the district court's evidentiary decision to was error. *See, e.g.*, Br. 10, 13. FAU has thus forfeited any argument that this Court should consider them here.

support athletic policies that allow youth to play sports consistent with their gender identity. Appellees App. 177-78; R. Doc. 69, at 12-13.

Each side's putative experts disputed the athletic-advantage question—especially with respect to transgender girls who never undergo male puberty. *Compare* Appellees App. 224-34; R. Doc. 70, at 7-17, *with* App. 267-69; R. Doc. 8-2, at 151-53. Minnesota's medical expert, A. Kade Goepferd, M.D., testified that the research on differences between transgender and cisgender athletes is limited and the subject of significant debate. Appellees App. 245-51; R. Doc. 70, at 28-33. No research focuses on youth sports. Appellees App. 246-47; R. Doc. 70, at 29-30. The available research focuses on adult athletes who transitioned post-puberty or elite transgender athletes, and even that research is inconclusive. Appellees App. 246-49; R. Doc. 70, at 30-32. For example, a recent 2024 study—funded, in part, by the International Olympic Committee—showed that transgender women perform worse than cisgender women on several athletic metrics. Appellees App. 248-49; R. Doc. 70, at 31-32. Similarly, experts agree that testosterone is the most significant correlate with youth athletic performance. *Compare* Appellees App. 224-25; R. Doc. 70, at 7-8, *with* App. 216-17; R. Doc. 8-2, at 100-01. But they dispute whether transgender girls who receive puberty blockers and feminizing hormones—and therefore do not undergo male puberty—have an athletic advantage over cisgender

girls. *Compare* Appellees App. 234-41; R. Doc. 70, at 17-24, *with* App. 206-13; R. Doc. 8-2, at 86-97.

## V. PROCEDURAL HISTORY.

FAU brought this case in May 2025 and asked for a preliminary injunction the next day. App. 22; R. Doc. 1; App. 71; R. Doc. 6. FAU claimed that the League's bylaw violates Title IX's equal treatment and effective accommodation regulations because allowing transgender girls to compete in girls' sports creates an "uneven playing field." App. 85-86; R. Doc. 7, at 9-10. FAU's requested injunction would, among other things, prohibit defendants "from allowing biologically male athletes to compete with or against female-athlete members of [FAU] in school sports designed for women or girls that are contact sports or sports involving competitive athletic skill." Appellees App. 2; R. Doc. 9, at 2. It would also require the district court "to declare ineligible any biologically male athletes competing or seeking to compete with or against" FAU's members. *Id.* And the injunction would enjoin all defendants "from applying or enforcing Minnesota law." *Id.*

When FAU sued and sought the injunction, the 2025 softball season was almost over, and Minnesota high school teams were preparing for the 2025 state tournament. FAU's motion said one of its members was likely to face Doe at that tournament. App. 92; R. Doc. 7, at 16. But FAU did not seek relief as to the 2025 state tournament. Instead, FAU sought an injunction for the 2026 season. Appellees

App. 9; R. Doc. 25, at 1. FAU's choice surprised the district court, which was prepared to make an expedited decision. App. 711; Tr. 62.

Even though the 2025 season was not in play, FAU opposed State Appellees' request to (1) develop the factual record through expedited discovery or (2) consolidate the preliminary-injunction proceedings with a trial on the merits under Fed. R. Civ. P. 65(a)(2). Appellees App. 9; R. Doc. 25, at 1. State Appellees stressed that the parties needed a decision before the 2026 season, and Rule 65 gave the district court flexibility "to extend the preliminary injunction in a way that offers [FAU] the benefit of getting to a *final* decision more quickly." Appellees App. 6 (emphasis added); R. Doc. 24, at 3. But FAU opposed: it wanted to pursue preliminary relief, not final relief, "and a potential appeal before the next softball season begins." Appellees App. 9; R. Doc. 25, at 1. The district court sided with FAU and set a preliminary-injunction hearing for August 20, 2025. App. 11; R. Doc. 37.

One month later, on September 19, 2025, the district court denied the preliminary injunction. Add. 1-66; App. 733-98; R. Doc. 134, at 1-66. The district court concluded that FAU had standing but had not shown a fair chance of prevailing on the merits. Add. 23-57; App. 755-89; R. Doc. 134, at 23-57. The district court also concluded that FAU had not shown that the other preliminary-injunction factors warranted relief. Add. 63-65; App. 795-97; R. Doc. 134, at 63-65.

FAU appealed on September 22, 2025, and this Court set a standard civil briefing schedule. App. 800; R. Doc. 136. Four days later, FAU moved the district court for an injunction pending appeal. App. 804; R. Doc. 140. The district court denied the motion immediately and noted that FAU could ask this Court to expedite. App. 819-20; R. Doc. 145. FAU did not do so. Instead, FAU sought another injunction pending appeal. *See* Emergency Mot. for Inj. Pending Appeal (filed Oct. 6, 2025). For their part, State Appellees asked this Court to hold the appeal in abeyance pending the Supreme Court's decision in two similar cases, *West Virginia v. B.P.J.*, No. 24-43, and *Hecox v. Little*, No. 24-38. *See* Mot. to Stay & Hold Appeal in Abeyance (filed Oct. 23, 2025). This Court denied both motions, ordered the parties to adhere to the original briefing schedule, and expedited oral argument. *See* Order (Nov. 5, 2025).

## SUMMARY OF ARGUMENT

I.     FAU lacks standing and its claims are not ripe for review.[7] FAU's members have not shown that their injuries are certainly impending. The possibility

---

[7] Because this Court has an independent duty to assess subject-matter jurisdiction, it may examine FAU's standing and ripeness without a cross-appeal. *See Const. Party of S.D. v. Nelson*, 639 F.3d 417, 420 (8th Cir. 2011), *abrogated on unrelated grounds by Young Am's Found. v. Kaler*, 14 F.4th 879 (8th Cir. 2021); *accord* 15A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 3904 (3d ed.) ("A cross-appeal also is not necessary to challenge the subject-matter jurisdiction of the district court, under the well-established rule that both district court and appellate courts are obliged to raise such questions on their own").

that they may play Doe during the 2026 softball season depends on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Trump v. New York*, 592 U.S. 125, 131 (2020) (quotation omitted). FAU also fails to support its assertions that FAU's members are injured by the League's policy, which allows a team with one transgender girl to play softball. The record undercuts FAU's claims that any of its members will be at a competitive disadvantage due to their sex even if they do play against Doe.

II.     If FAU has standing, then the district court did not abuse its discretion when it denied the injunction. FAU advances a disparate-impact theory of liability, and Title IX does not authorize disparate-impact claims. Regardless, FAU did not show it was likely to succeed on its effective accommodation and equal treatment claims. Nor did FAU show that any of the other factors favor an injunction.

III.    Even if the Court concludes that the district court erred in denying the preliminary injunction, the Court should remand to the district court to address in the first instance all of the injunctive factors. The parties raised issues about the scope and workability of the injunction and the bond requirement below, but the district court did not reach these issues because it denied FAU's motion for a preliminary injunction. It is this Court's common practice to remand when the district court did not address an issue.

**ARGUMENT**

## I.    FAU LACKS STANDING AND ITS CLAIMS ARE NOT RIPE.

FAU relies on four members to establish associational standing. These members have not shown that they have standing to seek prospective injunctive relief or that their claims are ripe for review. The district court found only Athlete 1 established standing.

FAU's members must make a "clear showing" that "the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024). Possible future injuries are insufficient. *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 409 (2013). Similarly, to be ripe, a case must not depend on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Trump*, 592 U.S. at 131 (2020) (citation modified).[8]

Athletes 2, 3, and 4 point to nothing more than chains of contingencies. Athletes 2 and 3 speculate that they are "likely" to play Doe's team in a pre-season game without explaining why. App. 401, 408; R. Docs. 114, at 3, and 115, at 3. Athlete 4 predicts that her team "will potentially play against" Doe's team at a regular-season tournament. App. 421; R. Doc 116, at 8. The district court properly found that whether Doe may play FAU's members during these games or any post-

---

[8]  Standing and ripeness are closely related and "essentially 'boil down to the same question.'" *Sch. of the Ozarks, Inc. v. Biden*, 41 F.4th 992, 998 (8th Cir. 2022).

season games is "subject to innumerable variables," including "regular-season records, the relative strength of regular-season and sectional opponents, upsets and tournament seedings." Add. 29; App. 761; R. Doc. 134, at 29. These three members have not alleged an injury that "sufficiently differentiate[s] [themselves] from a general population of individuals affected in the abstract" by the challenged policy. *Carney v. Adams*, 592 U.S. 53, 64 (2020).

FAU's claim that Athlete 1's team is "now scheduled" to play Doe's team in late April 2026 similarly falls short. Br. 31. The calendaring of a single game in the future is a very thin reed on which to rest standing. Moreover, FAU asks this Court to assume that Athlete 1 and Doe will make their varsity teams, remain injury-free, and be chosen by their coaches to play in that game. Athlete 1 cannot show that her asserted injury of competing against Doe is "certainly impending." *Murthy*, 603 U.S. at 58.

Even accepting that a single scheduled game could establish injury, FAU fails to support its broad theory that FAU's members are injured by the League's policy, which allows a team with one transgender girl to play against FAU members.[9] Br. 31. FAU claims that Doe is taller, longer-limbed, and pitches with greater speed, spin, and stamina, but provides no comparative data about its own members or other

---

[9] When the parties have introduced factual evidence, the plaintiff must point to that evidence and "cannot rest on mere allegations." *Murthy*, 603 U.S. at 58.

softball players. Br. 14-23. ███████████████████,

Appellees App. 438-41; R. Doc. 76, at 5-6, and even Athlete 1 ██████

███████████████████████████, App.

340; R. Doc. 80, at 4. FAU also makes no effort to negate all the other potential

factors that could explain some or all of Doe's success—like her work ethic and

pitch selection, and her team's strong defense. *See, e.g.*, Appellees App. 459-62; R.

Doc. 75, at 2-5; Appellees App. 470-71; R. Doc. 76, at 5-6. Moreover, FAU fails to

grapple with the fact that any athletic advantages associated ██████████

██████[10]—even if those advantages matter—███████████████

███████████████████████. Appellees

App. 451; R. Doc. 79, at 4. Thus, FAU has not met its burden to establish any

member will be at a competitive disadvantage due to their sex even if they do play

against Doe.

## II. THE STANDARD OF REVIEW IS ABUSE OF DISCRETION, AND THE COURT SHOULD NOT CONSIDER THE FEDERAL AGENCIES' FINDINGS.

If FAU has standing, the district court did not abuse its discretion when it

denied the preliminary injunction. To get around the district court's well-reasoned

---

[10]  The Court should reject FAU's unsupported factual assertions ██████████
███████████████, Br. 12, because FAU's expert conceded
there is no research ████████████████████, App. 210;
R. Doc. 8-2, at 94.

decision, FAU first overstates the scope of the Court's review and then tries to inject extra-record evidence into this appeal. The Court should reject both gambits.

### A.    The Standard of Review Is Abuse of Discretion—Not De Novo.

This Court's settled standard for reviewing the denial of a preliminary injunction is abuse of discretion. *Padda v. Becerra*, 37 F.4th 1376, 1381 (8th Cir. 2022). Yet FAU says that the Court's overall review of the district court's decision is de novo because the appeal involves legal questions about Title IX. Br. 28.

FAU overstates the scope of this Court's review. Although this Court does not defer to the district court's legal conclusions, it reviews the "ultimate ruling on a preliminary injunction for an abuse of discretion." *Minn. Chapter of Associated Builders & Contractors, Inc. v. Blissenbach*, 155 F.4th 1015, 1020 (8th Cir. 2025). Nor are the questions in this appeal "purely legal." Br. 28 (citation modified). The record includes 12 fact declarations from student-athletes, parents, coaches, and community members; expert declarations spanning hundreds of pages; and dozens of exhibits. *E.g.*, App. 117-306; R. Doc. 8-2, at 1-190; App. 337-43; R. Doc. 80, at 1-7; Appellees App. 218-69; R. Doc. 70, at 1-42. The district court considered all of this evidence when it balanced the preliminary-injunction factors. The question on appeal is whether the district court abused its discretion by denying FAU's motion for a preliminary injunction.

The factors—and the principles underlying them—are familiar. A preliminary injunction is an extraordinary remedy. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Whether that extraordinary remedy should issue requires courts to consider: "'(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.'" *Hotchkiss v. Cedar Rapids Cmty. Sch. Dist.*, 115 F.4th 889, 893 (8th Cir. 2024) (quoting *Dataphase Sys., Inc. v. C.L. Sys, Inc.*, 640 F.2d 109, 114 (8th Cir. 1981)). No single factor is dispositive; the district court must balance all of them before issuing an injunction. *Ng v. Bd. of Regents of Univ. of Minn.*, 64 F.4th 992, 997 (8th Cir. 2023).

## B. The Court Should Not Consider the Federal Agencies' Findings, Which Are Not Part of the Record on Appeal or Subject to Judicial Notice.

One other preliminary note on the scope of this Court's review is necessary. FAU argues repeatedly that the Court should consider a letter of "Findings" issued by DOE and HHS. Br. 26-27; *Letter of Findings (Notice of Violation)* 1, U.S. Dep'ts of Educ. & Health & Hum. Servs. (Sept. 30, 2025), https://perma.cc/S6TX-9H77 ("Findings"). The Findings purport to determine that MDE and the League have violated Title IX because they permit transgender girls to play girls' sports. *Id.* at 44, 60. They also allege that Title IX preempts the MHRA. *Id.* at 59-60. The Findings

mainly set forth the agencies' legal interpretations of Title IX, *e.g.*, *id.* at 8-11, 50-53, but those legal conclusions are not binding on this Court, *Union Pac. R.R. Co. v. Surface Transp. Bd.*, 113 F.4th 823, 833 (8th Cir. 2024) (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024)). The State of Minnesota has disputed the Findings in a pending legal challenge in federal court. *See* First Am. Compl., *Minnesota v. Trump et al.*, No. 25-cv-01608-ECT-DLM (filed D. Minn. Dec. 2, 2025), Dkt. No. 53.

The Court should not consider the Findings because they are neither part of the record on appeal nor subject to judicial notice. First, as to the record on appeal, this Court "can properly consider only the record and facts before the district court." *Cont'l Res., Inc. v. N.D. Bd. of Univ. & Sch. Lands*, 136 F.4th 778, 788 (8th Cir. 2025) (citation modified); *see also Econ Dev. Corp. v. Model Cities Agency*, 519 F.2d 740, 744 (8th Cir. 1975) (noting that review of the denial of a preliminary injunction is "necessarily base[d] on the record which was presented to the District Court"). But this Court cannot consider evidence that the district court had no opportunity to consider. *See Cont'l Res.*, 136 F.4th at 788 (explaining that would be "unfair" and "sandbag" the other party). The power to consider extra-record evidence is thus "narrow, rarely exercised," and only appropriate when the interests of justice demand it, like "when a misrepresentation deprived the district court of a

complete picture of the case." *Love v. United States*, 949 F.3d 406, 412 (8th Cir. 2020) (citation omitted).

Applying those standards, the Findings are not part of the record and should not otherwise be considered. The Findings were issued on September 30, 2025, eleven days after the district court ruled on the preliminary injunction. The district court thus had no opportunity to consider them. Nor do the "interests of justice" demand consideration of the Findings: no "misrepresentations or other injustice" prevented their consideration. *Love*, 949 F.3d at 411-12.

For similar reasons, the Findings are not subject to judicial notice. *See Ng*, 64 F.4th at 994 n.2 (refusing to take judicial notice of letter in appeal from preliminary-injunction denial in Title IX dispute). A court may only take judicial notice of "'a fact that is not subject to reasonable dispute.'" *Id.* (quoting Fed. R. Evid. 201(b)).

The Findings do not meet that standard. They are disputed and thus fall outside the confines of Federal Rule of Evidence 201(b). *See Ng*, 64 F.4th at 994 n.2 (declining to take judicial notice of "argumentative" contents of public letter). Moreover, the Findings contain legal conclusions, not facts. But even if they contained "facts," FAU does not rely on the Findings as such. *See* Br. 43-47 (relying on Findings when arguing probability of success on the merits). The Court should

thus decline to judicially notice the Findings and order FAU's references to them in "to be stricken from the record."[11] *Ng*, 64 F.4th at 994 n.2.

## III.  FAU DID NOT SHOW PROBABILITY OF SUCCESS ON THE MERITS.

The district court did not abuse its discretion when it concluded that FAU had not shown probability of success on the merits.

First, FAU must show that it is likely to prevail on its Title IX claims because its challenge to the bylaw is effectively a challenge to the MHRA. Second, FAU asserts a disparate-impact theory, and Title IX does not authorize private parties to sue for disparate impact. Third, even if Title IX allowed private parties to pursue disparate-impact theories, FAU has not stated valid effective-accommodation or equal-treatment claims—much less supported any such claims with injunction-worthy evidence.

Two additional arguments reinforce the district court's assessment of this factor. *See Collins v. Metro. Life Ins.*, 117 F.4th 1010, 1015 (8th Cir. 2024) (noting that appellate courts can affirm on any basis supported in the record). FAU claims that Title IX *forbids* states like Minnesota from adopting transgender-inclusive sports policies and preempts all contrary state antidiscrimination law. No court has

---

[11]  If the Court declines to strike the Findings, it should limit judicial notice to the *existence* of the Findings, and the fact of Minnesota's challenge to them—nothing more. *McIvor v. Credit Control Servs., Inc.*, 773 F.3d 909, 914 (8th Cir. 2014) (noting that courts may take judicial notice of the existence of a judicial opinion, "but not of the facts summarized in the opinion" (citation omitted)).

adopted FAU's interpretation of Title IX, and bedrock federalism principles counsel against it. Likewise, even if FAU's extraordinary interpretation of Title IX were correct, FAU's claims would still fail because Title IX was enacted under Congress's Spending Clause powers, and no Appellee had sufficient notice that the League's policy violated Title IX.

### A.     The Likely-To-Prevail Standard Applies to FAU's Claims.

Although courts consider all *Dataphase* factors, probability of success can be the most important. *Blissenbach*, 155 F.4th at 1020. In the Eighth Circuit, courts apply two standards when assessing probability of success. The first asks whether the plaintiff has a "fair chance of prevailing." *Planned Parenthood of Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732-33 (8th Cir. 2008) (en banc). The second—and more rigorous—standard applies when a plaintiff seeks to block state law. *Id.* In that scenario, the plaintiff must show that it is likely to prevail. *Id.*

FAU insists that the fair-chance standard applies here. Br. 29-30. The district court decided not to resolve this issue because FAU had not satisfied "the more lenient fair-chance-of-prevailing standard." Add. 36; App. 768; R. Doc. 134, at 36. The district court's bottom-line conclusion was right: FAU loses under either standard. But the likely-to-prevail test should apply for two reasons.

First, the League's bylaw is required by the MHRA, so FAU's challenge to the bylaw *is* a challenge to the statute. The MHRA forbids gender-identity

discrimination in education, and excluding transgender girls from girls' sports constitutes discrimination under the MHRA. Minn. Stat. § 363A.13; *see also* Minn. Stat. § 363A.03, subd. 1 (defining "discriminate"). The district court agreed, but it still thought the question was "difficult" because the MHRA contains an exemption for single-sex sports teams. Add. 36 n.13; App. 768 n.13; R. Doc. 134, at 36 n.13.

The district court did not have the benefit of *Cooper v. USA Powerlifting*, 26 N.W.3d 604 (Minn. 2025). The Minnesota Supreme Court decided *Cooper* one month *after* the district court denied injunctive relief. *Id.* It held that a powerlifting organization engaged in discrimination under the public accommodations and business provisions of the MHRA when it excluded a transgender woman from competing in the women's division of an athletic event. *Id.* at 617, 621-22. The public accommodations provision contains a similar substantive prohibition on discrimination as the education provision. *Compare* Minn. Stat. 363A.11, subd. 1(a)(1), *with id.* § 363A.13, subd. 1. Likewise, the public accommodations provision contains an exemption for single-sex athletic teams. *Compare id.* § 363A.24, subd. 2, *with id.* § 363A.23, subd. 2. Yet the Minnesota Supreme Court affirmed the grant of summary judgment to the transgender female athlete. *Cooper*, 6 N.W.3d at 621-22. Indeed, the powerlifting organization did not even challenge the district court's conclusion that the exemption did not apply to discrimination based on transgender status. *Id.*

Second, the district court did not consider the language of FAU's proposed injunction. FAU asked the district court to enjoin the Appellees "from applying or enforcing Minnesota *law*." Appellees App. 2 (emphasis added); R. Doc. 9, at 2. It did not simply ask the district court to block enforcement of the League's bylaw. Nor is the latter what FAU wants because the injunction would be worthless if it blocked the League's bylaw but not the state law that requires it. Because FAU is challenging state law, and not just the bylaw, the likely-to-prevail standard applies.

### B. FAU Brings Disparate Impact Claims that Title IX Does Not Allow.

FAU is unlikely to succeed on the merits because its Title IX claims are based on disparate-impact allegations. A private plaintiff may only enforce intentional discrimination claims through a private right of action under Title IX. FAU does not (and cannot) disclaim any reliance on a disparate impact theory of liability: FAU has challenged a facially neutral policy and does not allege that the policy was motivated even in part because of its adverse effects on female athletes. FAU cannot stretch these allegations to fit an intentional discrimination claim.

### 1. There is no private right of action to enforce disparate impact claims under Title IX.

A private plaintiff's Title IX claim under the athletic regulations must be based on intentional discrimination, not disparate impact. In *Alexander v. Sandoval*, 532 U.S. 275 (2001), the Supreme Court held that there is no private right of action to enforce disparate impact claims under Title VI of the Civil Rights Act of 1964.

*Id.* at 280-81. Because Title IX "was patterned after Title VI," the Court's reasoning extends to Title IX. *Cannon v. Univ. of Chi.*, 441 U.S. 677, 694-96 (1979).

In *Sandoval*, the Court held that although a private cause of action can enforce Section 601 of Title VI, that right does not extend to enforce disparate impact regulations promulgated under Section 602. *See* 532 U.S. at 279-90. Section 601 contains rights-creating language enforceable by a private right of action because it directs that "[n]o person . . . shall . . . be subjected to discrimination" by a recipient of federal funding. *Id.* at 288-89 (quoting 42 U.S.C. § 2000d). This rights-creating language is "completely absent" from Section 602, which authorizes federal agencies to "effectuate" rights already created by Section 601 by issuing regulations. *Id.* (quoting 42 U.S.C. § 2000d–1). Pursuant to Section 602, federal agencies promulgated the regulations at issue in *Sandoval* that forbade funding recipients from engaging in any activity having a disparate impact on racial groups. *Id.* at 278. But because Section 601 did not prohibit only intentional discrimination, the private right of action to enforce Section 601 does not include a private right to enforce these disparate impact regulations. *Id.* at 281-83, 285.

Title VI and Title IX are nearly identical and are often interpreted in like manner. *See Cannon*, 441 U.S. at 694-95. Like Title VI, Title IX contains a provision that creates the substantive right to be free from discrimination "on the basis of sex," 20 U.S.C. § 1681, as well as a provision empowering federal agencies to

"effectuate" this right through regulations, 20 U.S.C. § 1682. Reading Title IX in the manner required by *Sandoval*, Title IX also does not provide a basis for private litigants to sue federal funding recipients for disparate impact violations.

Many courts have reached this conclusion, and FAU is wrong that the district court's analysis "stand[s] alone." Br. 34. The district court is in good company with other courts. Add. 42-44 (collecting cases); App. 774-76; R. Doc. 134, at 42-44. And even the cases relied on by FAU engage in this analysis. *See, e.g.*, *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 97-98 (2d Cir. 2012); *Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 919 (7th Cir. 2012); *Mayerova v. E. Mich. Univ.*, 346 F. Supp. 3d 983, 991 (E.D. Mich. 2018); *Barrett v. W. Chester Univ. of Pa. of State Sys. of Higher Educ.*, No. CIV.A. 03-CV-4978, 2003 WL 22803477, at *11 (E.D. Pa. Nov. 12, 2003).

FAU asserts that *Sandoval* does not apply because the athletic regulations include the same rights-creating language as Title IX. Br. 33-34. But the Supreme Court rejected this argument in *Sandoval*. Only the substantive rights contained in the statute itself can be enforced through a private right of action; rights created by agency regulation cannot. *Sandoval*, 532 U.S. at 291. In other words, so long as Title IX's athletic regulations are used to challenge acts of intentional discrimination— conduct already prohibited by Title IX itself—the regulations are within the existing implied private right of action to enforce Title IX. But a disparate impact challenge

falls outside this scope. Thus, FAU does not have a private right of action under Title IX's text or athletic regulations to bring disparate impact claims.

> **2. FAU's complaint challenges a facially neutral policy under a disparate impact theory.**

The district court correctly found that FAU alleged a disparate impact theory. Add. 44-45; App. 776-77; R. Doc. 134, at 44-45. While disparate treatment claims allege that some group is being intentionally discriminated against "because of" their sex, disparate impact claims involve "facially neutral" practices that "in fact fall more harshly on one group than another." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977); *see also Biediger*, 691 F.3d at 98 n.5 (observing that "[d]isparate impact analysis focuses on facially neutral policies or practices that may have a discriminatory effect"); *Poloceno v. Dallas Indep. Sch. Dist.*, 826 F. App'x 359, 362 (5th Cir. 2020) (describing complaint as alleging disparate impact where policy "was facially neutral but had a disparate impact on female students"). Here, FAU challenges a gender-neutral policy that it claims happens to disparately impact female athletes. [12] FAU has alleged that the League's policy "has a detrimental effect

---

[12]  The League's policy allows all students to participate consistent with their gender identity or expression in athletics and fine arts. Appellees App. 355; R. Doc. 72-1 at 4. FAU is wrong that the policy "applies only to sex-designated teams," Br. 35 (emphasis omitted), and the Court should reject FAU's attempt to mischaracterize the policy as one that is gender conscious on its face.

on girls' opportunities," "resulted in fewer opportunities for girls to compete" and "has a discriminatory impact." App. 62; R. Doc. 1, at 41.

The district court also relied on this Court's precedent to explain that a plaintiff must allege "sex-based motivation" to make out an intentional discrimination claim, citing *Wolfe v. Fayetteville, Arkansas Sch. Dist.*, 648 F.3d 860, 865 (8th Cir. 2011). Add. 45; App. 777; R. Doc. 134, at 45. The district court thus correctly concluded that FAU has not alleged any facts that give rise to a reasonable inference that any Appellee acted—or failed to act—"because of" plaintiffs' sex. *Wolfe*, 648 F.3d at 865; *see also Poloceno*, 826 F. App'x at 362. In fact, FAU alleges the opposite: in adopting the policy, Appellees failed to "take into consideration" whether the policy "provided equal opportunity or effectively accommodated female athletes." App. 50-51; R. Doc. 1, at 29-30.

### 3. The cases FAU cites underscore the fact that FAU has alleged disparate impact and not disparate treatment claims.

FAU attempts to shoehorn its disparate impact allegations into an intentional discrimination theory on appeal, but FAU's complaint did not allege disparate treatment or deliberate indifference claims.

FAU incorrectly suggests that all claims grounded in Title IX's athletic regulations involved disparate treatment. Br. 34-35. The disparate treatment cases cited by FAU involved challenges to gender-conscious policies, like a school's decision to eliminate sports teams or allocate athletic opportunities "on the basis of

sex." *Biediger*, 691 F.3d at 97-98 (eliminating women's volleyball); *see also, e.g.,* *Mayerova*, 346 F. Supp. 3d at 990 (collecting cases). The Eighth Circuit has allowed private parties to sue under the Title IX regulations in such cases too. *See, e.g.*, *Berndsen v. N.D. Univ. Sys.*, 7 F.4th 782, 783 (8th Cir. 2021) (eliminating women's hockey); *Portz v. St. Cloud State Univ.*, 16 F.4th 577, 579 (8th Cir. 2021) (eliminating women's nordic skiing and tennis); *Chalenor v. Univ. of N.D.*, 291 F.3d 1042, 1043 (8th Cir. 2002) (eliminating men's wrestling).

Many of these courts explicitly found that plaintiffs brought disparate treatment claims—and not disparate impact claims—since intent was found "on the face" of the schools' decisions. *See, e.g.*, *Mayerova*, 346 F. Supp. 3d at 990-91. As the Second Circuit explained, a school's decision to provide students with athletic participation opportunities through separate sports programs for each sex "necessarily raises a disparate treatment rather than disparate impact claim" because the school decides which athletic opportunities are available to particular students "on the basis of sex." *Biediger*, 691 F.3d at 97; *see also Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 773 n.8 (9th Cir. 1999).

FAU, in contrast, asks this Court to infer discriminatory intent from a facially neutral policy. Br. 34-35. Courts may be able to infer intent where a disparate treatment claim is "based upon facially gender-based classifications," which "evidences an intent to treat the two groups differently." *Cmtys. for Equity v. Mich.*

*High Sch. Athletic Ass'n*, 459 F.3d 676, 694 (6th Cir. 2006); *see also Parker*, 667 F.3d at 920. But the cited cases provide no support for FAU's assertions that a challenge to a facially neutral policy absent any allegations of "sex-based motivation" is necessarily an intentional discrimination claim. *Wolfe*, 648 F.3d at 865; *contra EEOC v. Dial Corp.*, 469 F.3d 735 (8th Cir. 2006) (finding pattern or practice of sex discrimination when employer was aware of significant statistical disparities in hiring practices at issue).

The Court should reject FAU's attempts to dress up its allegations as intentional discrimination, whether styled as disparate treatment or deliberate indifference claims. Br. 34-35. FAU did not allege that the policy was motivated even in part because of its adverse effects on female athletes. FAU pleads no facts that would show Appellees singled out females for disparate treatment. *See Poloceno*, 826 F. App'x at 362. Nor does FAU allege that Appellees would have acted differently were males the impacted athletes. *See Soule v. Conn. Ass'n of Sch.*, 755 F. Supp. 3d 172, 199-200 (D. Conn. 2024) (finding complaint plausibly alleged intentional discrimination where defendants took girls' complaints less seriously than boys' complaints).

FAU's allegations fall short of a deliberate indifference claim for similar reasons. FAU does not allege that any of its members complained about the impact of the policy and received "a response" from Appellees "demonstrating deliberate

indifference to the alleged violation." *Grandson v. Univ. of Minn.*, [272 F.3d 568, 576](#) (8th Cir. 2001). Nor does FAU allege that Appellees "rebuffed" any complaints or "attempted to stifle further complaints." *Soule*, [755 F. Supp. 3d at 199](#)–200. At most, FAU claims that Appellees were "on notice" of the federal government's recent change in position that the League's policy violates Title IX—an interpretation that Defendants have contested. *See Minnesota v. Trump et al.*, No. 25-cv-01608-ECT-DLM (D. Minn. Dec. 2, 2025), Dkt. No. 53. And this Court has acknowledged that the fact that "vigorous public debate" exists about an issue does not by itself demonstrate deliberate indifference. *See Grandson*, [272 F.3d at 576](#).

FAU has not alleged that the challenged policy's adoption resulted from intentional sex discrimination. Thus, it is unlikely to prevail on the merits of its Title IX claims.

## C. FAU Is Unlikely to Succeed on Its Effective Accommodation and Equal Treatment Claims Anyway.

Even if FAU could pursue a disparate-impact theory, the district court properly concluded that FAU was unlikely to prevail on effective accommodation or equal treatment claims. Add. 46-56; App. 778-88; R. Doc. 134, at 46-56. Indeed, as the district court observed, FAU "did not engage with the applicable legal framework." Add. 56; App. 788; R. Doc. 134, at 56. FAU repeats that error on appeal. It mostly argues that "sex" in Title IX means "biological sex." Br. 36-41. FAU is boxing with shadows. The district court *agreed* with FAU that "'sex' as the

term is used in Title IX means 'biological sex.'"[13] Add. 46; App. 778; R. Doc. 134, at 46. Yet the district court still concluded that FAU was unlikely to prevail.

The district court was right. The starting point is the text of Title IX's athletics regulation, which creates a general rule that prohibits funding recipients from creating sex-separated sports teams. 34 C.F.R. § 106.41(a). As an exception to the general rule, the regulations permit schools to "operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(b). But the regulation does not, as the district court observed, "require a recipient . . . to maintain sex-separation across every team or sport." Add. 48 (observing that a school could sponsor "sex-separated track teams" and a "mixed-sex golf team"); App. 780; R. Doc. 134, at 48.

The regulation's overarching requirement is that schools provide "equal athletic opportunity," and it lists ten factors for courts to consider when assessing compliance. 34 C.F.R. § 106.41(c). Effective accommodation claims derive from the first factor, and equal treatment claims from the remaining nine. *Portz*, 16 F.4th at 580. To clarify the meaning of its original regulation, the Department of Health,

---

[13] State Appellees preserve for further review (and other litigation) the argument that "sex" in Title IX encompasses gender-identity discrimination. This Court need not resolve that issue.

Education, and Welfare (HEW)[14] issued a policy interpretation and subsequent guidance. *See* 44 Fed. Reg. 71413 (Dec. 11, 1979) (1979 Interpretation). This Court has relied on the 1979 Interpretation to determine compliance with § 106.41. *See, e.g.*, *Portz*, 16 F.4th at 580-82. Each type of claim is "adjudicated by reference to numerous fact-intensive considerations." Add. 46; App. 778, R. Doc. 134, at 46.

Within this framework, FAU did not show it was likely to succeed on its effective accommodation or equal treatment claims.

### 1. Effective Accommodation.

An effective accommodation claim focuses on participation opportunities. *Portz*, 16 F.4th at 580. It considers whether a funding recipient's "selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes." 34 C.F.R. 106.41(c)(1). In making that assessment, the agency examines three distinct issues: "(a) 'determination of athletic interests and abilities of students'; (b) 'selection of sports offered'; and (c) 'levels of competition available including the opportunity for team competition.'" *Berndsen*, 7 F.4th at 785 (quoting 44 Fed. Reg. at 71417). Those three issues are, in turn, examined by reference to three separate "Application of the Policy" provisions. *Id.* The agency then applies an "Overall Determination of Compliance" test, which considers

---

[14] HEW is the predecessor to HHS and DOE, both of which have "promulgated identical versions of HEW's original regulation." *Portz*, 16 F.4th at 580 n.2.

whether: "(1) the 'policies . . . are discriminatory in language or effect'; (2) 'disparities of a substantial and unjustified nature in the benefits, treatment, services, or opportunities afforded male and female athletes exist in the institution's program as a whole'; or (3) 'disparities in individual segments of the program with respect to benefits, treatment, services, or opportunities are substantial enough in and of themselves to deny equality of athletic opportunity.'" *Id.* (quoting <u>44 Fed. Reg. at 71418</u>).

FAU barely engages with this regulatory framework, and it mentions none of the extensive case law construing it. *See* Br. 46-47. At best, FAU alludes to the "selection of sports" provision in the 1979 Interpretation, arguing that Minnesota must provide a "sex-separated, female equivalent to boys' baseball." Br. 46. But that argument fails twice over.

First, FAU is wrong on the law. Title IX does not mandate sex-separated sports teams; the default rule is the opposite.[15] <u>34 C.F.R. § 106.41(a)</u>.

Second, FAU offered no evidence—other than its ipse dixit assertions—to show how one transgender athlete's participation in high-school softball "adversely impacted female students' participation opportunities" overall within their school

---

[15] FAU also assumes that baseball and softball are the same sport. Not so. Baseball and softball are different sports, with different rules, balls, pitching, and field size. *See Israel v. W. Va. Secondary Schs. Activities Comm'n*, <u>388 S.E.2d 480, 485</u> (W. Va. 1989) (holding that baseball and softball are not equivalent sports for equal-protection purposes).

district's respective athletics program. Add. 56; App. 788; R. Doc. 134, at 56. Nor did FAU offer any evidence to show that one transgender athlete's participation in high-school softball "resulted in a 'substantial and unjustified' disparity" in the League's program as a whole. *Id.* (quoting 44 Fed. Reg. at 71418). The district court was careful to note that FAU "*might* be able to make those connections as the case proceeds." *Id.* (emphasis added). FAU did not do so at the preliminary-injunction stage.

### 2.    Equal Treatment.

An equal treatment claim considers whether there are sex-based differences in a recipient's provision of benefits. 34 C.F.R. § 106.41(c)(2)-(10). To assess equal treatment, courts consider the "laundry list" of factors in § 106.41(c)(2)-(10): equipment, scheduling, travel, coaching and tutoring, locker rooms, training facilities, housing and dining, and publicity. *Portz*, 16 F.4th at 580. Like effective accommodation claims, the 1979 Interpretation, subsequent agency guidance, and case law guide the Court's assessment of compliance with the laundry list. The agency has specified that "identical benefits, opportunities, or treatment are not required, provided the overall effect of any differences is negligible." *Id.* (quoting 44 Fed. Reg. at 71415).

FAU failed to engage with the laundry list before the district court, Add. 56; App. 788; R. Doc. 134, at 56, and it fails again on appeal, Br. 46-47. In the same

vein, FAU's complaint contains *no* factual allegations that its members' teams had inadequate equipment and supplies, less favorable scheduling, or less publicity, as compared to a boys' team within their respective school district's athletic program. App. 61-63; R. Doc. 1, at 40-42. As a result, FAU is unlikely to succeed on the equal treatment claim. The district court did not abuse its discretion when it reached that conclusion.

### D. Title IX Does Not Preempt Minnesota Law or Otherwise Forbid Minnesota from Allowing Transgender Girls to Play Girls' Sports.

Because FAU's Title IX claims are unauthorized or unsupported, the Court need not go any further to affirm the district court's denial of the injunction. But core federalism principles reinforce that the district court was correct to deny a preliminary injunction, and they provide yet another basis to affirm.

Some preliminaries on Title IX's current legal landscape are useful. The Supreme Court will soon address whether Title IX *permits* states to exclude transgender girls from girls' sports. *B.P.J. v. W. Va. State Bd. of Educ.*, 98 F.4th 542 (4th Cir. 2024), *cert. granted*, __ S. Ct. __, 2025 WL 1829164 (July 3, 2025). But FAU goes further: it claims that Title IX *prohibits* Minnesota from allowing transgender girls to play girls' sports.[16] If FAU were right, then Title IX would

---

[16]  The United States has taken no position on that question before the Supreme Court, and it asked the Court to "make clear that its opinion in [*B.P.J.* and *Hecox*] does not address that question." Br. of Amicus Curiae United States at 21 n.2, *West Virginia v. B.P.J.* (No. 24-43) (Sept. 19, 2025), https://perma.cc/38CN-CDD6.

preempt the MHRA—and dozens of other state antidiscrimination laws and policies—that treat transgender students consistent with their gender identity. Nothing in the text of Title IX or its implementing regulations supports FAU's claim.

First, the sex-discrimination prohibition in Title IX does not require transgender girls to be excluded from girls' sports. Title IX does not define "sex," and "[t]here is insufficient evidence to support the assumption that sex can mean only biological sex." *A.C. by M.C. v. Metro Sch. Dist. of Martinsville*, 75 F.4th 760, 770 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 683 (2024). The term is at least broad enough to allow states to adopt laws or policies that prohibit discrimination based on gender identity. For that reason, multiple circuits have rejected claims that transgender students' use of sex-separated spaces according to gender identity violates Title IX. *Id.*; *accord Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 618 (4th Cir. 2020); *Parents for Privacy v. Barr*, 949 F.3d 1210, 1227 (9th Cir. 2020); *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 533-34 (3d Cir. 2018).

Second, even if Title IX refers to "biological sex," it does not follow that allowing transgender girls to participate in girls' sports violates Title IX. The Supreme Court reached that conclusion with respect to Title VII. *Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020). Moreover, the language of Title IX's regulations is clearly permissive, allowing but not requiring schools to offer sex-segregated

athletic teams. 34 C.F.R. § 106.41(b). The Sixth Circuit has taken this position. *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 610-11 (6th Cir. 2024). It held that Title IX's regulations allow schools to separate athletics and facilities "in accordance with one's biological sex without accommodating gender identity." *Id*. But it also held that Title IX's regulations do "not require" schools to do so, and that schools "could also separate programs and facilities by gender identity." *Id*.

Third, a contrary holding would preempt huge chunks of state and local law in a way that *is* inconsistent with Title IX. Title IX's regulations specify that the statute only preempts conflicting state or local law in very narrow circumstances. *See* 34 C.F.R. § 106.6(b), (h) (2020).[17] Athletics are not among them. *Id.* And this Court typically presumes that federal law does *not* preempt regulations within the states' core police powers. *Pharm. Rsch. & Mfrs. Ass'n of America v. McClain*, 95 F.4th 1136, 1140 (8th Cir. 2024). Education certainly falls within that core. *See, e.g.*, *United States v. Lopez*, 514 U.S. 549, 580-81 (1995) (Kennedy, J., concurring) ("[I]t is well established that education is a traditional concern of the States"); *Barbier v. Connolly*, 113 U.S. 27, 31 (1884) (states have police power to adopt regulations to promote "education" of their citizens).

Considered against this backdrop, FAU has not shown—at this early stage of the case—that it is likely to prevail on its novel Title IX claim.

---

[17] The 2020 Title IX regulations are in effect due to vacatur of the 2024 rule.

**E.    If Title IX Forbids Minnesota Law and Policy, Appellees Lacked Clear Notice Under the Spending Clause.**

FAU is also unlikely to succeed because Appellees lacked clear notice that Title IX requires the exclusion of transgender girls from girls' sports. The district court agreed that the Spending Clause's clear-notice requirement applied to FAU's request for injunctive relief. Add. 62; App. 794; R. Doc. 134, at 62. The district court, however, concluded that the record was "too thin" to determine whether injunctive relief "would impose a fiscal obligation stemming from compliance." *Id.* But this Court can affirm on any basis supported by the record. *Collins*, 117 F.4th at 1015. And the record shows that Appellees lacked clear notice.

Congress enacted Title IX under its Spending Clause power. U.S. Const. art. I, § 8 cl. 1; *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 181-82 (2005). Spending Clause legislation is like a contract: Congress may impose conditions on federal funds, but recipients must have clear notice of the conditions. *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 219-20 (2022). A federal funding recipient cannot knowingly and voluntarily accept the terms of the contract if the contract's terms are ambiguous. *Id.* The clear-notice rule applies to claims for nominal damages and injunctive relief—both of which FAU seeks here. *Roe v. Critchfield*, 137 F.4th 912, 930 (9th Cir. 2025); App. 64-65; R. Doc. 1, at 43-44.

FAU cannot establish that the Appellees had clear notice that Title IX required them to exclude transgender girls from girls' sports at the time they accepted federal funding. Flip flopping regulatory guidance between different Presidential administrations underscores the lack of clear notice. *See supra* Statement § I.B. Indeed, the Ninth Circuit recently affirmed the denial of a preliminary injunction because schools that *exclude* transgender girls from girls' sports did not have clear notice about Title IX's requirements. *Roe*, 137 F.4th at 928-31. That reasoning applies with equal force to schools who *include* transgender girls in girls' sports.

FAU's contrary arguments are not persuasive. FAU's principal argument below was that the clear-notice rule did not apply to claims for prospective relief. App. 384; R. Doc. 112, at 41. FAU appears to have abandoned that argument in its merits brief. Br. 47-48. Instead, FAU simply argues that the Appellees were on notice that the League's bylaw, and the MHRA's gender-identity protections as applied to high-school athletics, violated Title IX based on the cold text of the statute, the athletics regulations, and guidance documents from the 1970s. *Id.* But FAU cannot erase the last ten years of conflicting Title IX interpretations by the federal government.

Nor is FAU correct that the clear-notice rule does not apply because the injunction would impose minimal costs. Br. 48. The clear-notice rule is not limited to cases where injunctive relief would impose a fiscal obligation. *Roe*, 137 F.4th at

928-31. But even if it were, the only relevant expert evidence in the record—and common sense—establish that FAU's injunction would impose substantial compliance costs.[18] Appellees App. 244; R. Doc. 70, at 27.

## IV. FAU FAILED TO SHOW THAT THE OTHER INJUNCTION FACTORS FAVORED RELIEF.

The district court also conducted a careful analysis of the equitable factors that govern injunctive relief. It concluded that FAU had not shown irreparable harm, or that the balance of the equities and public interest warranted upsetting the status quo in Minnesota and excluding Doe from her senior season. The district court did not abuse its discretion when assessing these equitable factors.

### A. FAU Failed to Show Irreparable Harm.

To get a preliminary injunction, a plaintiff must demonstrate irreparable harm. *Hotchkiss*, 115 F.4th at 893. To establish irreparable harm, "a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011, 1017 (8th Cir. 2023) (citation modified). FAU failed to show irreparable harm.

---

[18] Alternatively, if the Court concludes that the Spending Clause record is insufficient, it should remand for further proceedings on that issue.

### 1. The League's bylaw does not prevent FAU's members from playing softball.

FAU's members cannot show irreparable harm because they are not at risk of exclusion from participating in athletics. *See D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1003 (8th Cir. 2019) ("Students who are denied the opportunity to join their schools' sports teams because of their sex may suffer irreparable harm."). Nothing in the record suggests that FAU's members will be unable to compete for their high schools. Doe attends a different school than FAU's members, so her participation has no bearing on whether FAU's members will be able to play for their schools. Nor does Doe's participation affect the members' ability to secure college scholarships because Doe is no longer eligible to participate at the college level. App. 339; R. Doc. 80, at 3.

FAU's authorities confirm that its members cannot establish irreparable harm. Br. 50. In *Portz v. St. Cloud State Univ.*, the school eliminated the plaintiffs' athletics team. 196 F.Supp.3d 963, 972-73 (D. Minn. 2016). In *McCormick v. School District of Mamaroneck*, the school scheduled the girls' soccer season so the team could not participate in regional or state championships.[19] 370 F.3d 275, 302 n.25 (2d Cir. 2004). But here, FAU members' schools will field softball teams, and the schedules for those teams will align with the state tournament. Simply put, FAU cites no

---

[19] The district court also denied preliminary-injunctive relief in *McCormick*, 370 F.3d at 283.

authority for its contention that losing a game is irreparable harm—even if that game is at the state tournament.

FAU's claim of irreparable harm is based on their members' *potential* success, which is only speculatively tied to Doe's participation. Only one member is even scheduled to play against Doe's team next season. *See supra* Arg. § I. The other members simply speculate that they will meet Doe's team in a preseason scrimmage, sectionals, or state tournament. *Id.* But there is no guarantee that the members' teams (or Doe's for that matter) will reach the playoffs or state tournament next season. *Id.* Their teams may suffer injuries or play—and lose to—other teams. *Id.* Courts cannot issue the "extraordinary remedy" of a preliminary injunction for such speculative harm. *Winter*, 555 U.S. at 24.

### 2. FAU's delay in seeking relief and dilatory litigation tactics further undermine any claim of irreparable harm.

FAU's unreasonable delay further undermines any claim of irreparable harm. "[A] party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 585 U.S. 155, 159 (2018). "[A]n unreasonable delay in moving for the injunction can undermine a showing of irreparable harm and is a sufficient ground to deny a preliminary injunction." *Ng.*, 64 F.4th at 997 (citation modified).

Here, FAU waited nearly a decade to challenge the League's bylaw. Moreover, FAU's members all claim that they learned that they were competing

against the targeted athlete before the 2025 softball season began—and one member knew as early as summer 2024. App. 311-12 (stating that the targeted athlete's performance sparked scrutiny in summer 2024); R. Doc. 48-2, at 5; App. 323 (stating one athlete's parents informed her about the targeted athlete after the 2023/2024 club season); R. Doc. 48-3, at 6; App. 332 (stating that one athlete's teammates refused to play pre-season game against the targeted athlete); R. Doc. 48-4, at 5. But FAU waited until after the regular softball season to seek an injunction. That delay undermines any claim of irreparable harm.

FAU's litigation decisions have also delayed final resolution. Before the district court, State Appellees proposed collapsing FAU's preliminary injunction with a trial on the merits under Fed. R. Civ. P. 65(a)(2). Appellees App. 4; R. Doc. 24. All parties recognized that the 2026 softball season was the real deadline for a decision, and State Appellees proposal would have allowed FAU to get to *final* judgment before the 2026 softball season. But FAU objected, arguing that it wanted the preliminary injunction resolved to allow for a "potential appeal" before the 2026 softball season. Appellees App. 9; R. Doc. 25. Yet on appeal, FAU made no effort to expedite this Court's consideration. Instead, FAU sought the extraordinary relief of an injunction pending appeal, requiring another round of briefing, and further delaying a merits decision.

FAU's delay in seeking relief and dilatory litigation tactics reinforce that the district court did not abuse its discretion when it concluded that FAU had not shown irreparable harm.

> **B.  FAU Did Not Show That the Balance of the Equities and the Public Interest Supported a Preliminary Injunction.**

The balance of the equities and the public interest also support affirmance. Those factors merge when the government is the non-movant. *Morehouse Enters.*, 78 F.4th at 1018. When applying the balance-of-harms factor, "the key question is whether the movant's likely harm without a preliminary injunction exceeds the nonmovant's likely harm with a preliminary injunction in place." *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1347 (8th Cir. 2024). The purpose is not to determine the parties' rights, "but to balance the equities as the litigation moves forward." *Id.* (citation modified).

The district court properly concluded that the balance of equities and public interest did not favor an injunction. The harm to FAU's members is negligible at best. There is no question that FAU's members will be able to play softball next season; the only question is the extent of their success. And their success is only speculatively tied to Doe. *See supra* Arg. § I.

Doe, however, will suffer significant harm because the injunction would prevent her from playing softball during her senior season. *See S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 779 (8th Cir. 2012) (noting the

interests of non-party "students" are "important"). This will be the last season she gets to play a sport that she loves, ████████████████████████████████ ██████. App. 337-39, 343; R. Doc. 80, at 1-3, 7. FAU callously argues that this prohibition is fine because Doe is no longer eligible to play in college. Br. 51. But obtaining a college scholarship is not the primary—or even one of the principal—purposes of high-school sports.

There is also significant harm to State Appellees because an injunction would disrupt the status quo and the enforcement of Minnesota law. *See supra* Arg. § III.A. This disruption will affect all Minnesotans who benefit from the anti-discrimination protections in the state's principal civil rights law, and it would inhibit Minnesotans from enforcing their own rights in court under the MHRA. "The public interest is . . . served by maintaining the ability to enforce the law adopted by the Minnesota Legislature." *Carson v. Simon*, 978 F.3d 1051, 1061 (8th Cir. 2020). Thus, the equities and public interest weigh against an injunction.

## V. IF THE COURT FINDS ERROR, IT SHOULD REMAND FOR FURTHER PROCEEDINGS ON THE SCOPE OF THE INJUNCTION AND A BOND DETERMINATION.

If the Court concludes that the district court erred in denying the preliminary injunction, the Court should remand to the district court to address in the first instance the scope of the requested injunction and whether to require a bond.

When a district court does not resolve an issue or otherwise address all the injunction factors, this Court does not usually do so "for the first time on appeal." *Firearms Regul. Accountability Coal., Inc. v. Garland*, 112 F.4th 507, 526 (8th Cir. 2024) (citation modified). District courts are best situated to evaluate evidence and to consider the scope of injunctive relief. *Id.* The Court's common practice is thus to remand when the district court did not address an injunction issue. *See, e.g.*, *Home Instead, Inc. v. Florance*, 721 F.3d 494, 500 (8th Cir. 2013). The same approach should prevail here. The parties raised issues about the scope and workability of the injunction[20] and the bond requirement[21] below, but the district court did not reach these issues because it denied FAU's motion for a preliminary injunction.

### A. FAU's Requested Injunction Is Overbroad.

In fashioning equitable relief, "the question is not whether an injunction offers complete relief to *everyone* potentially affected by an allegedly unlawful act" but whether it "will offer complete relief *to the plaintiffs before the court*." *Trump v. CASA, Inc.*, 606 U.S. 831, 852 (2025). The injunction also "must be tailored to remedy specific harm shown." *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982).

---

[20] *See, e.g.*, App. 386; R. Doc. 112, at 43; Appellees App. 49-50; R. Doc. 106, at 22-23; Appellees App. 90-91; R. Doc. 65, at 19-20; App. 714; Tr. 65.

[21] *See, e.g*, Appellees App. 529-30; R. Doc. 83, at 44-45; App. 387; R. Doc. 112 at 44.

The requested injunction goes beyond what is necessary to provide complete relief to FAU. For example, FAU has only alleged that four athletes will be harmed if they play against Doe's team this softball season. Thus, any injunction should be limited to identified games between the four FAU members and Doe. Similarly, the requested injunction is unworkable as to Appellees Independent School District Nos. 192 and 279. *E.g.*, Appellees App. 54; R. Doc. 107, at 4. Those Appellees have no authority to determine the eligibility of student-athletes on teams outside their own district athletic programs and neither school district has transgender athletes on their respective softball teams. These issues about the scope of any injunction would have to be addressed by the district court on remand.

## B.    FAU Should Provide a Bond.

Moreover, if this Court reverses, the district court should determine whether FAU has provided sufficient security for Appellees to carry out the relief requested. Fed. R. Civ. P. 65(c). The League will have to take extensive steps to change its policy and identify transgender athletes to implement the injunction. In addition, an unknown number of transgender athletes will be denied the opportunity to participate in sports (with all the benefits that flow from that participation). The State Appellees argued below that substantial security is appropriate because confirmatory sex testing costs at least $100 per student, and there are about 100,000 female high school athletes participating in Minnesota. *See* Appellees App. 244; R. Doc. 70 at

27; Appellees App. 179; R. Doc. 69, at 14. The Court should reject FAU's unsupported assertion that its "requested relief imposes no meaningful costs." Br. 51.

## CONCLUSION

The Court should affirm the denial of injunctive relief.

Dated: December 18, 2025          Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota

/s/ Liz Kramer
LIZ KRAMER (#0325089)
Solicitor General
PETER J. FARRELL (#0393071)
Deputy Solicitor General
ANNA VEIT-CARTER (#0392518)
MAURA ALLEN (#0504790)
KATHERINE BIES (#0401675)
Assistant Attorneys General

445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2131
(651) 757-1010 (Voice)
liz.kramer@ag.state.mn.us

*Attorneys for State Appellees*

# CERTIFICATE OF COMPLIANCE
## WITH FRAP 32

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,882 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14 pt Times New Roman font.

3.      This brief complies with the electronic filing requirements of Local Rule 28A(h) because the brief has been scanned for viruses and is virus-free.


/s/ Liz Kramer
LIZ KRAMER
Solicitor General

## CERTIFICATE OF SERVICE AND FILING

I hereby certify that on January 2, 2026, I caused the foregoing REDACTED brief to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit using the CM/ECF system, consistent with this Court's Order granting the State Appellees' motion to seal and to file a redacted brief, which was issued on December 30, 2025. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system. I further certify that the unredacted version of this brief was filed under seal with the Court and served on all parties on December 18, 2025.

Dated: January 2, 2026                    s/ *Liz Kramer*
                                          Liz Kramer